

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION - Civil Actions Branch**
500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001
Telephone: (202) 879-1133 Website: www.dccourts.gov

Sam Tyler
_____
*Plaintiff(s)*

v.

Rider Grayson                                    Case No: 19ca6949  ____
_____
*Defendant(s)*

### NOTICE AND ACKNOWLEDGMENT OF SERVICE

To (insert name and address of the party to be served):
Rider Grayson
_____
815 Connecticut Avenue
_____
Suite 400
_____
Washington DC 20006
_____

    The enclosed summons, complaint, initial order, and any addendum are served in accordance with Superior Court Rule of Civil Procedure 4(c)(5).

    Please sign and date the Acknowledgement at the bottom of the page. If you are served on behalf of a corporation, unincorporated association (including a partnership), or other entity, please indicate your relationship to that entity in the space beside your signature. If you are served on behalf of another person and you are authorized to receive process, please indicate your authority in the space beside your signature.

    If you do not complete and return the form to the sender within 21 days after it was mailed and you do not show good cause for this failure, you (or the party on whose behalf you are being served) will be required to pay 1) the costs incurred in serving the summons, complaint, initial order, and any addendum in any other manner permitted by law and 2) the reasonable expenses, including attorney's fees, for any motion required to collect those service expenses.

    If you do complete and return this form, you (or the party on whose behalf you are being served) must answer the complaint within 21 days after you have signed, dated, and returned the form (or within 60 days if the party being served is the United States, the District of Columbia, or officers or employees of either). If you fail to do so, judgment by default may be entered against you for the relief demanded in the complaint.

    This Notice and Acknowledgment of Receipt of Summons, Complaint, Initial Order, and Any Addendum was mailed on (insert date): 11/1/.2019 _____.

_____                              _____
*Signature*                                          *Date of Signature*

### ACKNOWLEDGMENT OF RECEIPT OF SUMMONS,
### COMPLAINT, INITIAL ORDER, AND ANY ADDENDUM

    I (print name) _____ received a copy of the summons, complaint, initial order, and any addendum in the above captioned matter at (insert address): _____
_____
_____

_____          _____          _____
*Signature*                      *Relationship to Defendant/Authority*     *Date of Signature*
                                 *to Receive Service*

Para pedir una traducción, llame al (202) 879-4828          如需翻译,请打电话 (202) 879-4828          Veuillez appeler au (202) 879-4828 pour une traduction
Để có một bài dịch, hãy gọi (202) 879-4828          ለአማርኛ ትርጉም ለማግኘት ይደውሉ (202) 879-4828 ይደውሉ          번역을 원하시면, (202) 879-4828 로 전화주십시오

CA 1-A [Rev. June 2017]                                                   Super. Ct. Civ. R. 4



**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION - Civil Actions Branch**
500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001
Telephone: (202) 879-1133 Website: www.dccourts.gov

SAM TYLER
_____
*Plaintiff(s)*

v.                                                    Case No: 19ca6949 _____

UBER TECHNOLOGIES
_____
*Defendant(s)*

## NOTICE AND ACKNOWLEDGMENT OF SERVICE

To (insert name and address of the party to be served):
Uber Technologies
_____
815 Connecticut Avenue NW
_____
Suite 400
_____
Washington DC 20006
_____

The enclosed summons, complaint, initial order, and any addendum are served in accordance with Superior Court Rule of Civil Procedure 4(c)(5).

Please sign and date the Acknowledgement at the bottom of the page. If you are served on behalf of a corporation, unincorporated association (including a partnership), or other entity, please indicate your relationship to that entity in the space beside your signature. If you are served on behalf of another person and you are authorized to receive process, please indicate your authority in the space beside your signature.

If you do not complete and return the form to the sender within 21 days after it was mailed and you do not show good cause for this failure, you (or the party on whose behalf you are being served) will be required to pay 1) the costs incurred in serving the summons, complaint, initial order, and any addendum in any other manner permitted by law and 2) the reasonable expenses, including attorney's fees, for any motion required to collect those service expenses.

If you do complete and return this form, you (or the party on whose behalf you are being served) must answer the complaint within 21 days after you have signed, dated, and returned the form (or within 60 days if the party being served is the United States, the District of Columbia, or officers or employees of either). If you fail to do so, judgment by default may be entered against you for the relief demanded in the complaint.

This Notice and Acknowledgment of Receipt of Summons, Complaint, Initial Order, and Any Addendum was mailed on (insert date): 11/1/2019 _____.

_____                                    _____ 11-1-19
*Signature*                                                *Date of Signature*

## ACKNOWLEDGMENT OF RECEIPT OF SUMMONS,
## COMPLAINT, INITIAL ORDER, AND ANY ADDENDUM

I (print name) _____ received a copy of the summons, complaint, initial order, and any addendum in the above captioned matter at (insert address): _____
_____
_____

_____          _____          _____
*Signature*                      *Relationship to Defendant/Authority*     *Date of Signature*
                                 *to Receive Service*

Para pedir una traducción, llame al (202) 879-4828          如需翻译,请打电话 (202) 879-4828          Veuillez appeler au (202) 879-4828 pour une traduction
Đề có một bài dịch, hãy gọi (202) 879-4828           የትርጉም ፡ እርዳታ ፡ ከፈለጉ ፡ (202) 879-4828 ይደውሉ          번역을 원하시면, (202) 879-4828 로 전화주십시오

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001**
**Telephone: (202) 879-1133 • Website: www.dccourts.gov**

SAM TYLER
    Vs.                                                C.A. No.     2019 CA 006949 B
UBER TECHNOLOGIES et al

## INITIAL ORDER AND ADDENDUM

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("Super. Ct. Civ. R.") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the summons, the complaint, and this Initial Order and Addendum. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in Super. Ct. Civ. R. 4(m).

(3) Within 21 days of service as described above, except as otherwise noted in Super. Ct. Civ. R. 12, each defendant must respond to the complaint by filing an answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in Super. Ct. Civ. R. 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an initial scheduling and settlement conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than seven business days before the scheduling conference date.
No other continuance of the conference will be granted except upon motion for good cause shown.

(6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each judge's Supplement to the General Order and the General Mediation Order. Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

Chief Judge Robert E. Morin

Case Assigned to:  Judge FERN FLANAGAN SADDLER
Date:  October 23, 2019
Initial Conference: 9:30 am, Friday, January 24, 2020
Location:  Courtroom 100
          500 Indiana Avenue N.W.
          WASHINGTON, DC 20001

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement. The early mediation schedule shall be included in the Scheduling Order following the ISSC. Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC." D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator. Information about the early mediation date also is available over the internet at https://www:dccourts.gov/pa/. To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. D.C. Code § 16-2825 Two separate Early Mediation Forms are available. Both forms may be obtained at www.dccourts.gov/medmalmediation. One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator. Both forms also are available in the Multi-Door Dispute Resolution Office, Suite 2900, 410 E Street, N.W. Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov. *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles. All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation. D.C. Code § 16-2823(a). If the parties cannot agree on a mediator, the Court will appoint one. D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case. D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code§ 16-2826. Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Actions Branch. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief   Judge   Robert   E.   Morin



**Superior Court of the District of Columbia**
CIVIL DIVISION
Civil Actions Branch
500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001
Telephone: (202) 879-1133 Website: www.dccourts.gov

Sam Tyler

Plaintiff

vs.

Uber Technologies & Co Defendant "Rider Grayson"

Case Number  **19 - 0 0 0 6 9 4 9**

Defendant

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Name of Plaintiff's Attorney
**Please see attached In Forma Pauperis application under.**
**Other Special Circumstances**
Address
202.989.1591
SamuelTyler JR @ gmal.com
Telephone

*Clerk of the Court*

By _____
Deputy Clerk

Date _____

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, *DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME.*

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202) 628-1161 or the Neighborhood Legal Services (202) 279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                                                 Super. Ct. Civ. R. 4



Superior Court of the District of Columbia
CIVIL DIVISION
Civil Actions Branch
500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001
Telephone: (202) 879-1133 Website: www.dccourts.gov

Sam Tyler

Plaintiff

vs.

Uber Technologies & Co Defendant "Rider Grayson"          Case Number:  19 - 0006949

Defendant

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Name of Plaintiff's Attorney
**Please see attached In Forma Pauperis application under.**
**Other Special Circumstances**

Address
202-499.64 12

SamuelTperple@gmail.com

Telephone

Clerk of the Court

By

Deputy Clerk

Date

11/05/2019

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, *DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME.*

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                                                    Super. Ct. Civ. R. 4

# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

Sam Tyler
Please see attached In Forma Pauperis application under
Other Special Circumstances
Samueltylerjr@gmail.com
202.999.1592

4706 Oxbow Rd.
Rockville, MD 20052

*Plaintiff*

FILED
CIVIL ACTIONS BRANCH
OCT 2 3 2019
Superior Court
of the District of Columbia
Washington, D.C.

Uber Technologies & Co Defendant "Rider Grayson"
c/o Littler Mendelson, PC (Ethan D. Balsam, atty.)
815 Connecticut Avenue NW, Suite 400,
Washington, DC 20006
202.789.3424

CIVIL Action No. **19 - 0006949**

*Defendants*

## COMPLAINT

1. Jurisdiction of this court is founded on D.C. Code Annotated, 2001 edition, as amended, Sec. 11-921.

1) Defendant failed to meet the requirements of DC §50–301.29a(10)(A)(ii) General requirements for private vehicles-for-hire, and 42 U.S.C.A. § 2000e-2(a)(1) to ensure an environment safe from the derogatory, harassing language of a false, retributive and continuing allegation of "drunk driving".

2) Defendant failed to meet the requirements of Spirides v. Reinhardt, 613 F.2d 826, 829 (D.C.Cir 1979) by exercising the rights of an employer without assuming the responsibilities of an employer to investigate sexual harassment.

2) Defendant failed in its obligation to terminate a contract only after a reasonable investigation, required by § 50–301.29a(9)(B)(C); and 42 U.S.C. §§ 12111–12117, defendant denied the plaintiff the opportunity to show that he met th criteria for sobriety, which determined termination of his contract.

Wherefore, Plaintiff demands judgment against Defendant in the sum of $ **$242,842.02** with interest and costs.

**(Relief Narrative Attached)**

**DISTRICT OF COLUMBIA, SS**

Phone: 202.999.1592

being first duly sworn on oath deposes and says that the foregoing is a just and true statement of the amount owing by defendant to the plaintiff, exclusive of all set-offs and just grounds of defense.

*Samuel Tyler* Sam Tyler

(Plaintiff)                                                                                           Agent)

Subscribed and sworn to before me this **23rd** day of **October**

(Notary Public/Deputy Clerk

## RELIEF NARRATIVE[1]

1) The court is requested to compel the defendant to identify where the drunk driving allegation "lives" in UT's global tech infrastructure; that it be deleted immediately;  that the allegation be documented in writing as "false"  wherever it appears in UT's digital infrastructure in association with Plaintiff's name, duties, affiliations, reason for termination or in any connection with UT.

As discussed in the Damages section of the Complaint Summary below (p. 12), the October 6, 2018 letter to UT senior management (pp. 21-22), and the draft case brief (section 12, Plaintiff's Personal Statement p.1) the present and future international work of the Plaintiff as a photojournalist is jeopardized due to the false charge of drunk driving.  UT has never responded to basic questions about where the charge lives, if it's shared outside of UT? With whom ? Who has access? This is important because the Complainant works in countries with tense security apparatus like Cuba, Lebanon, Algeria and others.  The success or failure of getting into high-security global environments depends on background checks, done on global data networks. An allegation of drunk driving raises red flags.  It is regarded as "derogatory information", especially when the Plaintiff unintentionally fails to mention the false charge.

Domestically, Plaintiff is unable to apply for unemployment, without typing into a government database that he was discharged for committing a crime with penalties of up to one year in jail, and a $10,000 fine[2]. In nearly one year UT has not said where the charge of drunk driving is stored in it's global digital records. Allegations can appear when applying for a job, as well as participating in a legal case.  The embarrassment, discomfort and psychological impact of having to out oneself as a recovering alcoholic only to be disbelieved is hard.  It's as hard as alleging sexual harassment and being disbelieved there, too.

2) Damages[3] of $37,321.43. UT failed to ensure a work environment safe from sexual harassment required by **§ 50–301.29a.(10)(A)(ii)**

3) Damages of $37,321.43. UT failed to investigate a sexual harassment charge required by **§ 50–301.29a.(10)(A)(ii);**

---

[1] Although damages were included in the December 21, 2018 draft case brief, those amounts are revised here. Please also see the **Damages** section at p. 12 of the **Complaint Summary** below.

[2] By answering question about discharge, "describe in detail the reason you were given for discharged," and "were you discharged for violating a rule," you were compelled to enter that reason as "drunk driving" in a data base that snakes through a government information system.  The last job I was discharged from before UT was in 2012.

[3] Damages are developed by applying the $33,928.57 disbursement amount of the UT sexual harassment settlement.  (The $11,000 added to that amount in the draft case brief is deleted here, because it was for pay discrimination, which is not a part of this case.) Damages for racial and disability discrimination are $33,928.57 respectively because they also fall under **Title VII.**

Sam Tyler v. Uber Technologies & Co Defendant "Rider Grayson"

**Complaint: Relief Narrative**

4) Damages of $41,964.29. UT failed to investigate a false allegation of drunk driving required by **§ 50–301.29a(9)(B)(C)**, which resulted in termination of Plaintiff's contract;

5) $27,988.38 for lost income (June – October 2018) due to the negligent absence of protocols to review sexual harassment delayed a final decision;

6) $17,000 for the plaintiff's repossessed 2013 Acura ILX hybrid, resulting from termination of contract;

7) $13,926.38 for lost income while writing, researching and bringing this case pro se when no pro bono counsel was available (calculated at minimum wage for 40 hours per week, October 2018 – October 2019);

8) Damages of $37,321.43. Under **42 U.S.C. §§ 12111–12117** UT discriminated against the Plaintiff as a recovering alcoholic, with more than 20 years of continuous sobriety, by denying the Plaintiff a chance to prove that his fatal disease continued in its remission for over 20 years, and had not impacted his ability to perform his duties.  The Plaintiff was subjected to background checks, performance reviews, yet denied the chance to prove that his disability had no negative impact on his ability to perform his duties:

   a. 42 U.S.C. §§ 12111–12117 An employer may not discriminate against a person who has a history of drug addiction but who is not currently using drugs and who has been rehabilitated.

   b. Office of the Senate Sergeant-at-Arms v. Office of Senate Fair Employment Practices, 95 F.3d 1102 (Fed. Cir. 1996)  (alcoholism is a recognized as a disabling disease).

   c. 79 F.3d 1003 (10th Cir. 1996). Adamczyk v. Baltimore County, 1998 U.S. (alcoholism is covered under Title VII of the ADA).

Sam Tyler v. Uber Technologies & Co Defendant "Rider Grayson"

**Complaint: Relief Narrative**

October 23, 2019


Sam Tyler[1]

       v.

Uber Technologies & "Rider Grayson"
c/o Littler Mendelson, PC
815 Connecticut Ave, NW
Suite 400
Washington, DC 20006-4046
Attn: Mr. Ethan D. Balsam, Esq.
cc: Mr. Olaoluwaposi O. Oshinowo, Esq.


## **Complaint Summary**


Your Honor:

Please accept this  Complaint Summary as a request to bring this matter *Pro se*, *In Forma Pauperis* before your court.

*Equal Opportunity Employment Commission (EEOC)*

Ordinarily, sexual and racial harassment cases benefit from the history of the EEOC's competencies. The December 21, 2018 and sexual harassment draft case brief to the EEOC – written and researched by the Plaintiff, a non-attorney – relied on those competencies.  Instead, the EEOC cut and pasted the draft case brief to its Public Portal as is.

This case is the intersection of sexual harassment, racial harassment and drunk driving, with UT (and Rider Grayson) as the defendant. The Plaintiff needed more explanation of the law and applicability of the "non employees" defense than what was offered by UT.

---

[1] I was evicted after my contract was terminated for a false charge of drunk driving.
I'm staying with friends and family and have no fixed address. I ask the court to require all correspondence and documentation between the court, Littler Mendelson, PC, and myself to be sent by email.  If that's not possible, I ask the court and Littler Mendelson, PC to send an email notice when any correspondence and documentation are generated so that they can be picked up from the court and from Littler Mendelson, PC offices. Samuelltylerjr@gmail.com 202.999.1592.

September 9, 2019
Page 2

The EEOC's involvement had technical and administrative glitches. The day after any major development, like in-take (February 6, 2019) or the Defendant Position Statement (PS) and dismissal (July 25, 12019), the investigator would be out of the office for two weeks starting the next day[2,3]. Because of glitches in the Public Portal, documents requested by the EEOC to be uploaded couldn't be. As of this writing, the Public Portal doesn't work[4].

July 9, 2019, four months after filing and no contact from the EEOC, the Plaintiff called the EEOC investigator, Ms. Hedayati, for an update. Ms. Hedayati confirmed Plaintiff's email address and said that he would be notified of developments, that UT had 30 days to respond, and that the Plaintiff would get a copy of that response via The Portal. By chance Plaintiff logged onto the EEOC Portal on August 7th to learn that UT filed its Position Statement on July 24th. Only the first page of the PS had been uploaded by the EEOC.



2

3

4

This above screen shot of QuickTime screen recording which shows the un-navigability of the EEOC Public Portal, is in QuickTime, which can't be attached to this document, but can be emailed to the court.

Sam Tyler v. UT & Co Defendant "Rider Grayson"

**Complaint: Complaint Summary**

September 9, 2019
Page 3

On August 7th the Plaintiff called and emailed the EEOC investigator, who was out of the office, for the full UT Position Statement. On August 8th, Plaintiff emailed Ms. Hedayati with the sum of his concerns[5]. Those concerns included the public trust fading in the Department of Justice since he first submitted his case on December 21, 2018. Case in-take was delayed from December 21, 2018 until February 6, 2019 by the government shut down. The Plaintiff noted the increasing number of senior US government officials with documented ties to violent supremacist hate groups. Although this case was about sexual and racial harassment, he questioned if the case would be impacted by US Attorney General Bill Barr's deference to the demonstrably racist and violently sexist executive branch.

On August 9th, Deputy Director, Allen W. Anderson left a message that the full PS was "now up on the portal". The July 25th posting to the EEOC - with no notification to the Plaintiff given in Ms. Hedayati's July 9th assurance - delayed preparing this case for court by two weeks. Although the case was filed with the court in the 90-day period allowed, the two-week time gone would have been very useful for the Plaintiff to prepare even more fully[6].

The Plaintiff moved forward to bring this case before you, in the belief that the court wouldn't be patient with the two-week delay, and that with the current goings-on at the DOJ, the Plaintiff is better pursing this case himself.

*Worker Status*

UT defends its negligence with sexual harassment charges by using its go-to "not employees," defense. In it's 11 year history UT uses "not employees" to shape interaction with its drivers. But the "not employees," defense doesn't shield UT from siphoning driver earnings with no explanation; from investigating a false drunk driving charge; from investigating a claim where the worker's disability[7] hinges on the reason for

---

5

[6] The Plaintiff will immediately provide anything the court needs, due to the two weeks delayed to prepare.
[7] §§ 12111–12117 UT discriminated against the Plaintiff as a recovering alcoholic, with more than 20 years of continuous sobriety, by denying the Plaintiff a chance to prove that his fatal disease continued in its remission for over 20 years, and had not impacted his ability to perform his duties. The Plaintiff was subjected to back ground checks, performance reviews, yet denied the chance to prove that his disability had no negative impact on his ability to perform his duties optimally: a. 42 U.S.C. §§ 12111–12117 An employer may not discriminate against a person who has a history of drug addiction but who is not currently using drugs and who has been rehabilitated. b. Office of the Senate Sergeant-at-Arms v. Office of Senate Fair Employment Practices, 95 F.3d 1102 (Fed. Cir. 1996) (alcoholism is a recognized

---

Sam Tyler v. UT & Co Defendant "Rider Grayson"

**Complaint: Complaint Summary**

September 9, 2019
Page 4

termination.  It doesn't allow the protection of the dignity and safety of one group at the expense of another in a shared environment. The "not employees," defense doesn't shield UT from investigating a sexual harassment charge, or from ensuring an environment safe from sexual and racial harassment, as the law requires under **§ 50–301.29a. General requirements for private vehicles-for-hire.**  "Not employees," doesn't allow UT to assume the role of employer and not assume the responsibilities of that role, as it's layed out in **Spirides v. Reinhardt, 613 F.2d 826, 829 (D.C.Cir 1979)**

UT argues that it had no legal obligation to ensure a working environment safe from sexual harassment.  At page 8, UT tries to sum up its argument by citing the Spirides factors in **Spirides v. Reinhardt, 613 F.2d 826, 829 (D.C.Cir 1979)**. UT argues, "the facts [] make clear that Plaintiff was an independent contractor." The facts, through the lens of Spirides and UT's application of that case, doesn't provide that level of clarity that UT suggests. In fact, it establishes the opposite. In Spirides, Circuit Judge McGowan decided that,

> *"Consideration of all of the circumstances surrounding the work relationship is essential, and no one factor is determinative. Nevertheless, the extent of the employer's right to control the "means and manner" of the worker's performance is the most important factor to review here."*

This section of Judge McGowan's decision was given added emphasis by UT.  The emphasis ignores the full reading and mischaracterizes Judge McGowan's ruling.  Judge McGowan continues:

> *"If an employer has the right to control and direct the work of an individual, not only as to the result to be achieved, but also as to the details by which that result is achieved, an employer/employee relationship is likely to exist."*

"Control and direct," are what UT does. The determination of whether a plaintiff is an employee or an independent contractor is a question of law, while the existence and degree of the factors to be considered in this determination are questions of fact. *See Stetka*, 859 F. Supp. at 665.  UT uses algorithms and bonuses to override driver control and direct them. Ryan Calo, a law professor at The University of Washington, is cited in this document as expert testimony:

> *"[UT Officials are] using what they know about drivers, their control over the interface and the terms of transaction to channel the behavior of the driver in the direction they want it to go[8]."*

---

as a disabling disease) c) 79 F.3d 1003 (10th Cir. 1996). Adamczyk v. Baltimore County, 1998 U.S. (alcoholism is covered under Title VII of the ADA).
[8] How UT Pushes Drivers' Buttons: [National Desk] Scheiber, Noam. New York Times, Late Edition (East Coast); New York, N.Y. [New York, N.Y]03 Apr 2017: A.1.

September 9, 2019
Page 5

Classifying a worker as contractor doesn't shield an enterprise from ensuring basic, reasonable protections against racial and sexual harassment. A temporary employee is also a contractor. So are the fast growing number of domestic and international government workers, civilians working in the military, landscapers and consultants. In fact, 20 percent of the American work force is contracted[9]. In those environments the enterprise doesn't shirk its responsibility from ensuring a safe work environment. Everyone in that interaction is accountable to the law against sexual harassment, which explains why a third party can merely hear sexual or racial harassment under Title VII, and make a charge. As the Plaintiff detailed in his October 6, 2018 memo to UT Executive Leadership, Dara Khosrowshahi – Chief Executive Officer, Jill Hazelbaker - Senior Vice President, Communications & Public Policy, Rachel Holt – Vice President & Head of New Modalities, Daniel Graf - Vice President & Head of Product, the success of UT's multi-billion dollar model is unique. That model relies exclusively on encouraging two or more strangers to engage in a higher than usual level of social intimacy. The number of cases of sexual harassment and violence against passengers[10] and drivers shows that that environment is an incubator for harassment, and needs an even higher level of protection, which can only be done by UT.

Under Eisenberg v. Advance Relocation Storage, Inc., 237 F.3d 111, 114 n. 1 (2d Cir. 2000) the court makes two points:

    i.   The interaction between drivers and passengers is brokered by UT.

    ii.  The contract, no matter the execution or terms, may not be used to waive protections granted to an individual under Title VII.

In Spirides, to what extent is Judge McGowan's "right" being assumed by UT, when UT doesn't have that right? Not only does UT assume that right, it commissions research to study and determine how to control and direct drivers more effectively.[11] Can UT shield itself behind the "not employees," defense and have it both ways, to direct and control drivers, then claim exemption from the laws that accompany that right. In effect, to expose drivers to harassment by failing to ensure a work environment free from harassment, then penalize drivers for experiencing that harassment.

## I. "RIDER GRAYSON" IS THE CO-DEFENDANT

At p. 2, second full paragraph of the PS, it reads, "Plaintiff appears to claim that an unspecified person subjected him to a sexually hostile work environment." This isn't

---

[9] http://maristpoll.marist.edu/wp-content/misc/usapolls/us171204_KoC/NPR/NPR_Marist%20Poll_National%20Nature%20of%20the%20Sample%20and%20Tables_January%202018.pdf#page=3
[10] https://www.usatoday.com/story/news/investigations/2019/10/04/UT-uses-claims-company-for-settlements-sexual-assault-cases/3857008002/
[11] How UT Pushes Drivers' Buttons: [National Desk]

Sam Tyler v. UT & Co Defendant "Rider Grayson"

**Complaint: Complaint Summary**

true.  The "unspecified person" (the co-defendant) is named as "Rider Grayson" at least
seven times in the case brief to EEOC, and 19 times in the October 6, 2018 letter to UT
executive leadership.  At p. 7 the PS reads, "on June 3, 2018, UT received a Rider
complaint alleging that "[Plaintiff] was clearly drunk."  This case hinges on the false
allegation from Rider Grayson, who is written out of UT's PS.  Without his testimony
there is no case.  Rider Grayson should continue to appear in all documents and
correspondence so the court can review how closely he identifies with his allegation
under oath.

## II.  WHAT'S IMPORTANT[12]

At p. 1, UT claims that, "this [PS] fully responds to Plaintiff's charge."  It doesn't.

1)  At pp. 1-2, UT argues that, "Plaintiff claims that by deactivating his account UT
    discriminated against him on the basis of his sex."  This mischaracterization is like
    suggesting that the Plaintiff was fondled by a manager at UT.  The PS does finally
    acknowledge that the charge is sexual harassment caused by UT's inertia.  But
    mischaracterizing the case as discrimination by UT based on gender (like being
    passed over for a promotion), unfairly burdens the Plaintiff with proving two
    violations when there's only one.

2)  At p. 3 of the PS it reads, "[Plaintiff] cannot show that he was subjected to severe or
    pervasive harassment."  This isn't true.  The October 6 letter documents 23 separate
    instances, pp.2-4 of sexual and racial harassment.  That letter includes two more
    instances at pp. 13 and 14.  The 23 incidents have dates, drop off and pick up
    points, user names, addresses, the pattern of threatening and suggestive behavior
    experienced by Plaintiff over three years, and a video of Plaintiff being violently
    attacked in a hate crime while driving on January 24, 2018.

3)  At p. 7, counsel argues, "he didn't believe he had been sexually harassed until after
    the incident." This isn't true.

    a.  It's not possible to believe or report being sexually harassed before being
        sexually harassed.  Immediately after UT notified Plaintiff of the false charge
        by Rider Grayson at 6:24, Plaintiff replied at 6:58am that the false charge was
        was sexual harassment.

    b.  During an October 17, 2018 call with "Lando" at UT, five months after the
        incident, Lando asked the Plaintiff why the sexual harassment wasn't reported
        when it happened.  Lando seemed unaware that the Plaintiff was unplugged

---

[12] Although UT exclusively uses email to terminate contracts, review and decide on drunk driving and
sexual harassment charges, the driver platform is designed to prevent printing emails between Driver
Support and drivers. Although only screenshots are available, any requested originals will be forwarded
to the court.

September 9, 2019
Page 7

from communication with UT on the platform after responding that the drunk driving charge was sexual harassment.  At that point, Lando stopped the recording, then returned to the call to repeat several times that, "there was no new information," and the contract would stay terminated.  UT has the recording of this call.

4)  At p. 7, last full paragraph, UT argues that, "[Plaintiff] accepted the decision [because he] understood UT's position about the drunk driving accusation." This isn't true. If Plaintiff had accepted the decision he wouldn't have asked what happens next if he didn't accept it, and Lando wouldn't have texted him the UT link about legal remedies[13]. UT has a recording of that conversation.

5)  In Exhibit A section 15.1, pp 29 -36, counsel adds 8 pages titled, "Arbitration".  By July 24th, when UT filed a PS with the EEOC, the EEOC had removed the arbitration option, and the case was returned, on the flow web site flow chart, to an investigator, at least four weeks before the filing. In May of 2018 UT ended mandatory arbitration. Removing these eight pages creates less of a distraction.

6)  Of the 23 Exhibits C-N, none are included from the District of Columbia to make the Defendant's case, because none exist.  This case is subject to the **District of Columbia § 50–301.29a. General requirements for private vehicles-for-hire**.

UT interprets Spirides narrowly, but applies it broadly, and ignores the finer points of the case, like the drunk driving charge UT brings.  32 of the 63 page PS are irrelevant.  The court is respectfully asked to temporarily set aside those 32 irrelevant pages captured in points 1-6 above, and review the defining factual points below.

III.  SUMMARY

1)  On June 3, 2018 at 6:24am UT notified Plaintiff that Rider Grayson reported that the Plaintiff was driving while "clearly drunk." The Plaintiff immediately responded that the false charge was sexual harassment, and that Rider Grayson

---



13

Sam Tyler v. UT & Co Defendant "Rider Grayson"

**Complaint: Complaint Summary**

September 9, 2019
Page 8

"wanted to play"[14]; also on June 3, 2018 five separate emails were sent to the Plaintiff from four different people at UT (p. draft case brief, section 27 i – vi, each repeating that the account was on hold.[15]) The 7:22am email stated that a "summary of our conversation" would be sent.  None was sent;

2)   On June 4, 2018 at 7:03am[16], UT terminated Plaintiff's account;

3)   On July 27, 2017 Sharon at UT emailed the Plaintiff that the incident was "being investigated," that UT was "awaiting [Plaintiff's] reply,"[17].  By then the investigation was closed;

---

14

[15] Samuel L. Tyler v. UT and Rider Grayson draft case brief, section 27, i-vii

**UBER**

A MESSAGE FROM UBER

Hi Samuel

Thank you for your patience regarding the recent report that your driving seemed impaired. As we have mentioned in our previous messages, Uber prohibits the use of drugs or alcohol by drivers using the app. We have completed a full review of your account and identified similar reports from past riders. As a result of these reports, we are ending your partnership with Uber effective immediately.

Please understand that this was not a swift decision, but one that we stand by in an effort to ensure that Uber is delivering a safe and comfortable experience for all users. Please note that this decision is final and cannot be reversed.

16

Sam Tyler v. UT & Co Defendant "Rider Grayson"

**Complaint: Complaint Summary**

September 9, 2019
Page 9

4) On October 6, 2018, Plaintiff sent a letter to UT executive leadership. Attached were the Plaintiff's 19-year celebratory Alcoholics Anonymous chip[18], and a video of a January 24th racist attack. The letter was to 1) see where UT was in the investigation, per Sharon's July 27th email 2) show that drivers are vulnerable to pervasive racial and sexual harassment 3) suggest experienced-based causes, conditions and solutions to improve the driver-rider dynamic;

5) On October 17, 2018 Plaintiff sent a follow-up email to the executive leadership;[19] also on October 17, "Lando" called the Plaintiff to say several times, "no new information." Lando confirmed that Dara Khosrowshahi had forwarded the October 6 memo to him, that the drunk driving charge wouldn't be removed. Lando asked why Plaintiff didn't allege sexual harassment the night it happened. Plaintiff responded that he did say it was sexual harassment by calling Rider Grayson's behavior as, "wanting to play." The Plaintiff explained in that call, and in the memo, that he wanted to give a detailed response to sexual harassment in a setting



17

18

19

Sam Tyler v. UT & Co Defendant "Rider Grayson"

**Complaint: Complaint Summary**

more appropriate and less open than email. Lando stopped the recording, came back on the line, restarted the recording to repeat, "there's no new information."

## IV. LEGAL ANALYSIS

Plaintiff emphasizes at pp. 11-14 in the October 6 memo, and pp. 5-6 in the December 21st case brief, that this case is site specific to the demographics and laws of Washington, DC because, as the court no doubt knows, sexual harassment cases are subject to state laws. This case is subject to District of Columbia laws governing the operation of for-hire vehicles, **§ 50–301.29a. General requirements for private vehicles-for-hire**, which protect passengers, ride share companies, and drivers.

The Plaintiff doesn't ask the court to decide the wisdom or reasonableness of settled law, he asks the court to consider three legitimate questions under that law:

1) Does the status of "driver" preclude UT from ensuring the environment shared by driver and rider is free from racial and sexual harassment for both rider and driver under **§50-301.29a(10)(A)(iii)?**

2) Did UT have the legal right to terminate Plaintiff's contract, when UT didn't fulfill its legal obligation to ensure a safe working environment for Plaintiff under **Spirides v. Reinhardt, 613 F.2d 826, 829 (D.C.Cir 1979)?**

3) A. Was UT reckless in terminating the driver's contract based on an unreasonable allegation of drunk driving, and without doing an investigation under **§ 50–301.29a(9)(B)(C)?** Yes. There was no reasonable investigation. There was no reasonable allegation.

B. Did UT discriminate against the Plaintiff as a recovering alcoholic, with more than 20 years of continuous sobriety? Yes. By denying the Plaintiff a chance to prove that his fatal disease, which could impair driving if untreated, continued in remission for over 20 years, and did not impair his ability to perform his duties, under **42 U.S.C. §§ 12111–12117**? UT requires background checks, and a series of qualifications to determine if they can do the work. While the Plaintiff was given the chance to prove he met each criteria required to drive for UT, that opportunity to meet the criteria for sobriety, which determined termination of his contract, was denied.

Question one, first addressed in the *Worker Status* above, asks if the dignity and safety of one person at the expense of another is protected by the law. UT argues that it had no obligation to ensure an environment for drivers safe from sexual and racial harassment, even when it provided that protection to the rider's passengers. In his October 6th letter to UT executive leadership, the Plaintiff emphasized that a level of social intimacy is encouraged between drivers and passengers. The social intimacy that has made UT's

success is an encouraged and sustained priority for UT, one that's quantified on every trip by drivers' and passengers' ratings, and the law **§ 50–301.29a.(100(A)(iv)**, "rating a passenger on the basis of a protected status". In that letter to executive leadership, the Plaintiff underlined that the social intimacy was a revolutionary model and lucrative, but UT needed to better define the boundaries of that intimacy.  UT was moving in the opposite direction[20], making drivers even more vulnerable and emboldening passengers to be even more aggressive and overly familiar by setting up that environment before each ride. From pp. 4-11, Plaintiff offered experience-based causes and suggested protocol to ensure a safe environment inside the car.

Question two, is about UT's failure to ensure that the environment shared by riders and driver is mutually safe from sexual harassment, under District of Columbia law **§ 50–301.29a.(10)(A)(ii) General requirements for private vehicles-for-hire.**

Section **(10)(A)** binds District of Columbia private vehicles for hire companies to, "Establish a policy of zero tolerance for discrimination or discriminatory conduct on the basis of a protected characteristic under § 2-1402.31 while a private vehicle-for-hire operator is logged into a private vehicle-for-hire company's digital dispatch. Discriminatory conduct may include":

> i.   Refusal of service on the basis of a protected characteristic, including refusal of service to an individual with a service animal unless the operator has a documented serious medical allergy to animals on file with the private vehicle-for-hire company;
>
> **ii.  Using derogatory or harassing language on the basis of a protected characteristic;**
>
> iii. Refusal of service based on the pickup or drop-off location of the passenger; or
> iv.  Rating a passenger on the basis of a protected characteristic;

Three of the four definitions of "discriminatory conduct," use language that deliberately distinguishes the protection of passengers.  Only point ii ensures protection of both the passenger and the driver.  Because a passenger can't "refuse service" (i and iii) or "rate" themselves (iv), point two protects both driver and passenger from sexual harassment.  If the writers of the law took care to define who was being protected from whom in three fourths of that subsection, then the writers were also aware that excluding that distinction in the final fourth (point ii) ensured that the dignity and safety of both rider and passenger

---

[20] As an aside, Plaintiff offers the friendly suggestion that either the judge or their clerks anonymously take a few UT rides, and gently turn the conversation with their driver towards the Rider-Driver dynamic.  The wild dynamics initiated by riders towards drivers is so frequent that the UT driver platform asks drivers to write their most unforgettable and eventful experiences with riders, and add the account to their driver bios for new riders to read before getting in.

Sam Tyler v. UT & Co Defendant "Rider Grayson"

**Complaint: Complaint Summary**

September 9, 2019
Page 12

are protected equally. The law recognizes the basic threshold of civility, that everyone, in any environment, or work setting must be safe from racism and sexism, including the harassing language of a false drunk driving allegation. The UT business model relies on a higher level of social intimacy between riders and drivers. By its own admission UT knew about the high vulnerability of drivers to racial and sexual harassment in that closed environment, and by its own admission, knew that it needed to act.

On July 17th, 2017 the male passenger sitting in the front seat of a three-party ride, spat in the Plaintiff's face twice[21].

---

[21] This email thread is verbatim. Drivers type on a tiny screen often at night. The typos are included.

**Share Details**: this Rider just spit in my face twice. all three passengers were highly intoxicated. the one in the front seat kept calling me brother after I asked him twice to stop. he was drunk and agitated and agitated. the male in the seat behind me threw a big glass bottle out of the window. I pulled over and ended the ride. the front passenger spit in my face as the woman who had been in the back pulled him out telling him to stop. he unbuckled his belt and spit in my face again.
**Sent by Sam (Samuel) T. on Monday, July 17, 2017 at 4:42:10 AM**

Thank you for reporting this situation, Samuel. We tried reaching you at the number associated with your UT account. Our team has launched an internal investigation and someone will be in contact with you as soon as possible regarding this matter. If you have further details about this accident that you would like to share with us in the meantime, please feel free to respond to this message. We look forward to speaking with you soon.
**Sent by Cordelia on Monday, July 17, 2017 at 5:01:38 AM**

Nothing to add. Happy to follow up with the post incident interview.
**Sent by Sam (Samuel) T. on Monday, July 17, 2017 at 5:31:52 AM**

Actually, here is a bit more although o don't think its any worse than the rest of it. The threatening behavior happened long before I ended the ride. The rider in the front immediately got agitated, beating his hand on the gear shift and scolding me for not being more "upbeat" with them. He slurred how unhappy he was with me, with the ride and told me to be more engaging with them. Apart from making sure they're safe and going to the right address I very rarely engage in an upbeat way with drunk drivers because it makes a complex situation even more unstable. They want to grab you while you're driving, insist you stop and come for a drink with them, or ramble loudly and distract you from driving. Instead I ask drunk people to just relax and ensure them they'll be home soon. This guy demanded that I engage him more than I was able to do. From there it escalated.
**Sent by Sam (Samuel) T. on Monday, July 17, 2017 at 5:51:05 AM**

And one final thing: after this was over, I pulled into a parking lot to decompress. The three of them came into the same parking lot. The guy from the front seat started again with the threatening obscenities yelling "mutherfucker" this and "asshole" that. He stumbled, fell down a small hill, got up and kept yelling. I drove away.
**Sent by Sam (Samuel) T. on Monday, July 17, 2017 at 5:54:28 AM**

Thanks for letting us know, Sam.
We're sorry to hear your experience was less than excellent. We've reviewed your trip details and made note of your feedback as well as blocked future pairing with this rider.
All riders and drivers must treat one another with respect and courtesy. UT's Community Guidelines detail

---

Sam Tyler v. UT & Co Defendant "Rider Grayson"

**Complaint: Complaint Summary**

September 9, 2019
Page 13

On July 18th, 2017, "Chris" called from UT Corporate Headquarters to ask about the incident. The Plaintiff gave the same account as detailed in the incident report, with no mention of race as a motivating factor.  On his own, Chris at UT asked the Plaintiff directly if Plaintiff believed the incident was racially motivated.  The issue of race was introduced by Chris, and not by the Plaintiff in the report, or conversation.  UT has the recording of that call. Unless UT called to confirm its suspicion that drivers are harassed, and wanted to ensure that harassment *would* continue, the UT the call showed that UT understood it needed to do more to ensure a safe work environment where harassment *would not* continue.

Side by side, the false accusation from Rider Grayson and the incident with the rider who spat twice in the Plaintiff's face are similar.  White males did both.  Each white male demanded a level of interaction from the driver beyond a reasonable level of social intimacy. Both felt entitled to lash out when they didn't get the level and type of interaction they demanded. In the October 6, 2018 memo to UT executive leadership, the Plaintiff was exhaustive in documenting the nuances and incidents of racial and sexual harassment bringing to UT's attention that "if it's happening outside the car, it's happening inside the car."

The third question is about UT's failure to follow the District of Columbia Code **§ 50– 301.29a.(9)**, requiring that allegations be reasonable, and investigations be done.

a.  Establish a policy of zero tolerance for the use of alcohol or illegal drugs or being impaired by the use of alcohol or drugs while a private vehicle-for-hire operator is logged into a private vehicle-for-hire company's digital dispatch;

b.  Immediately suspend, for the duration of the investigation conducted pursuant to subparagraph (c) of this paragraph, a private vehicle-for-hire operator upon receiving a written complaint from a passenger submitted through regular mail or electronic means containing a reasonable allegation that the operator violated the zero tolerance policy established by subparagraph (a) of this paragraph; and

---

how this works. We're grateful that you took the time to contact us. Thank you!
**Sent by Priority Support : Hurie on Monday, July 17, 2017 at 5:59:56 AM**

---

Hi Samuel, Chris again.
Thank you for taking the time to speak with me just now over the phone. We do take feedback of this nature seriously, and I appreciate you taking the time to give your account of the incident.
If there is anything else we can do for you, don't hesitate to reach out to us by responding to this message.
Kindest regards,
Chris
**Sent by Christopher on Tuesday, July 18, 2017 at 4:32:24 PM**

---

<u>Sam Tyler v. UT & Co Defendant "Rider Grayson"</u>

**Complaint: Complaint Summary**

September 9, 2019
Page 14

  c. Conduct an investigation when a passenger alleges that a private vehicle-for-
    hire operator violated the zero tolerance policy established by paragraph (A)
    of this subparagraph;

The Zero Tolerance Law **§ 50–301.29a.(9)(A)(B)(C)** demands specific steps from the
ride-share company that include investigating "reasonable allegations" of drunk driving,
that UT conducts "a searching inquiry for ascertaining facts; detailed or careful
examination[22]." There was no investigation.  As detailed in section 27 of the Plaintiff's
draft case brief, Plaintiff received five separate emails from four different people at UT,
each email repeated the substance of the prior emails, that the account was on hold, that
there was an accusation, and finally that the account was terminated.  The Zero Tolerance
law emphasizes a "reasonable allegation". Basic questions like those below would
establish if Rider Grayson's allegation, and UT's investigation, were reasonable:

   *Did you see or smell any drugs or alcohol in the car?*
   *Did you see the driver possess or ingest any drugs or alcohol as you entered the*
   *car? During the ride? When you got out?*
   *If you felt unsafe, why didn't you stop the ride?*

If UT bases termination of the contract on law **§ 50–301.29a. (9)(A)(B)(C)**, then UT
must accept its legal obligations to investigate the claim required under that same law.
The allegation of drunk driving is serious.  Drunk driving is serious.  Nearly 10,500
people died from alcohol-impaired driving crashes in one year[23].  With the likelihood of
more deaths, in and out of the car.  Drunk driving carries penalties of up to one year in
jail, and a $10,000 fine in the District of Columbia.  The mere unproven allegation has
cost the Plaintiff his current livelihood, threatens future employment, and has shaken his
private life.  But neither UT nor Rider Grayson has produced credible, reasonable proof
under District of Columbia law, and they don't invite an investigation.

The previous reports referenced in UT's July 25, 2019 PS at p. 7 (section D, first full
paragraph) are first referenced by the Plaintiff at p. 6 of his October 6th, 2018 memo.  UT
dismissed those allegations.  The dismissed accusations didn't prevent the ride share
company from continuing the partnership, but are now paired with an unproven claim of
drunk driving to terminate the contract. In fact, the Plaintiff gave careful and consistent
attention to his performance, initiating calls to Driver Support to ask for specific details if

---

[22] Dictionary.com
[23] National Highway Traffic Safety Administration. Traffic Safety Facts 2016 data: alcohol-impaired
  driving. U.S. Department of Transportation, Washington, DC; 2017 Available at:
  https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/812450External

Sam Tyler v. UT & Co Defendant "Rider Grayson"

**Complaint: Complaint Summary**

September 9, 2019
Page 15

a rating dropped.  Each call was met with a range of positive reassurance, "you're doing good…keep driving…everything's fine…nothing to worry about."

The prior references to marijuana don't prove that the Plaintiff was driving under the influence, they show a shift in the social and legal climate of Washington, DC.  The incidents (July 16, 2016, February 3, 2017) happened after marijuana was legalized in Washington, DC on December 3, 2014[24].  The Plaintiff drove almost exclusively at night and weekends, when the lingering smells of marijuana in UT's and at street level were common.  The July 16th incident was on a Saturday, the February 3rd incident was on a Friday.

At p. 7, first section, UT adds to the policy so that it now reads, "UT may also deactivate the account of any driver who receives several unconfirmed complaints of drug or alcohol use." This provision is unfamiliar and noted by UT as being "last visited on July 23, 2019," one day before UT filed its PS.  Until it's established that this section of the policy was in use before the sexual harassment charge, Plaintiff respectfully requests that the court view this section as a revision of convenience.

## V. DAMAGES

At p. 3, counsel argues that, "the charge fails to state a claim of relief." This isn't true.  At pp. 12-13 of Plaintiff's December 21, 2018 draft case brief to EEOC, the section titled, **Prayer for Relief**, lists the relief, repeated and updated in the Relief Narrative at the top of this document.

The Plaintiff, Sam Tyler, has spent more that twenty years building a life different than the drunken life he's accused of.  He's mended relationships, worked harder than anybody at any job (including UT as a top earner) and substantially improved his credit rating.  Through his efforts, personality and reviews of more than 3,000 riders, customer experiences with Sam are documented as not just sober, but humorous, global, thought provoking, and enjoyable.  His later-in-life study of Photojournalism and International Affairs at George Washington University has strengthened his vocation as a freelance photojournalist working internationally.  Mr. Tyler is fortunate to document the challenges and hopes of people surviving the geo-politics of post conflict and resettlement.  He publishes and exhibits to help change the unforgiving circumstances of innocent people.  No false allegation of using drugs or alcohol will shake the accomplishments of his sobriety.

But false accusations attach to people differently, whether or not they're true.  UT's deficient responses to sexual and racial harassment, its leadership woes, and how both caused #metoo moments for a lot of people, have been re-written by UT's media machine, corporate insulation and bottomless resources.  The countless sexual and racial

---

[24] http://lims.dccouncil.us/Download/33230/B20-1064-SignedAct.pdf

Sam Tyler v. UT & Co Defendant "Rider Grayson"

**Complaint: Complaint Summary**

September 9, 2019
Page 16

harassment law suits, and the indiscretions of Mr. Kalanick, are now invisible.  The general public, and passengers who ride in Uber's, acknowledge Travis Kalanick as a brilliant entrepreneur, in-demand public speaker and the genius who built a better mousetrap for the 21st century.  This doesn't happen at street level, even when the allegation is false.

The social, professional and economic fallout for Mr. Tyler are devastating.  That fallout has hindered present livelihood, brought severe depression[25], and threatens future employment. The Plaintiff was evicted on October 2, 2018.  His car was repossessed on or about November of 2018.  His credit is destroyed.  Every possession he owned, from furniture and family heirlooms, to electronic equipment and clothes, were lost when he could no longer pay the storage fees for what he could carry during the eviction[26]. Even if the court awards the requested damages, it will take seven years to clean up this mess.

*Conclusion*

UT failed to adequately answer three questions:

1) Does the status of "driver" preclude UT from ensuring the environment shared by driver and rider is free from racial and sexual harassment for both rider and driver under **§50-301.29a(10)(A)(iii)**? No.  The law equally ensures the dignity and safety



25

RE: Information for Account holder only

U Store

U-Store Washington DC <Nya@u-store.com>          Mar 29, 2019, 10:03 AM

Mr. Tyler

Your unit is about to be auctioned. Are you planning to make a payment?
We sent you the invoice yesterday

26

Sam Tyler v. UT & Co Defendant "Rider Grayson"

**Complaint: Complaint Summary**

of both driver and rider.

2) Did UT have the legal right to terminate Plaintiff's contract, when UT didn't fulfill its legal obligation to ensure a safe working environment for Plaintiff under **Spirides v. Reinhardt, 613 F.2d 826, 829 (D.C.Cir 1979)**? Answer: No. Although UT assumes that right, that right isn't given to UT by law.

3) A. Was UT reckless in terminating the driver's contract based on an unreasonable allegation of drunk driving, and without doing an investigation under **§ 50–301.29a(9)(B)(C)**? Yes. There was no investigation.  There was no reasonable allegation.

B. Did UT discriminate against the Plaintiff as a recovering alcoholic, with more than 20 years of continuous sobriety?  Yes. By denying the Plaintiff a chance to prove that his fatal disease, which could impair driving if untreated, continued in remission for over 20 years, and did not impair his ability to perform his duties, under **42 U.S.C. §§ 12111–12117**? UT requires background checks, and a series of qualifications to determine if they can do the work.  While the Plaintiff was given the chance to prove he met each criteria required to drive for UT, that opportunity to meet the criteria for sobriety, which determined termination of his contract, was denied.

What comes out of UT's "not employees" blanket defense in a case about sexual harassment, is a disturbing and revealing subtext.  UT, on its own, suggests that a white male spitting in the face of a black male is racial harassment, even if the incident isn't characterized by the black male as racially motivated.  But UT can't consider for a moment that a black male is being sexually harassed by a white male, even when the behavior of that white male is lock step with the sexually suggestive behavior that the Plaintiff has documented over three years as his experience. UT is as certain that there's no sexual harassment by Rider Grayson against the Plaintiff, as Defendant Rider Grayson is certain that the Plaintiff was "clearly drunk."  In failing to reasonably investigate the harassment and drunk driving charges, UT is complicit in Rider Grayson's endgame of retribution, whether it means to be or not[27].

UT isn't taking the outcome of its negligence around sexual and racial harassment seriously.  It took UT approximately 15 minutes to become convinced enough that the Plaintiff was guilty of drunk driving to pull him off of the platform.  It took 28 minutes for UT to decide that the Plaintiff's sexual harassment charge wasn't worth investigating. It took UT less than a day to terminate the contract, and more than a year and four months to offer arguments that fail under law.

---

[27] "Fighting Racism Even, And Especially Where, We Don't Realize It Exists", Jeffrey Stewart August 22, 2019. www.nytimes.com/2019/08/20/books/review/how-to-be-an-antiracist-ibram-x-kendi.html

Sam Tyler v. UT & Co Defendant "Rider Grayson"

**Complaint: Complaint Summary**

September 9, 2019
Page 18

UT characterizes sexual harassment of a black male by a white male as "frivolous," and "without the reasonable possibility that investigating the charge will result in a finding of probable cause." That's confident and absolute language. That declaration doesn't speak to the Plaintiff representing himself because he can't afford an attorney, or for not having legal training. It sums up a dark history where sexual harassment and racism intersect to create an historical pattern that treats African Americans as bestial, unable to be harassed sexually. African Americans can be the aggressor, no matter their age or the facts (The Scottsboro Nine, The Central Park Five, Emmet Till), but never the victim, no matter their accomplishments or the facts (Anita Hill). Till, Ms. Hill and those two groups of black boys - and the history they bear witness to - are referenced before this court with the utmost gravity and care. Referencing that history isn't playing a card. The times, places and circumstances are different. But those lives, in their totality, show how thorough and lasting that dark history is. It subjects a group to all of the penalties, like termination, with none of the protections of the law.

Your Honor, UT drivers don't want to be employees. We enjoy the open road, the flexibility to earn a little extra for a family vacation while being home when the kids get in, or to pursue a freelance vocation. And by District of Columbia § 50–301.29a.(10)(A)(iii) **General requirements for private vehicles-for-hire,** we are shielded by the law from the pathology of racism, and the uncivilized behavior of sexual harassment. UT argues that it has no right to abide by that law. In fact, UT argues that it is the one shielded from taking steps to ensure the safety and dignity of its drivers. The fast increasing number of drivers filing with the EEOC shows that drivers have turned to the courts to ensure their dignity and safety UT because won't.

On June 3, 2018, Rider Grayson "shot his shot" at his UT driver. The driver had experienced the same sexually suggestive behavior from men and women as a driver for three years. To protect himself, and Rider Grayson, from the discomfort of the driver's disinterest, the driver minimized interaction to brief, "yes and no," answers. The driver setting a boundary offended Rider Grayson. Embarrassed by an unintended shot to his ego, Rider Grayson made a false charge of drunk driving to teach the driver a lesson. That lesson continues to damage the Plaintiff's life, and UT Technologies is complicit.

The Plaintiff asks the court to review what's important in this case, the facts, the law and the 21st century environment of the on-demand economy they govern. Not mischaracterizations and irrelevant facts that make the reckless, blanket application of "not employees," possible. The burdensome outcomes on the safety, dignity and income of drivers are significantly disproportionate to the fiscal benefits to UT.
The Plaintiff requests a jury trial. Thank you, Your Honor.

Respectfully submitted,
Sam Tyler

Samuelltylerjr@gmail.com

Sam Tyler v. UT & Co Defendant "Rider Grayson"

**Complaint: Complaint Summary**

September 9, 2019
Page 19

202.999.1592

Sam Tyler v. UT & Co Defendant "Rider Grayson"

**Complaint: Complaint Summary**

# Attachment A

Littler

Littler Mendelson, PC
815 Connecticut Avenue, NW
Suite 400
Washington, DC 20006-4046

Ethan D. Balsam
202.789.3424 direct
202.842.3400 main
202.403.3128 fax
ebalsam@littler.com

July 24, 2019

**Via EEOC Portal**

U.S. Equal Employment Opportunity Commission
Washington, D.C. Field Office

Re:   **Samuel L. Tyler v. Uber Technologies, Inc.**
       **EEOC Charge # 570-2019-00801**

Dear Sir or Madam:

Please accept this confidential letter[1] and the accompanying exhibits as the Position Statement of Respondent Uber Technologies, Inc. ("Uber" or the "Company") in response to the above-referenced Charge of Discrimination ("Charge") filed by Samuel Tyler ("Complainant"). In his Charge, Complainant alleges that Uber discriminated against him based on his sex and that he was subjected to a sexually hostile work environment during his relationship with the Company. Complainant's claims fail as a matter of law and fact for the reasons set forth in detail below. Uber is confident that the information presented in this Position Statement fully responds to Complainant's Charge. However, should the Commission desire any further information relating to this matter, please do not hesitate to contact me.

## I.     INTRODUCTION

Uber respectfully requests that the Commission dismiss Complainant's Charge with no further investigation, for at least two reasons.

**First,** Complainant's Charge fails as a matter of law on a key threshold issue: he was an independent contractor and not an employee. Complainant signed up to use Uber's

---

[1] The information and accompanying documentation contained herein, and that which may be submitted hereafter, is strictly confidential and not to be used for any purpose, other than the resolution of the current Charge, and it may be not disclosed publicly. Anything contained herein designated confidential and/or containing sensitive medical information, confidential commercial or financial information, or trade secret information may not be disclosed to Complainant. To the extent Complainant is in receipt of this Position Statement or any parts thereof, Complainant is advised that this information is strictly confidential and should not be disclosed publicly or to any individual unless Complainant has a privileged relationship with that individual.

July 24, 2019
Page 2

smartphone application ("Uber App" or "App") as an independent transportation provider ("Driver-Partner") in order to connect with individuals seeking transportation ("Riders"). In doing so, Complainant entered into a Technology Services Agreement ("Agreement") with Rasier, LLC ("Rasier"), a subsidiary of Uber. *See* **Exhibit A**. As discussed in more detail below, Complainant was an independent contractor as a matter of District of Columbia law, both under the Agreement and in fact.

Complainant was an independent contractor because he had full discretion and control over the manner and means that he used to provide services to Riders. Under Title VII of the Civil Rights Act of 1964 ("Title VII"), complaints of employment discrimination may only be brought by employees. Complainant was never employed by Uber. Rather, like all Driver-Partners, Complainant's sole relationship with the Company was as an independent contractor who used the Uber App as a lead-generation resource for his private business as a private vehicle-for-hire driver.[2] Notably, various EEOC Field Offices have already recognized that Driver-Partners, such as Complainant, are independent contractors. Accordingly, Complainant has no standing to bring claims against Uber for discrimination and/or hostile work environment, and the Commission has no jurisdiction over his claims.[3]

**Second,** even if Complainant could bring claims against Uber under Title VII—which he cannot—his Charge would still fail as a matter of fact. Complainant claims that by deactivating his account, Uber discriminated against him on the basis of his sex, and he also appears to claim that an unspecified person or persons subjected him to a sexually hostile work environment during his relationship with Uber. There is no merit to these allegations. To the contrary, Uber deactivated Complainant's account in accordance with its Zero-Tolerance Policy and the laws of the District of Columbia after receiving multiple complaints from Riders that Complainant was driving dangerously, either while intoxicated, or while his vehicle smelled of marijuana. Thus, the deactivation of Complainant's account was completely unrelated to his sex. Furthermore, Complainant's

---

[2] Indeed, the Commission lacks jurisdiction pursuant to the express terms of the EEOC Compliance Manual (http://www.eeoc.gov/policy/docs/threshold.html#2-III-A-1).   Section 2 of the Manual—entitled "Threshold Issues"—identifies which claims are "covered" and can be investigated by the Commission, and which claims are not covered and therefore should not be investigated.  The Manual expressly states: "[A]n individual is only protected [under Title VII] if s/he was an 'employee' at the time of the alleged discrimination, rather than an independent contractor, partner, or other non-employee."

[3] *See* dismissals in the matters of *Strack v. Uber Techs., Inc.; Wink v. Uber Techs., Inc.; Nash v. Uber Techs., Inc.; Fisher v. Uber Techs., Inc.; Moore v. Uber Techs., Inc.; Alarcon v. Uber Techs., Inc.; Dunn v. Uber Techs., Inc.; Jackson v. Uber Techs., Inc.; Medina v. Uber Techs., Inc.; Yeager v. Uber Techs., Inc.; Palardy v. Uber Techs., Inc.;* and *Smith v. Uber Techs., Inc.,* attached hereto as **Exhibits C–N.**

July 24, 2019
Page 3

conclusory assertion that he was subjected to a sexually hostile work environment fails because he cannot show that he was subjected to severe or pervasive harassment, which Uber knew or should have known of and failed to promptly investigate and remedy.

For these reasons, Uber respectfully submits that the Charge can and should be dismissed in its entirety, because the Charge fails to state a claim for relief, the Charge is frivolous on its face, Uber is exempt because it has never employed Complainant, and/or there is no reasonable possibility that investigating the Charge will result in a finding of probable cause.

II.    **FACTUAL BACKGROUND**

    A.    **Uber is a technology company.**

Uber is a San Francisco-based technology company that maintains an online marketplace accessible through a software application available on smartphones. The Uber App allows people in need of services to connect with individuals and businesses offering those services. Although a variety of services can be arranged through the Uber App, the products relevant here are those that enable riders to connect with nearby, available Driver-Partners. Driver-Partners may be individual independent contractors, such as Complainant, or employees or subcontractors of independent transportation businesses. To be clear, Uber is not a transportation company and it does not perform any transportation services itself. Rather, the Company offers the Uber App as a lead-generation resource to Driver-Partners in order to connect them to Riders.

When a Rider electronically requests a trip through the Uber App, Uber's software locates a nearby Driver-Partner who has their Uber App online and offers a trip to them. The Driver-Partner may then accept or decline the trip in their discretion. If they choose to accept the request, the Uber App then indicates the Rider's location, and the Driver-Partner proceeds to pick up the Rider. Once the Rider is picked up, the Driver-Partner and Rider agree on the route to take to arrive at the Rider's desired destination. After the trip is complete, the fare is charged to the Rider's credit card and disbursed to the Driver-Partner, less the contractual fee paid by the Driver-Partner to Uber for their use of the Uber App. Uber uses third-party payment processors and financial institutions to charge Rider's credit cards and disburse the fares to Driver-Partners. Also at the end of the trip, the Rider and Driver-Partner have an option to rate one another on a 1 to 5 star rating scale. Uber does not rate the Rider or the Driver. As explained below, Driver-Partners such as Complainant are bona fide independent contractors and enter into an Agreement before they may access the Uber App to accept trip requests from Riders. At no time did Uber employ Complainant in any capacity.

July 24, 2019
Page 4

**B.    Driver-Partners, Like Complainant, Enter Into Independent Contractor Relationships With Uber's Subsidiary, Rasier, LLC.**

Uber's sole relation to Driver-Partners, including Complainant, is to provide them access to the Uber App pursuant to the Agreement. Any Driver-Partner in D.C., including Complainant, who wishes to use Uber's product must enter into the Agreement with Rasier, LLC ("Rasier"), a subsidiary of Uber. *See* **Exhibit A**, the operative Rasier Technology Services Agreement. Like Uber, Rasier is not in the business of providing rides – its sole business is offering the Uber App to Driver-Partners as a lead generation and payment processing resource, in exchange for which it receives a contractual fee. In the Agreement, Rasier and Driver-Partners expressly disclaim the existence of any employment relationship arising from the use of the Uber App:

> [T]he relationship between the parties under this Agreement is solely that of independent contracting parties. The parties expressly agree that: (a) this Agreement is not an employment agreement, nor does it create an employment relationship, between Company and you; and (b) no joint venture, partnership, or agency relationship exists between Company and you.

*Id.* at § 13.1 The Agreement also clearly provides that Rasier may not direct or control Driver-Partner's provision of transportation services to Riders:

> You acknowledge and agree that Company's provision to you of the Driver App and the Uber Services creates a direct business relationship between Company and you. Company does not, and shall not be deemed to, direct or control you generally or in your performance under this Agreement specifically, including in connection with your provision of Transportation Services, your acts or omissions, or your operation and maintenance of your Vehicle. You retain the sole right to determine when, where, and for how long you will utilize the Driver App or the Uber Services. You retain the option, via the Driver App, to attempt to accept or to decline or ignore a User's request for Transportation Services via the Uber Services, or to cancel an accepted request for Transportation Services via the Driver App, subject to Company's then-current cancellation polices.

*Id.* at § 2.4. The Agreement also explicitly disclaims any ability on the part of Rasier to require Driver-Partner's to display Uber's name, logo, etc., or to restrict their participation in other economic activities:

July 24, 2019
Page 5

> With the exception of any signage required by local law or permit/license requirements, Company shall have no right to require you to: (a) display Company's or any of its Affiliates' names, logos or colors on your Vehicle(s); or (b) wear a uniform or any other clothing displaying Company's or any of its Affiliates' names, logos or colors. You acknowledge and agree that you have complete discretion to provide services or otherwise engage in other business or employment activities.

*Id.* Per the Agreement, Driver-Partners are free to use other technology platforms in conjunction with the Uber App, including those of Uber's direct competitors (e.g. Lyft):

> For the sake of clarity, you understand that **you retain the complete right to; (i) use other software application services in addition to the Uber Services; and (ii) engage in any other occupation or business**.

*Id.* (emphasis added).

Complainant first accepted the terms of the Agreement to use the Uber App on July 9, 2015, and subsequently accepted the operative Agreement on March 10, 2016. *See* Samuel Tyler's Agreement List, **Exhibit B**.

Pursuant to these contractual terms, Complainant provided transportation services to Riders as a *bona fide* independent contractor. Indeed, Complainant was free from direction and control over the performance of his work. He had full discretion to accept or reject ride requests he received through the Uber App; he set his own hours; he did not have a supervisor and was not required to report to any supervisor; he was not restricted to any particular territory; he owned, operated, maintained, and insured his own vehicle; he paid his own taxes; he retained control over the details of how he performed his work, including the selection of an appropriate route; and he could work using any and all competitor apps. He also did not receive any healthcare, pension, or other non-wage benefits from Uber.

Accordingly, there are simply no *indicia* of an employment relationship between Complainant and Uber. His claims thus fall outside the scope of the Title VII and the jurisdiction of the Commission.

July 24, 2019
Page 6

### C.     D.C. Law Requires Uber To Establish A Zero Tolerance Policy Concerning Drug And Alcohol Use As Well As Impaired Driving

By accepting the terms of the Agreement, Complainant agreed to "provide Transportation Services in a professional manner with due skill, care and diligence" and to "comply with all applicable laws in [his] performance of this Agreement." **Exhibit A** at §§ 3.1, 9.1. He further acknowledged his understanding that Uber retained the right to deactivate or restrict his access if he failed to meet the requirements of the Agreement. *Id.* at § 3.1.

As mandated by D.C. law, Uber—and other companies that provide technology platforms for the use of private vehicles-for-hire—are required to "[e]stablish a policy of zero tolerance for the use of alcohol or illegal drugs or being impaired by the use of alcohol or drugs while a private vehicle-for-hire operator is logged into a private vehicle-for-hire company's digital dispatch." D.C. Code § 50-301.29a(9)(A) (hereinafter, the "D.C. Zero Tolerance DUI Law"). The D.C. Zero Tolerance DUI Law further provides as follows with respect to the additional requirements Uber must comply with under the law:

> (B) Immediately suspend, for the duration of the investigation conducted pursuant to subparagraph (C) of this paragraph, a private vehicle-for-hire operator upon receiving a written complaint from a passenger submitted through regular mail or electronic means containing a reasonable allegation that the operator violated the zero tolerance policy established by subparagraph (A) of this paragraph; and

> (C) Conduct an investigation when a passenger alleges that a private vehicle-for-hire operator violated the zero tolerance policy established by paragraph (A) of this subparagraph;

*Id.*

Pursuant to the requirements of the D.C. Zero Tolerance DUI Law, Uber maintains and publishes on its website in its Community Guidelines a zero tolerance policy for drug and alcohol use as well as impaired driving, which provides as follows:

Zero Tolerance for Drugs and Alcohol

Uber does not tolerate the use of drugs or alcohol by partners while driving.

What leads to you losing access to your account? The account of any driver found to be under the influence of drugs or alcohol while using the Uber

July 24, 2019
Page 7

app will be permanently deactivated. Uber may also deactivate the account
of any driver who receives several unconfirmed complaints of drug or
alcohol use.

Legal, Uber, https://www.uber.com/legal/community-guidelines/us-can-en/ (last visited
Jul 23, 2019); *see also* D.C. Code § 50–301.29a 3(b) (requiring private vehicle-for-hire
companies to publish their zero tolerance policies on their website) (the "Community
Guidelines").

Uber applies its Zero Tolerance for Drugs and Alcohol Policy without regard for an
individual Driver-Partner's protected trait(s) in order to comply with D.C.'s Zero Tolerance
DUI Law and to ensure the safety of passengers using Uber's application.

> **D.** **Uber Waitlisted and Ultimately Deactivated Complainant's Driver-
> Partner Account After Receiving Multiple Rider Complaints
> Alleging That He Was Impaired And Driving Dangerously**

On June 3, 2018, Uber received a Rider complaint alleging that "[Complainant] was clearly
drunk, he ran over a median, braked sporadically, and made abrupt turns." Because
Complainant's Rider claimed that Complainant was both intoxicated and driving
dangerously, Uber immediately waitlisted Complainant's Driver-Partner account and
contacted him to conduct an investigation, as the Company was required to do under the
D.C. Zero Tolerance DUI Law. Upon review, the Company learned that Complainant's
account had previously been suspended on two separate occasions based on Rider
complaints about his dangerous driving and potential violations of the Uber Zero
Tolerance for Drugs and Alcohol Policy.  On July 16, 2016, a Rider reported that
"[Complainant's] car reeked of marijuana." In another incident occurring on February 3,
2017, a Rider reported that "[Complainant] was completely rude [sic] he was cussing
[sic] his car smelled of marijuana . . . and he was very reckless."

Based on Uber's verification that Complainant received several complaints of drug or
alcohol use and dangerous driving, on June 4, 2018, Uber informed Complainant that the
Company was ending its partnership with him effective immediately pursuant to the
Company's Zero Tolerance for Drugs and Alcohol Policy.

The Charge confirms that Uber explained to Complainant that the Company ended its
partnership with him because it received three Rider complaints about potential violations
of Uber's Zero Tolerance for Drugs and Alcohol Policy, and that "[Complainant] accepted
the decision [because he] understood Uber's position about the drunk driving
accusation[.]" Charge at ¶ 31. The Charge also confirms that Complainant did not allege

July 24, 2019
Page 8

that he believed he had been sexually harassed during his partnership with Uber until *after* he lost access to his account and that his allegation was not a motivating factor in Uber's decision. *Id.*

## I.   LEGAL ANALYSIS

### A.   Complainant Lacks Standing To Bring A Claim Under Title VII, Because He Was An Independent Contractor

A *bona fide* independent contractor such as Complainant cannot bring an employment discrimination charge under Title VII. "Title VII extends protection to . . . employees, but 'independent contractors or those not directly employed . . . are unprotected.'" *Zhengxing v. Nathanson,* 215 F. Supp. 2d 114, 116–17 (D.D.C. 2002) (quoting *Spirides v. Reinhardt,* 613 F.2d 826, 829 (D.C.Cir. 1979).

The application of settled law to the facts before the Commission make clear that Complainant was an independent contractor. In determining whether an individual was an employee or an independent contractor under circumstances such as these, District of Columbia courts focus on the following factors, known as the "*Spirides* factors":

> (1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the 'employer' or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated; i.e., by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the 'employer'; (9) whether the worker accumulates retirement benefits; (10) whether the 'employer' pays social security taxes; and (11) the intention of the parties.

*Spirides,* 613 F.2d at 832. In most situations, *the extent to which the hiring party controls* "the means and manner" by which the worker completes his tasks *will be the "most important factor"* in the analysis. *Id.* at 831 (emphasis added).

As explained above, the Agreement gave Complainant full discretion and control in the performance of his work. He had full discretion to accept or reject requests for transportation services he received from Riders through the Uber App; he was free to

July 24, 2019
Page 9

turn the Uber App on or off at his discretion (i.e., he set his own working hours); he was not required to report to any supervisor; he was not restricted to any particular territory[4]; he retained control over the details of how he performed his work, including the selection of an appropriate route; and he could use any and all competing software products (such as Lyft) or engage in any other type of economic activity that he saw fit.

The additional factors, besides "the right to control," also support a finding that Complainant is an independent contractor, and not an employee. Complainant was engaged in an occupation distinct from that of Uber, and the work that Complainant did is not part of the regular business of Uber: Complainant is an individual operating a transportation business; Uber is a technology company that creates and maintains software products. Complainant supplied the instrumentalities and tools, which required an investment in such equipment; specifically, he owned, operated, maintained, and insured his own vehicle. The method of payment was by job—specifically, by ride, and not solely by time. Finally, Complainant and Uber were both fully aware that they were not creating an employer-employee relationship. Complainant accepted the terms of the Agreement, which clearly explains that the parties' relationship is solely that of independent contracting parties, not that of employer and employee.

Put simply, Uber never employed Complainant. Accordingly, the EEOC does not have jurisdiction to investigate Complainant's claim. Indeed, EEOC Field Offices across the country have concluded that Driver-Partners are independent contractors who do not have standing to pursue claims before the agency under anti-discrimination laws like Title VII. The following decisions are illustrative, but not exhaustive:

1. Lawrence Strack – Decision Issued on 3/30/2015 (U.S. EEOC): the San Francisco Field Office dismissed Charging Party's charge for "No Jurisdiction."
2. Gary Wink – Decision Issued on 1/28/2016 (U.S. EEOC): the Houston Field Office dismissed a Driver-Partner's charge for "No Employee/Employer [sic] Relationship."
3. Nathanial Nash – Decision Issued on 9/2/2016 (South Carolina Human Affairs Commission/U.S. EEOC): the Charlotte Field Office adopted the findings of the South Carolina Human Affairs Commission, which determined that it did "not have jurisdiction to process [the Driver-Partner's] charge" because there was "No employee/employer relationship."

---

[4] The Agreement does not restrict Driver-Partners to designated territories. However, state or local statutes, ordinances, or regulations may restrict Driver-Partners to a given area or territory.

July 24, 2019
Page 10

4. Herman Fisher – Decision Issued on 9/26/2016 (U.S. EEOC): the Philadelphia Field Office dismissed a Driver-Partner's charge because "There is no employer-employee relationship between the parties."
5. Tyreice Moore – Decision Issued on 10/6/2017 (U.S. EEOC): the Detroit Field Office dismissed a Driver-Partner's charge for "No employer employee relationship."
6. Lisa Alarcon – Decision Issued on 1/29/2018 (U.S. EEOC): the Philadelphia Field Office dismissed a Driver-Partner's charge for "No Jurisdiction."
7. Sandra Dunn – Decision Issued on 2/15/2018 (U.S. EEOC): the Philadelphia Field Office dismissed a Driver-Partner's charge for "No Jurisdiction."
8. Naima Jackson – Decision Issued on 4/26/2018 (U.S. EEOC): the Cincinnati Area Office dismissed a Driver-Partner's charge for "No Employee/Employer Relationship."
9. Jesus Medina – Decision Issued on 5/31/2018 (U.S. EEOC): the Tampa Field Office dismissed a Driver-Partner's charge for "No Employee-Employer Relationship."
10. Michael Yeager – Decision Issued on 10/29/2018 (U.S. EEOC): the Philadelphia Field Office dismissed a Driver Partner's charge for "no employee/employer relationship."
11. Kevin Palardy – Decision Issued on 12/11/2018 (U.S. EEOC): the Philadelphia Field Office dismissed a Driver-Partner's charge for "no employer/employee relationship between the parties."
12. Micah Smith – Decision Issued on 12/12/2018 (U.S. EEOC): the Savannah Field Office dismissed a Driver-Partner's charge for "no employee/employer relationship."

*See* **Exhibits C-N.**

Likewise, a number of courts in other jurisdictions have made similar findings. *See McGillis v. Dep't of Econ. Opportunity,* 210 So. 3d 220 (Fla. Dist. Ct. App. 2017) (finding Driver-Partners using the Uber App to generate leads in Florida to be independent contractors under "control" test based on finding that Driver-Partners "decide whether, when, where, with whom, and how to provide rides using Uber's computer programs" which "is incompatible with the control to which a traditional employee is subject"); *Razak v. Uber Techs., Inc.,* No. 2:16-cv-00573 (E.D. Pa. April 11, 2018) (granting summary judgment in favor of Uber with respect to the plaintiff Driver-Partners' independent contractor status under federal and state wage and hour laws after finding that several factors, including the plaintiffs' right to control the manner in which the work was to be performed, the plaintiffs' opportunity for profit or loss, the plaintiffs' investment, and the degree of permanence of the working relationship, strongly favored independent contractor status); *see also, e.g.,* Opinion Letter Fair Labor Standards Act (FLSA), 2019 WL 1977301 (concluding that individuals who utilize an application platform to provide services,

July 24, 2019
Page 11

including transportation services, under circumstances such as these are independent contractors).

Because Complainant's allegations are not covered by Title VII by virtue of his independent contractor status, the Commission lacks jurisdiction to investigate or adjudicate the substance of his claims. As a result, the Charge should be dismissed in its entirety.

**B.    Even If Complainant Was An Employee, Which He Is Not, His Title VII Discrimination And Hostile Work Environment Claims Fail**

Even if Complainant was an employee, which he is not, his claims would fail as a matter of law because he cannot establish a claim of sex discrimination, and he cannot establish that he was subjected to a sexually hostile work environment under Title VII.

**1.    Complainant's Sex Discrimination Claim Fails As A Matter Of Law**

Sex discrimination claims under Title VII are governed by the burden-shifting analysis outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *E.g., Barnette v. Chertoff*, 453 F.3d 513, 515 (D.C. Cir. 2006).

Under *McDonnell Douglas*, Complainant must first establish a *prima facie* case of discrimination. 411 U.S. at 802. To establish a *prima facie* case of sex discrimination, Complainant must show: (1) he belongs to a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) similarly-situated individuals outside his protected class were treated more favorably. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *McDonnell Douglas*, 411 U.S. at 802.

If Complainant can satisfy the above elements, Uber can nonetheless defeat his claim by offering a legitimate, nondiscriminatory reason for its action. *Burdine*, 450 U.S. at 253. Upon articulating such a reason, Complainant must then produce sufficient evidence that the articulated reason was not the true reason, but was in fact a mere pretext for unlawful discrimination. *Id.* at 252. This burden merges with Complainant's ultimate burden of persuading the Department that he has been the victim of intentional discrimination. *Id.* at 255.

Complainant cannot prove the *prima facie* elements of a discrimination claim based on sex. Specifically, Complainant cannot establish that he experienced an adverse action based on his sex. Complainant has not presented any evidence that Uber considered his

July 24, 2019
Page 12

sex when it deactivated his account due to multiple reports of dangerous and impaired driving. Furthermore, Complainant has not established—and cannot establish—that similarly-situated individuals outside his protected class were treated more favorably. Without satisfying these elements of his *prima facie* case, Complainant's discrimination claims must fail as a matter of law.

Moreover, even if Complainant could establish a *prima facie* case of discrimination based on his sex—which he cannot—his claims still fail because Uber had legitimate, non-discriminatory, and non-pretextual reasons for ending its contractual relationship with Complainant. As discussed above, Uber ended its partnership with Complainant after it received three separate Rider complaints about his dangerous driving and potential violations of the Uber Zero Tolerance for Drugs and Alcohol Policy.

Uber applied the Policy to Complainant because it was required to do so by District of Columbia law, specifically, the D.C. Zero Tolerance DUI Law.  Complainant is aware of the foregoing, and his assertion that the Rider complaints Uber received were false does not alter the legality of Uber's decision, because Courts will not second-guess a company's good-faith application of its policies following an investigation. *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 496 (D.C. Cir. 2008) ("[T]he issue is whether the [defendant] honestly and reasonably believed that the underlying . . . incident occurred [at the time the decision was made]" not whether the underlying incident is ultimately true). Complainant's conduct violated the Agreement and Uber's Community Guidelines, which apply to both Driver-Partners and Riders who use the Uber App. Consequently, Uber chose to end its contractual relationship with Complainant pursuant to the terms of the Agreement and Community Guidelines. Uber's decision had nothing to do with Complainant's sex.

## 2. Complainant's Sex-Based Hostile Work Environment Claim Also Fails

Complainant also cannot prove the *prima facie* elements of a hostile work environment claim based on sex. To establish a *prima facie* case of hostile work environment based on sex, Complainant must show: (1) he was a member of a protected class; (2) he was subjected to unwelcome sexual harassment; (3) the harassment complained of was based upon his sex; (4) the charged sexual harassment had the effect of unreasonably interfering with his work performance and creating an intimidating, hostile, or offensive working environment; and (5) Uber knew or should have known about the harassment but failed to take prompt, corrective action. *See, e.g., Davis v. Coastal International Security, Inc.*, 275 F.3d 1119, 1123 (D.C. Cir. 2002).

July 24, 2019
Page 13

Complainant has not alleged any facts that would satisfy his burden of showing that he was subjected to unwelcome harassment; that the harassment was based on his sex; or that the harassment was sufficiently severe or pervasive to affect any term, condition, or privilege of his relationship with Uber. Most important, Complainant cannot show that Uber knew or should have known about the alleged harassment but failed to take prompt, corrective action. Significantly, Complainant concedes in the Charge that he did not inform Uber of the purported sexual harassment he claims to have been subjected to until *after he lost access to his account*. *See* Charge at ¶ 31. Accordingly, by Complainant's own admission, Uber did not have actual or constructive knowledge of Complainant's purported sexual harassment.[5] The paucity of factual allegations addressed to the critical elements of Complainant's hostile work environment claim show that the claim should be dismissed, as it is not supported by law or fact.

## III.  CONCLUSION

In light of the foregoing, the Charge should be dismissed in its entirety, because the Charge fails to state a claim for relief, the Charge is frivolous on its face, Uber is exempt because it has never employed Complainant, and/or there is no reasonable possibility that investigating the Charge will result in a finding of probable cause.

---

[5] Importantly, Uber's Community Guidelines specifically prohibit sexual assault, misconduct, or harassment and provide an avenue for Driver-Partners and Riders to redress complaints of such prohibited conduct by reporting the conduct to Uber. *See* Community Guidelines. Complainant was aware that he could report any alleged sexual harassment to Uber—as evidenced by his belated report—yet he failed to do so at any time during his Driver-Partner relationship with Uber. Complainant's failure to take advantage of Uber's numerous avenues for reporting sexual harassment is also fatal to his claim. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998) (establishing that where, as here, a defendant exercises reasonable care to prevent and correct sexual harassment by maintaining a policy prohibiting harassment and establishing a mechanism for reporting violations of the policy, a complainant's unreasonable failure to take advantage of the preventive or corrective opportunities provided by the defendant is fatal to his claim).

July 24, 2019
Page 14


Sincerely,

LITTLER MENDELSON, P.C.


By:   */s/ Ethan D. Balsam*
      Ethan D. Balsam


cc:   Olaoluwaposi O. Oshinowo, Esq.

# Exhibit A

RASIER, LLC / RASIER-CA, LLC / RASIER-PA, LLC / RASIER-DC, LLC / RASIER-MT, LLC / HINTER-NM

**TECHNOLOGY SERVICES AGREEMENT**

Last update: December 11, 2015

This Technology Services Agreement ("*Agreement*") constitutes a legal agreement between you, an individual ("*you*") and Rasier-CA, LLC if your Territory (as defined below) is within the State of California, Rasier-PA, LLC if your Territory is within the State of Pennsylvania, Rasier-DC, LLC if your Territory is within the State of Florida, Rasier-MT, LLC if your Territory is within the State of Montana, Hinter-NM if your Territory is within the State of New Mexico, or Rasier, LLC if your Territory is anywhere else within the United States (as applicable, "*Company*").

Company, a subsidiary of Uber Technologies, Inc. ("*Uber*"), provides lead generation to independent providers of rideshare or peer-to-peer (collectively, "*P2P*") passenger transportation services using the Uber Services (as defined below). The Uber Services enable an authorized transportation provider to seek, receive and fulfill requests for transportation services from an authorized user of Uber's mobile applications. You desire to enter into this Agreement for the purpose of accessing and using the Uber Services.

**You acknowledge and agree that Company is a technology services provider that does not provide transportation services.**

In order to use the Uber Services, you must agree to the terms and conditions that are set forth below. Upon your execution (electronic or otherwise) of this Agreement, you and Company shall be bound by the terms and conditions set forth herein.

IMPORTANT: PLEASE NOTE THAT TO USE THE UBER SERVICES, YOU MUST AGREE TO THE TERMS AND CONDITIONS SET FORTH BELOW. PLEASE REVIEW THE ARBITRATION PROVISION SET FORTH BELOW CAREFULLY, AS IT WILL REQUIRE YOU TO RESOLVE DISPUTES WITH THE COMPANY ON AN INDIVIDUAL BASIS, EXCEPT AS PROVIDED IN SECTION 15.3, THROUGH FINAL AND BINDING ARBITRATION UNLESS YOU CHOOSE TO OPT OUT OF THE ARBITRATION PROVISION.  BY VIRTUE OF YOUR ELECTRONIC EXECUTION OF THIS AGREEMENT, YOU WILL BE ACKNOWLEDGING THAT YOU HAVE READ AND UNDERSTOOD ALL OF THE TERMS OF THIS AGREEMENT (INCLUDING THE ARBITRATION PROVISION) AND HAVE TAKEN TIME TO CONSIDER THE CONSEQUENCES OF THIS IMPORTANT BUSINESS DECISION.  IF YOU DO NOT WISH TO BE SUBJECT TO ARBITRATION, YOU MAY OPT OUT OF THE ARBITRATION PROVISION BY FOLLOWING THE INSTRUCTIONS PROVIDED IN THE ARBITRATION PROVISION BELOW.

1. **Definitions**

1.1   *"Affiliate"* means an entity that, directly or indirectly, controls, is under the control of, or is under common control with a party, where control means having more than fifty percent (50%) of the voting stock or other ownership interest or the majority of the voting rights of such entity.

1.2   *"City Addendum"* means an addendum or supplemental information to this Agreement setting forth additional Territory-specific terms, as made available and as updated by Company from time to time.

1.3   *"Company Data"* means all data related to the access and use of the Uber Services hereunder, including all data related to Users (including User Information), all data related to the provision of Transportation Services via the Uber Services and the Driver App, and the Driver ID.

1.4   *"Company Device"* means a mobile device owned or controlled by Company that is provided to you solely for your use of the Driver App to provide Transportation Services.

1.5   *"Device"* means a Company Device or Your Device, as the case may be.

1.6   *"Driver App"* means the mobile application provided by Company that enables transportation providers to access the Uber Services for the purpose of seeking, receiving and fulfilling on-demand requests for transportation services by Users, as may be updated or modified from time to time.

1.7   *"Driver ID"* means the identification and password key assigned by Company to you that enables you to use and access the Driver App.

1.8   *"Fare"* has the meaning set forth in Section 4.1.

1.9   *"Service Fee"* has the meaning set forth in Section 4.4.

1.10  *"Territory"* means the city or metro areas in the United States in which you are enabled by the Driver App to receive requests for Transportation Services.

1.11  *"Tolls"* means any applicable road, bridge, ferry, tunnel and airport charges and fees, including inner-city congestion, environmental or similar charges as reasonably determined by the Uber Services based on available information.

1.12  *"Transportation Services"* means your provision of P2P passenger transportation services to Users via the Uber Services in the Territory using the Vehicle.

1.13  *"Uber Services"* mean Uber's on-demand lead generation and related services licensed by Uber to Company that enable transportation providers to seek, receive and fulfill on-demand requests for transportation services by Users seeking transportation services; such Uber Services include access to the Driver App and Uber's software, websites, payment services as described in Section 4 below, and related support services systems, as may be updated or modified from time to time.

1.14  *"User"* means an end user authorized by Uber to use the Uber mobile application for the purpose of obtaining Transportation Services offered by Company's transportation provider customers.

1.15  *"User Information"* means information about a User made available to you in connection with such User's request for and use of Transportation Services, which may include the User's name, pick-up location, contact information and photo.

1.16   *"Vehicle"* means your vehicle that: (a) meets the then-current Company requirements for a vehicle on the Uber Services; and (b) Company authorizes for your use for the purpose of providing Transportation Services.

1.17   *"Your Device"* means a mobile device owned or controlled by you: (a) that meets the then-current Company specifications for mobile devices as set forth at www.uber.com/byod-devices; and (b) on which the Driver App has been installed as authorized by Company solely for the purpose of providing Transportation Services.

2.   **Use of the Uber Services**

2.1   **Driver IDs.** Uber will issue you a Driver ID to enable you to access and use the Driver App on a Device in accordance with this Agreement. Company reserves the right to deactivate your Driver ID if you have not fulfilled a request for Transportation Services using the Driver App at least once a month. **You agree that you will maintain your Driver ID in confidence and not share your Driver ID with any third party. You will immediately notify Company of any actual or suspected breach or improper use or disclosure of your Driver ID or the Driver App.**

2.2   **Provision of Transportation Services.** When the Driver App is active, User requests for Transportation Services may appear to you via the Driver App if you are available and in the vicinity of the User. If you accept a User's request for Transportation Services, the Uber Services will provide you with certain User Information via the Driver App, including the User's first name and pickup location. In order to enhance User satisfaction with the Uber mobile application and your Transportation Services, it is recommended that you wait at least ten (10) minutes for a User to show up at the requested pick-up location. You will obtain the destination from the User, either in person upon pickup or from the Driver App if the User elects to enter such destination via Uber's mobile application. You acknowledge and agree that once you have accepted a User's request for Transportation Services, Uber's mobile application may provide certain information about you to the User, including your first name, contact information, photo and location, and your Vehicle's make and license plate number. You shall not contact any Users or use any User's personal data for any reason other than for the purposes of fulfilling Transportation Services. As between Company and you, you acknowledge and agree that: (a) you shall be solely responsible for determining the most effective, efficient and safe manner to perform each instance of Transportation Services; and (b) except for the Uber Services or any Company Devices (if applicable), you shall provide all necessary equipment, tools and other materials, at your own expense, necessary to perform Transportation Services. You understand and agree that you have a legal obligation under the Americans with Disabilities Act and similar state laws to transport Users with Service Animals (as defined by applicable state and federal law), including guide dogs for the blind and visually impaired Users, and there is no exception to this obligation for allergies or religious objections. Your knowing failure to transport a User with a Service Animal shall constitute a material breach of this Agreement. You agree that a "knowing failure" to comply with this legal obligation shall constitute either: (1) a denial of a ride where you state the denial was due to a Service Animal; or (2) there is more than one (1) instance in which a User or the companion of a User alleges that you cancelled or refused a ride on the basis of a Service Animal.

2.3   **Your Relationship with Users.** You acknowledge and agree that your provision of Transportation Services to Users creates a direct business relationship between you and the User. Company is not responsible or liable for the actions or inactions of a User in relation to you, your activities or your Vehicle. You shall have the sole responsibility for any obligations or liabilities to Users or third parties that arise from your provision of Transportation Services. You acknowledge and

agree that you are solely responsible for taking such precautions as may be reasonable and proper (including maintaining adequate insurance that meets the requirements of all applicable laws including motor vehicle financial responsibility laws) regarding any acts or omissions of a User or third party. You acknowledge and agree that Company may release your contact and/or insurance information to a User upon such User's reasonable request. You acknowledge and agree that, unless specifically consented to by a User, you may not transport or allow inside your Vehicle individuals other than a User and any individuals authorized by such User, during the performance of Transportation Services for such User. You acknowledge and agree that all Users should be transported directly to their specified destination, as directed by the applicable User, without unauthorized interruption or unauthorized stops.

2.4   **Your Relationship with Company.** You acknowledge and agree that Company's provision to you of the Driver App and the Uber Services creates a direct business relationship between Company and you. Company does not, and shall not be deemed to, direct or control you generally or in your performance under this Agreement specifically, including in connection with your provision of Transportation Services, your acts or omissions, or your operation and maintenance of your Vehicle. You retain the sole right to determine when, where, and for how long you will utilize the Driver App or the Uber Services. You retain the option, via the Driver App, to attempt to accept or to decline or ignore a User's request for Transportation Services via the Uber Services, or to cancel an accepted request for Transportation Services via the Driver App, subject to Company's then-current cancellation policies. With the exception of any signage required by local law or permit/license requirements, Company shall have no right to require you to: (a) display Company's or any of its Affiliates' names, logos or colors on your Vehicle(s); or (b) wear a uniform or any other clothing displaying Company's or any of its Affiliates' names, logos or colors. You acknowledge and agree that you have complete discretion to provide services or otherwise engage in other business or employment activities.  For the sake of clarity, you understand that you retain the complete right to; (i) use other software application services in addition to the Uber Services; and (ii) engage in any other occupation or business. Company retains the right to deactivate or otherwise restrict you from accessing or using the Driver App or the Uber Services in the event of a violation or alleged violation of this Agreement, your disparagement of Company or any of its Affiliates, your act or omission that causes harm to Company's or its Affiliates' brand, reputation or business as determined by Company in its sole discretion.

2.5   **Ratings.**

2.5.1   You acknowledge and agree that: (a) after receiving Transportation Services, a User will be prompted by Uber's mobile application to provide a rating of you and such Transportation Services and, optionally, to provide comments or feedback about you and such Transportation Services; and (b) after providing Transportation Services, you will be prompted by the Driver App to provide a rating of the User and, optionally, to provide comments or feedback about the User. You shall provide your ratings and feedback in good faith.

2.5.2   You acknowledge that Company desires that Users have access to high-quality services via Uber's mobile application. In order to continue to receive access to the Driver App and the Uber Services, you must maintain an average rating by Users that exceeds the minimum average acceptable rating established by Company for your Territory, as may be updated from time to time by Company in its sole discretion ("*Minimum Average Rating*"). Your average rating is intended to reflect Users' satisfaction with your

Transportation Services rather than your compliance with any of Company's policies or recommendations. In the event your average rating falls below the Minimum Average Rating, Company will notify you and may provide you, in Company's discretion, a limited period of time to raise your average rating above the Minimum Average Rating. If you do not increase your average rating above the Minimum Average Rating within the time period allowed (if any), Company reserves the right to deactivate your access to the Driver App and the Uber Services. Additionally, you acknowledge that your repeated failure to accept User requests for Transportation Services while you are logged in to the Driver App creates a negative experience for Users of Uber's mobile application. If you do not wish to accept User requests for Transportation Services for a period of time, you agree that you will log off of the Driver App.

2.5.3    Company and its Affiliates reserve the right to use, share and display your and User ratings and comments in any manner in connection with the business of Company and its Affiliates without attribution to you or your approval. You acknowledge and agree that Company and its Affiliates are distributors (without any obligation to verify) and not publishers of your and User ratings and comments, provided that Company and its Affiliates reserve the right to edit or remove comments in the event that such comments include obscenities or other objectionable content, include an individual's name or other personal information, or violate any privacy laws, other applicable laws or Company's or its Affiliates' content policies.

2.6    **Devices.**

2.6.1    Company encourages you to use Your Device in providing Transportation Services. Otherwise, if you elect to use any Company Devices, Company will supply you upon request with Company Devices and provide the necessary wireless data plan for such Devices, provided that Company will require reimbursement from you for the costs associated with the wireless data plan of each Company Device and/or request a deposit for each Company Device. You agree that: (a) Company Devices may only be used for the purpose of enabling your access to the Uber Services; and (b) Company Devices may not be transferred, loaned, sold or otherwise provided in any manner to any party other than you. Company Devices shall at all times remain the property of Company, and upon termination of this Agreement or your termination or deactivation, you agree to return to Company the applicable Company Devices within ten (10) days. You agree that failure to timely return any Company Devices, or damage to Company Devices outside of "normal wear and tear," will result in the forfeiture of related deposits.

2.6.2    If you elect to use Your Devices: (i) you are responsible for the acquisition, cost and maintenance of Your Devices as well as any necessary wireless data plan; and (ii) Company shall make available the Driver App for installation on Your Device. Company hereby grants you a personal, non-exclusive, non-transferable license to install and use the Driver App on Your Device solely for the purpose of providing Transportation Services. You agree to not provide, distribute or share, or enable the provision, distribution or sharing of, the Driver App (or any data associated therewith) with any third party. The foregoing license grant shall immediately terminate and you will delete and fully remove the Driver App from the Driver-Provided Device in the event that you cease to provide Transportation Services using Your Device. You agree that: (i) use of the Driver App on Your Device requires an active data plan with a wireless carrier associated with Your Device, which data plan will be provided by you at your own

expense; and (ii) use of the Driver App on Your Device as an interface with the Uber Services may consume very large amounts of data through the data plan. **COMPANY ADVISES THAT YOUR DEVICE ONLY BE USED UNDER A DATA PLAN WITH UNLIMITED OR VERY HIGH DATA USAGE LIMITS, AND COMPANY SHALL NOT BE RESPONSIBLE OR LIABLE FOR ANY FEES, COSTS, OR OVERAGE CHARGES ASSOCIATED WITH ANY DATA PLAN.**

2.7    **Location Based Services**. You acknowledge and agree that your geo-location information must be provided to the Uber Services via a Device in order to provide Transportation Services. You acknowledge and agree that: (a) your geo-location information may be obtained by the Uber Services while the Driver App is running; and (b) the approximate location of your Vehicle will be displayed to the User before and during the provision of Transportation Services to such User. In addition, Company and its Affiliates may monitor, track and share with third parties Driver's geo-location information obtained by the Driver App and Device for safety and security purposes.

3.  **You and Your Vehicle**

3.1    **Your Requirements**. You acknowledge and agree that at all times, you shall: (a) hold and maintain (i) a valid driver's license with the appropriate level of certification to operate your Vehicle, and (ii) all licenses, permits, approvals and authority applicable to you that are necessary to provide passenger transportation services to third parties in the Territory; (b) possess the appropriate and current level of training, expertise and experience to provide Transportation Services in a professional manner with due skill, care and diligence; and (c) maintain high standards of professionalism, service and courtesy. You acknowledge and agree that you may be subject to certain background and driving record checks from time to time in order to qualify to provide, and remain eligible to provide, Transportation Services. You acknowledge and agree that Company reserves the right, at any time in Company's sole discretion, to deactivate or otherwise restrict you from accessing or using the Driver App or the Uber Services if you fail to meet the requirements set forth in this Agreement.

3.2    **Vehicle Requirements**. You acknowledge and agree that your Vehicle shall at all times be: (a) properly registered and licensed to operate as a passenger transportation vehicle in the Territory; (b) owned or leased by you, or otherwise in your lawful possession; (c) suitable for performing the passenger transportation services contemplated by this Agreement; and (d) maintained in good operating condition, consistent with industry safety and maintenance standards for a Vehicle of its kind and any additional standards or requirements in the applicable Territory, and in a clean and sanitary condition.

3.3    **Documentation**. To ensure your compliance with all requirements in Sections 3.1 and 3.2 above, you must provide Company with written copies of all such licenses, permits, approvals, authority, registrations and certifications prior to your provision of any Transportation Services. Thereafter, you must submit to Company written evidence of all such licenses, permits, approvals, authority, registrations and certifications as they are renewed. Company shall, upon request, be entitled to review such licenses, permits, approvals, authority, registrations and certifications from time to time, and your failure to provide or maintain any of the foregoing shall constitute a material breach of this Agreement. Company reserves the right to independently verify your documentation from time to time in any way Company deems appropriate in its reasonable discretion.

4.  **Financial Terms**

4.1    **Fare Calculation and Your Payment.** You are entitled to charge a fare for each instance of
completed Transportation Services provided to a User that are obtained via the Uber Services
(*"Fare"*), where such Fare is calculated based upon a base fare amount plus distance (as
determined by Company using location-based services enabled through the Device) and/or time
amounts, as detailed at www.uber.com/cities for the applicable Territory (*"Fare Calculation"*).
You acknowledge and agree that the Fare provided under the Fare Calculation is the only
payment you will receive in connection with the provision of Transportation Services, and that
neither the Fare nor the Fare Calculation includes any gratuity. You are also entitled to charge
User for any Tolls, taxes or fees incurred during the provision of Transportation Services, if
applicable. You:  (i) appoint Company as your limited payment collection agent solely for the
purpose of accepting the Fare, applicable Tolls and, depending on the region and/or if requested
by you, applicable taxes and fees from the User on your behalf via the payment processing
functionality facilitated by the Uber Services; and (ii) agree that payment made by User to
Company (or to an Affiliate of Company acting as an agent of Company) shall be considered the
same as payment made directly by User to you. In addition, the parties acknowledge and agree
that as between you and Company, the Fare is a recommended amount, and the primary
purpose of the pre-arranged Fare is to act as the default amount in the event you do not
negotiate a different amount. You shall always have the right to: (i) charge a fare that is less
than the pre-arranged Fare; or (ii) negotiate, at your request, a Fare that is lower than the pre-
arranged Fare (each of (i) and (ii) herein, a *"Negotiated Fare"*). Company shall consider all such
requests from you in good faith. Company agrees to remit, or cause to be remitted, to you on at
least a weekly basis: (a) the Fare less the applicable Service Fee; (b) the Tolls; and (c) depending
on the region, certain taxes and ancillary fees. If you have separately agreed that other amounts
may be deducted from the Fare prior to remittance to you (*e.g.*, vehicle financing payments,
lease payments, mobile device usage charges, etc.), the order of any such deductions from the
Fare shall be determined exclusively by Company (as between you and Company).

4.2    **Changes to Fare Calculation.** Company reserves the right to change the Fare Calculation at any
time in Company's discretion based upon local market factors, and Company will provide you
with notice in the event of changes to the base fare, per mile, and/or per minute amounts that
would result in a change in the recommended Fare. Continued use of the Uber Services after
any such change in the Fare Calculation shall constitute your consent to such change.

4.3    **Fare Adjustment.** Company reserves the right to:  (i) adjust the Fare for a particular instance of
Transportation Services (*e.g.*, you took an inefficient route, you failed to properly end a
particular instance of Transportation Services in the Driver App, technical error in the Uber
Services, etc.); or (ii) cancel the Fare for a particular instance of Transportation Services (*e.g.*,
User is charged for Transportation Services that were not provided, in the event of a User
complaint, fraud, etc.). Company's decision to reduce or cancel the Fare in any such manner
shall be exercised in a reasonable manner.

4.4    **Service Fee.** In consideration of Company's provision of the Driver App and the Uber Services for
your use and benefit hereunder, you agree to pay Company a service fee on a per
Transportation Services transaction basis calculated as a percentage of the Fare determined by
the Fare Calculation (regardless of any Negotiated Fare), as provided to you via email or
otherwise made available electronically by Company from time to time for the applicable
Territory (*"Service Fee"*). In the event regulations applicable to your Territory require taxes to be
calculated on the Fare, Company shall calculate the Service Fee based on the Fare net of such
taxes. Company reserves the right to change the Service Fee at any time in Company's discretion

based upon local market factors, and Company will provide you with notice in the event of such change. Continued use of the Uber Services after any such change in the Service Fee calculation shall constitute your consent to such change.

4.5     **Cancellation Charges.** You acknowledge and agree that Users may elect to cancel requests for Transportation Services that have been accepted by you via the Driver App at any time prior to your arrival. In the event that a User cancels an accepted request for Transportation Services, Company may charge the User a cancellation fee on your behalf. If charged, this cancellation fee shall be deemed the Fare for the cancelled Transportation Services for the purpose of remittance to you hereunder ("*Cancellation Fee*"). The parties acknowledge and agree that as between you and Company, this Cancellation Fee is a recommended amount, and the primary purpose of such Cancellation Fee is to act as the default amount in the event you do not negotiate a different amount. You shall always have the right to:  (i) charge a cancellation fee that is less than the Cancellation Fee; or (ii) negotiate, at your request, a cancellation fee that is lower than the Cancellation Fee (each of (i) and (ii) herein, a "*Negotiated Cancellation Fee*"). If charged, the Cancellation Fee (regardless of any Negotiated Cancellation Fee) shall be deemed the Fare for the cancelled Transportation Services for the purpose of remittance to you hereunder.

4.6     **Receipts.** As part of the Uber Services, Company provides you a system for the delivery of receipts to Users for Transportation Services rendered. Upon your completion of Transportation Services for a User, Company prepares an applicable receipt and issues such receipt to the User via email on your behalf. Such receipts are also provided to you via email or the online portal available to you through the Uber Services. Receipts include the breakdown of amounts charged to the User for Transportation Services and may include specific information about you, including your name, contact information and photo, as well as a map of the route you took. Any corrections to a User's receipt for Transportation Services must be submitted to Company in writing within three (3) business days after the completion of such Transportation Services. Absent such a notice, Company shall not be liable for any mistakes in or corrections to the receipt or for recalculation or disbursement of the Fare.

4.7     **No Additional Amounts.** You acknowledge and agree that, for the mutual benefit of the parties, through advertising and marketing, Company and its Affiliates may seek to attract new Users to Uber and to increase existing Users' use of Uber's mobile application. You acknowledge and agree such advertising or marketing does not entitle you to any additional monetary amounts beyond the amounts expressly set forth in this Agreement.

4.8     **Taxes.** You acknowledge and agree that you are required to:  (a) complete all tax registration obligations and calculate and remit all tax liabilities related to your provision of Transportation Services as required by applicable law; and (b) provide Company with all relevant tax information. You further acknowledge and agree that you are responsible for taxes on your own income arising from the performance of Transportation Services. Notwithstanding anything to the contrary in this Agreement, Company may in its reasonable discretion based on applicable tax and regulatory considerations, collect and remit taxes resulting from your provision of Transportation Services and/or provide any of the relevant tax information you have provided pursuant to the foregoing requirements in this Section 4.8 directly to the applicable governmental tax authorities on your behalf or otherwise.

5.   **Proprietary Rights; License**

5.1 **License Grant**. Subject to the terms and conditions of this Agreement, Company hereby grants you a non-exclusive, non-transferable, non-sublicensable, non-assignable license, during the term of this Agreement, to use the Uber Services (including the Driver App on a Device) solely for the purpose of providing Transportation Services to Users and tracking resulting Fares and Fees. All rights not expressly granted to you are reserved by Company, its Affiliates and their respective licensors.

5.2 **Restrictions**. You shall not, and shall not allow any other party to: (a) license, sublicense, sell, resell, transfer, assign, distribute or otherwise provide or make available to any other party the Uber Services, Driver App or any Company Device in any way; (b) modify or make derivative works based upon the Uber Services or Driver App; (c) improperly use the Uber Services or Driver App, including creating Internet "links" to any part of the Uber Services or Driver App, "framing" or "mirroring" any part of the Uber Services or Driver App on any other websites or systems, or "scraping" or otherwise improperly obtaining data from the Uber Services or Driver App; (d) reverse engineer, decompile, modify, or disassemble the Uber Services or Driver App, except as allowed under applicable law; or (e) send spam or otherwise duplicative or unsolicited messages. In addition, you shall not, and shall not allow any other party to, access or use the Uber Services or Driver App to: (i) design or develop a competitive or substantially similar product or service; (ii) copy or extract any features, functionality, or content thereof; (iii) launch or cause to be launched on or in connection with the Uber Services an automated program or script, including web spiders, crawlers, robots, indexers, bots, viruses or worms, or any program which may make multiple server requests per second, or unduly burden or hinder the operation and/or performance of the Uber Services; or (iv) attempt to gain unauthorized access to the Uber Services or its related systems or networks.

5.3 **Ownership**. The Uber Services, Driver App and Company Data, including all intellectual property rights therein, and the Company Devices are and shall remain (as between you and Company) the property of Company, its Affiliates or their respective licensors. Neither this Agreement nor your use of the Uber Services, Driver App or Company Data conveys or grants to you any rights in or related to the Uber Services, Driver App or Company Data, except for the limited license granted above. Other than as specifically permitted by the Company in connection with the Uber Services, you are not permitted to use or reference in any manner Company's, its Affiliates', or their respective licensors' company names, logos, products and service names, trademarks, service marks, trade dress, copyrights or other indicia of ownership, alone and in combination with other letters, punctuation, words, symbols and/or designs (the "UBER Marks and Names") for any commercial purposes. You agree that you will not try to register or otherwise use and/or claim ownership in any of the UBER Marks and Names, alone or in combination with other letters, punctuation, words, symbols and/or designs, or in any confusingly similar mark, name or title, for any goods and services.

6. **Confidentiality**

6.1 Each party acknowledges and agrees that in the performance of this Agreement it may have access to or may be exposed to, directly or indirectly, confidential information of the other party ("*Confidential Information*"). Confidential Information includes Company Data, Driver IDs, User Information, and the transaction volume, marketing and business plans, business, financial, technical, operational and such other non-public information of each party (whether disclosed in writing or verbally) that such party designates as being proprietary or confidential or of which the other party should reasonably know that it should be treated as confidential.

6.2 Each party acknowledges and agrees that: (a) all Confidential Information shall remain the exclusive property of the disclosing party; (b) it shall not use Confidential Information of the other party for any purpose except in furtherance of this Agreement; (c) it shall not disclose Confidential Information of the other party to any third party, except to its employees, officers, contractors, agents and service providers ("*Permitted Persons*") as necessary to perform under this Agreement, provided Permitted Persons are bound in writing to obligations of confidentiality and non-use of Confidential Information no less protective than the terms hereof; and (d) it shall return or destroy all Confidential Information of the disclosing party, upon the termination of this Agreement or at the request of the other party (subject to applicable law and, with respect to Company, its internal record-keeping requirements).

6.3 Notwithstanding the foregoing, Confidential Information shall not include any information to the extent it: (a) is or becomes part of the public domain through no act or omission on the part of the receiving party; (b) was possessed by the receiving party prior to the date of this Agreement without an obligation of confidentiality; (c) is disclosed to the receiving party by a third party having no obligation of confidentiality with respect thereto; or (d) is required to be disclosed pursuant to law, court order, subpoena or governmental authority, provided the receiving party notifies the disclosing party thereof and provides the disclosing party a reasonable opportunity to contest or limit such required disclosure.

7. **Privacy**

7.1 **Disclosure of Your Information.** Subject to applicable law, Company and its Affiliates may, but shall not be required to, provide to you, a User, an insurance company and/or relevant authorities and/or regulatory agencies any information (including personal information (*e.g.*, information obtained about you through any background check) and any Company Data) about you or any Transportation Services provided hereunder if: (a) there is a complaint, dispute or conflict, including an accident, between you and a User; (b) it is necessary to enforce the terms of this Agreement; (c) it is required, in Company's or any Affiliate's sole discretion, by applicable law or regulatory requirements (*e.g.*, Company or its Affiliates receive a subpoena, warrant, or other legal process for information); (d) it is necessary, in Company's or any Affiliate's sole discretion, to (1) protect the safety, rights, property or security of Company or its Affiliates, the Uber Services or any third party; (2) to protect the safety of the public for any reason including the facilitation of insurance claims related to the Uber Services; (3) to detect, prevent or otherwise address fraud, security or technical issues; (4) to prevent or stop activity which Company or any of its Affiliates, in their sole discretion, may consider to be, or to pose a risk of being, an illegal, unethical, or legally actionable activity); or (e) it is required or necessary, in Company's or any Affiliate's sole discretion, for insurance or other purposes related to your ability to qualify, or remain qualified, to use the Uber Services. You understand that Company may retain your personal data for legal, regulatory, safety and other necessary purposes after this Agreement is terminated.

7.2 Company and its Affiliates may collect your personal data during the course of your application for, and use of, the Uber Services, or may obtain information about you from third parties. Such information may be stored, processed, transferred, and accessed by Company and its Affiliates, third parties, and service providers for business purposes, including for marketing, lead generation, service development and improvement, analytics, industry and market research, and such other purposes consistent with Company's and its Affiliates' legitimate business needs. You expressly consent to such use of personal data.

8. **Insurance**

8.1    You agree to maintain during the term of this Agreement on all Vehicles operated by you under this Agreement automobile liability insurance that provides protection against bodily injury and property damage to third parties at levels of coverage that satisfy the minimum requirements to operate a private passenger vehicle on the public roads within the Territory. This coverage must also include any no-fault coverage required by law in the Territory that may not be waived by an insured. You agree to provide Company and its Affiliates a copy of the insurance policy, policy declarations, proof of insurance identification card and proof of premium payment for the insurance policy required in this Section 8.1 upon request. Furthermore, you must provide Company with written notice of cancellation of any insurance policy required by Company. Company shall have no right to control your selection or maintenance of your policy. You must be a named insured or individually rated driver, for which a premium is charged, on the insurance policy required in this Section 8.1 at all times.

8.2    **You agree to maintain during the term of this Agreement workers' compensation insurance as required by all applicable laws in the Territory. If permitted by applicable law, you may choose to insure yourself against industrial injuries by maintaining occupational accident insurance in place of workers' compensation insurance. Furthermore, if permitted by applicable law, you may choose not to insure yourself against industrial injuries at all, but do so at your own risk.**

8.3    You understand and acknowledge that your personal automobile insurance policy may not afford liability, comprehensive, collision, medical payments, personal injury protection, uninsured motorist, underinsured motorist, or other coverage for the Transportation Services you provide pursuant to this Agreement. If you have any questions or concerns about the scope or applicability of your own insurance coverage, it is your responsibility, not that of Company, to resolve them with your insurer(s).

8.4    Company may maintain during the term of this Agreement insurance related to your provision of Transportation Services as determined by Company in its reasonable discretion or as described in a City Addendum, provided that Company and its Affiliates are not required to provide you with any specific insurance coverage for any loss to you or your Vehicle. You are required to promptly notify Company of any accidents that occur while providing Transportation Services and to cooperate and provide all necessary information related thereto.

9.   Representations and Warranties; Disclaimers

9.1    **By You.** You hereby represent and warrant that: (a) you have full power and authority to enter into this Agreement and perform your obligations hereunder; (b) you have not entered into, and during the term will not enter into, any agreement that would prevent you from complying with this Agreement; and (c) you will comply with all applicable laws in your performance of this Agreement, including holding and complying with all permits, licenses, registrations and other governmental authorizations necessary to provide (i) Transportation Services using the Vehicles pursuant to this Agreement, and (ii) passenger transportation services to third parties in the Territory generally.

9.2    **Disclaimer of Warranties.** COMPANY AND ITS AFFILIATES PROVIDE, AND YOU ACCEPT, THE UBER SERVICES, DRIVER APP AND THE COMPANY DEVICES ON AN "AS IS" AND "AS AVAILABLE" BASIS. COMPANY AND ITS AFFILIATES DO NOT REPRESENT, WARRANT OR GUARANTEE THAT YOUR ACCESS TO OR USE OF THE UBER SERVICES, DRIVER APP OR THE COMPANY DEVICES: (A) WILL BE UNINTERRUPTED OR ERROR FREE; OR (B) WILL RESULT IN ANY REQUESTS FOR TRANSPORTATION

SERVICES. COMPANY AND ITS AFFILIATES FUNCTION AS AN ON-DEMAND LEAD GENERATION AND RELATED SERVICE ONLY AND MAKE NO REPRESENTATIONS, WARRANTIES OR GUARANTEES AS TO THE ACTIONS OR INACTIONS OF THE USERS WHO MAY REQUEST OR RECEIVE TRANSPORTATION SERVICES FROM YOU, AND COMPANY AND ITS AFFILIATES DO NOT SCREEN OR OTHERWISE EVALUATE USERS. BY USING THE UBER SERVICES AND DRIVER APP, YOU ACKNOWLEDGE AND AGREE THAT YOU MAY BE INTRODUCED TO A THIRD PARTY THAT MAY POSE HARM OR RISK TO YOU OR OTHER THIRD PARTIES. YOU ARE ADVISED TO TAKE REASONABLE PRECAUTIONS WITH RESPECT TO INTERACTIONS WITH THIRD PARTIES ENCOUNTERED IN CONNECTION WITH THE USE OF THE UBER SERVICES OR DRIVER APP.NOTWITHSTANDING COMPANY'S APPOINTMENT AS THE LIMITED PAYMENT COLLECTION AGENT OF YOU FOR THE PURPOSE OF ACCEPTING PAYMENT FROM USERS ON YOUR BEHALF AS SET FORTH IN SECTION 4 ABOVE, COMPANY AND ITS AFFILIATES EXPRESSLY DISCLAIM ALL LIABILITY FOR ANY ACT OR OMISSION OF YOU, ANY USER OR OTHER THIRD PARTY.

9.3     **No Service Guarantee.** COMPANY AND ITS AFFILIATES DO NOT GUARANTEE THE AVAILABILITY OR UPTIME OF THE UBER SERVICES OR DRIVER APP. YOU ACKNOWLEDGE AND AGREE THAT THE UBER SERVICES OR DRIVER APP MAY BE UNAVAILABLE AT ANY TIME AND FOR ANY REASON (*e.g.,* DUE TO SCHEDULED MAINTENANCE OR NETWORK FAILURE). FURTHER, THE UBER SERVICES OR DRIVER APP MAY BE SUBJECT TO LIMITATIONS, DELAYS, AND OTHER PROBLEMS INHERENT IN THE USE OF THE INTERNET AND ELECTRONIC COMMUNICATIONS, AND COMPANY AND ITS AFFILIATES ARE NOT RESPONSIBLE FOR ANY DELAYS, DELIVERY FAILURES, OR OTHER DAMAGES, LIABILITIES OR LOSSES RESULTING FROM SUCH PROBLEMS.

10. **Indemnification.** You shall indemnify, defend (at Company's option) and hold harmless Company and its Affiliates and their respective officers, directors, employees, agents, successors and assigns from and against any and all liabilities, expenses (including legal fees), damages, penalties, fines, social security contributions and taxes arising out of or related to: (a) your breach of your representations, warranties or obligations under this Agreement; or (b) a claim by a third party (including Users, regulators and governmental authorities) directly or indirectly related to your provision of Transportation Services or use of the Uber Services. This indemnification provision shall not apply to your breach of any representations regarding your status as an independent contractor.

11. **Limits of Liability.** COMPANY AND ITS AFFILIATES SHALL NOT BE LIABLE UNDER OR RELATED TO THIS AGREEMENT FOR ANY OF THE FOLLOWING, WHETHER BASED ON CONTRACT, TORT OR ANY OTHER LEGAL THEORY, EVEN IF A PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES: (i) ANY INCIDENTAL, PUNITIVE, SPECIAL, EXEMPLARY, CONSEQUENTIAL, OR OTHER INDIRECT DAMAGES OF ANY TYPE OR KIND; OR (ii) YOUR OR ANY THIRD PARTY'S PROPERTY DAMAGE, OR LOSS OR INACCURACY OF DATA, OR LOSS OF BUSINESS, REVENUE, PROFITS, USE OR OTHER ECONOMIC ADVANTAGE. EXCEPT FOR COMPANY'S OBLIGATIONS TO PAY AMOUNTS DUE TO YOU PURSUANT TO SECTION 4 ABOVE, BUT SUBJECT TO ANY LIMITATIONS OR OTHER PROVISIONS CONTAINED IN THIS AGREEMENT WHICH ARE APPLICABLE THERETO, IN NO EVENT SHALL THE LIABILITY OF COMPANY OR ITS AFFILIATES UNDER THIS AGREEMENT EXCEED THE AMOUNT OF SERVICE FEES ACTUALLY PAID TO OR DUE TO COMPANY HEREUNDER IN THE SIX (6) MONTH PERIOD IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO SUCH CLAIM.

12. **Term and Termination**

12.1    **Term.** This Agreement shall commence on the date accepted by you and shall continue until terminated as set forth herein.

12.2 **Termination.** Either party may terminate this Agreement: (a) without cause at any time upon seven (7) days prior written notice to the other party; (b) immediately, without notice, for the other party's material breach of this Agreement; or (c) immediately, without notice, in the event of the insolvency or bankruptcy of the other party, or upon the other party's filing or submission of request for suspension of payment (or similar action or event) against the terminating party. In addition, Company may terminate this Agreement or deactivate your Driver ID immediately, without notice, with respect to you in the event you no longer qualify, under applicable law or the standards and policies of Company and its Affiliates, to provide Transportation Services or to operate the Vehicle, or as otherwise set forth in this Agreement.

12.3 **Effect of Termination.** Upon termination of the Agreement, you shall: (a) promptly return to Company all Company Devices; and (b) immediately delete and fully remove the Driver App from any of Your Devices. Outstanding payment obligations and Sections 1, 2.3, 2.5.3, 4.7, 4.8, 5.3, 6, 7, 9, 10, 11, 12.3, 13, 14 and 15 shall survive the termination of this Agreement.

## 13. Relationship of the Parties

13.1 **Except as otherwise expressly provided herein with respect to Company acting as the limited payment collection agent solely for the purpose of collecting payment from Users on your behalf, the relationship between the parties under this Agreement is solely that of independent contracting parties. The parties expressly agree that: (a) this Agreement is not an employment agreement, nor does it create an employment relationship, between Company and you; and (b) no joint venture, partnership, or agency relationship exists between Company and you.**

13.2 You have no authority to bind Company or its Affiliates and you undertake not to hold yourself out as an employee, agent or authorized representative of Company or its Affiliates. Where, by implication of mandatory law or otherwise, you may be deemed an agent or representative of Company, you undertake and agree to indemnify, defend (at Company's option) and hold Company and its Affiliates harmless from and against any claims by any person or entity based on such implied agency or representative relationship.

## 14. Miscellaneous Terms

14.1 **Modification.** In the event Company modifies the terms and conditions of this Agreement at any time, such modifications shall be binding on you only upon your acceptance of the modified Agreement. Company reserves the right to modify any information referenced at hyperlinks from this Agreement from time to time. You hereby acknowledge and agree that, by using the Uber Services, or downloading, installing or using the Driver App, you are bound by any future amendments and additions to information referenced at hyperlinks herein, or documents incorporated herein, including with respect to Fare Calculations. Continued use of the Uber Services or Driver App after any such changes shall constitute your consent to such changes. Unless changes are made to the arbitration provisions herein, you acknowledge and agree that modification of this Agreement does not create a renewed opportunity to opt out of arbitration.

14.2 **Supplemental Terms.** Supplemental terms may apply to your use of the Uber Services, such as use policies or terms related to certain features and functionality, which may be modified from time to time ("*Supplemental Terms*"). You may be presented with certain Supplemental Terms from time to time. Supplemental Terms are in addition to, and shall be deemed a part of, this Agreement. Supplemental Terms shall prevail over this Agreement in the event of a conflict.

14.3   **Severability.** If any provision of this Agreement is or becomes invalid or non-binding, the parties shall remain bound by all other provisions hereof. In that event, the parties shall replace the invalid or non-binding provision with provisions that are valid and binding and that have, to the greatest extent possible, a similar effect as the invalid or non-binding provision, given the contents and purpose of this Agreement.

14.4   **Assignment.** Neither party shall assign or transfer this Agreement or any of its rights or obligations hereunder, in whole or in part, without the prior written consent of the other party; provided that Company may assign or transfer this Agreement or any or all of its rights or obligations under this Agreement from time to time without consent: (a) to an Affiliate; or (b) to an acquirer of all or substantially all of Company's business, equity or assets.

14.5   **Entire Agreement.** This Agreement, including all Supplemental Terms, constitutes the entire agreement and understanding of the parties with respect to its subject matter and replaces and supersedes all prior or contemporaneous agreements or undertakings regarding such subject matter. In this Agreement, the words "including" and "include" mean "including, but not limited to." The recitals form a part of this Agreement.

14.6   **No Third Party Beneficiaries.** There are no third party beneficiaries to this Agreement, except as expressly set forth in the Arbitration Provision in Section 15.3. Nothing contained in this Agreement is intended to or shall be interpreted to create any third-party beneficiary claims.

14.7   **Notices.** Any notice delivered by Company to you under this Agreement will be delivered by email to the email address associated with your account or by posting on the portal available to you on the Uber Services. Any notice delivered by you to Company under this Agreement will be delivered by contacting Company at http://partners.uber.com in the "Contact Us" section. Additional Territory-specific notices may be required from time to time.

15. **Governing Law; Arbitration**

15.1   The choice of law provisions contained in this Section 15.1 do not apply to the arbitration clause contained in Section 15.3, such arbitration clause being governed by the Federal Arbitration Act. Accordingly, and except as stated in Section 15.3, the interpretation of this Agreement shall be governed by California law, without regard to the choice or conflicts of law provisions of any jurisdiction. Any disputes, actions, claims or causes of action arising out of or in connection with this Agreement or the Uber Services that are not subject to the arbitration clause contained in Section 15.3 shall be subject to the exclusive jurisdiction of the state and federal courts located in the City and County of San Francisco, California. However, neither the choice of law provision regarding the interpretation of this Agreement nor the forum selection provision is intended to create any other substantive right to non-Californians to assert claims under California law whether that be by statute, common law, or otherwise. These provisions, and except as otherwise provided in Section 15.3, are only intended to specify the use of California law to interpret this Agreement and the forum for disputes asserting a breach of this Agreement, and these provisions shall not be interpreted as generally extending California law to you if you do not otherwise reside or provide services in California. The foregoing choice of law and forum selection provisions do not apply to the arbitration clause in Section 15.3 or to any arbitrable disputes as defined therein. Instead, as described in Section 15.3, the Federal Arbitration Act shall apply to any such disputes. The failure of Company to enforce any right or provision in this Agreement shall not constitute a waiver of such right or provision unless

acknowledged and agreed to by Uber in writing.

15.2   Other than disputes regarding the intellectual property rights of the parties and other claims identified in Section 15.3.ii, any disputes, actions, claims or causes of action arising out of or in connection with this Agreement or the Uber Services shall be subject to arbitration pursuant to Section 15.3.

### 15.3   Arbitration Provision

Important Note Regarding this Arbitration Provision:

- Except as provided below, arbitration does not limit or affect the legal claims you may bring against the Company.  Agreeing to arbitration only affects where any such claims may be brought and how they will be resolved.

- Arbitration is a process of private dispute resolution that does not involve the civil courts, a civil judge, or a jury.  Instead, the parties' dispute is decided by a private arbitrator selected by the parties using the process set forth herein.  Other arbitration rules and procedures are also set forth herein.

- Unless the law requires otherwise, as determined by the Arbitrator based upon the circumstances presented, you will be required to split the cost of any arbitration with the Company.

- IMPORTANT: This Arbitration Provision will require you to resolve any claim that you may have against the Company or Uber on an individual basis, except as provided below, pursuant to the terms of the Agreement unless you choose to opt out of the Arbitration Provision.  Except as provided below, this provision will preclude you from bringing any class, collective, or representative action (other than actions under the Private Attorneys General Act of 2004 ("PAGA"), California Labor Code § 2698 et seq. ("PAGA")) against the Company or Uber, and also precludes you from participating in or recovering relief under any current or future class, collective, or representative (non-PAGA) action brought against the Company or Uber by someone else.

  - *Cases have been filed against Company or Uber and may be filed in the future involving claims by users of the Service, including by drivers.  You should assume that there are now, and may be in the future, lawsuits against the Company or Uber alleging class, collective, and/or representative (non-*

*PAGA) claims on your behalf, including but not limited to claims for tips, reimbursement of expenses, and employment status.  Such claims, if successful, could result in some monetary recovery to you.  (THESE CASES NOW INCLUDE, FOR EXAMPLE, YUCESOY ET AL. V. UBER TECHNOLOGIES, INC., ET AL., CASE NO. 3:15-CV-00262(NORTHERN DISTRICT OF CALIFORNIA); IN RE UBER FCRA LITIGATION, CASE NO. 14-CV-05200-EMC (NORTHERN DISTRICT OF CALIFORNIA); AND O'CONNOR  V. UBER TECHNOLOGIES, INC., ET AL., CASE NO. CV 13-03826-EMC (NORTHERN DISTRICT OF CALIFORNIA).The contact information for plaintiffs' counsel in the O'Connor matter is as follows: Shannon Liss-Riordan, Lichten & Liss-Riordan, P.C., 100 Cambridge Street, 20th Floor, Boston, MA 02114, Telephone: (617) 994-5800, Fax: (617) 994-5801, email: sliss@llrlaw.com.)*

o  The mere existence of such class, collective, and/or representative lawsuits, however, does not mean that such lawsuits will ultimately succeed.  But if you do agree to arbitration with the Company, you are agreeing in advance, except as otherwise provided, that you will not participate in and, therefore, will not seek to recover monetary or other relief under any such class, collective, and/or representative (non-PAGA) lawsuit, except as provided below.

o  However, as discussed above and except as provided below, if you agree to arbitration, you will not be precluded from bringing your claims against the Company or Uber in an individual arbitration proceeding. If successful on such claims, you could be awarded money or other relief by an arbitrator (subject to splitting the cost of arbitration as mentioned above).

WHETHER TO AGREE TO ARBITRATION IS AN IMPORTANT BUSINESS DECISION. IT IS YOUR DECISION TO MAKE, AND YOU SHOULD NOT RELY SOLELY UPON THE INFORMATION PROVIDED IN THIS AGREEMENT AS IT IS NOT INTENDED TO CONTAIN A COMPLETE EXPLANATION OF THE CONSEQUENCES OF ARBITRATION.  YOU SHOULD TAKE REASONABLE STEPS TO CONDUCT FURTHER

**RESEARCH AND TO CONSULT WITH OTHERS — INCLUDING BUT NOT LIMITED TO AN ATTORNEY — REGARDING THE CONSEQUENCES OF YOUR DECISION, JUST AS YOU WOULD WHEN MAKING ANY OTHER IMPORTANT BUSINESS OR LIFE DECISION.**

     i.    <u>How This Arbitration Provision Applies.</u>

This Arbitration Provision is governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq. (the "FAA") and evidences a transaction involving interstate commerce. This Arbitration Provision applies to any dispute arising out of or related to this Agreement or termination of the Agreement and survives after the Agreement terminates. Nothing contained in this Arbitration Provision shall be construed to prevent or excuse you from utilizing any informal procedure for resolution of complaints established in this Agreement (if any), and this Arbitration Provision is not intended to be a substitute for the utilization of such procedures.

**Except as it otherwise provides, this Arbitration Provision is intended to apply to the resolution of disputes that otherwise would be resolved in a court of law or before any forum other than arbitration, with the exception of proceedings that must be exhausted under applicable law before pursuing a claim in a court of law or in any forum other than arbitration. Except as it otherwise provides, this Arbitration Provision requires all such disputes to be resolved only by an arbitrator through final and binding arbitration on an individual basis only and not by way of court or jury trial, or by way of class, collective, or representative action.**

Except as provided in Section 15.3(v), below, regarding the Class Action Waiver, such disputes include without limitation disputes arising out of or relating to interpretation or application of this Arbitration Provision, including the enforceability, revocability or validity of the Arbitration Provision or any portion of the Arbitration Provision. All such matters shall be decided by an Arbitrator and not by a court or judge. However, as set forth below, the preceding sentences shall not apply to disputes relating to the interpretation or application of the Class Action Waiver or PAGA Waiver below, including their enforceability, revocability or validity.

Except as it otherwise provides, this Arbitration Provision also applies, without limitation, to all disputes between You and the Company or Uber, as well as all disputes between You and the Company's or Uber's fiduciaries, administrators, affiliates, subsidiaries, parents, and all successors and assigns of any of them, including but not limited to any disputes arising out of or related to this Agreement and disputes arising out of or related to your relationship with the Company, including termination of the relationship. This Arbitration Provision also applies, without limitation, to disputes regarding any city, county, state or federal wage-hour law, trade secrets, unfair competition, compensation, breaks and rest periods, expense reimbursement, termination, harassment and claims arising under the Uniform Trade Secrets Act, Civil Rights Act of 1964, Americans With Disabilities Act, Age Discrimination in Employment Act, Family Medical Leave Act, Fair Labor Standards Act, Employee Retirement Income Security Act (except for individual claims for employee benefits under any benefit plan sponsored by the Company and covered by the Employee Retirement Income Security Act of 1974 or funded by insurance), Genetic Information Non-Discrimination Act, and state statutes, if any, addressing the same or similar subject matters, and all other similar federal and state statutory and common law claims.

This Agreement is intended to require arbitration of every claim or dispute that lawfully can be arbitrated, except for those claims and disputes which by the terms of this Agreement are expressly excluded from the Arbitration Provision.

Uber Technologies, Inc. is an intended, third party beneficiary of this Agreement.

ii.    Limitations On How This Agreement Applies.

The disputes and claims set forth below shall not be subject to arbitration and the requirement to arbitrate set forth in this Arbitration Provision shall not apply:

A representative action brought on behalf of others under the Private Attorneys General Act of 2004 ("PAGA"), California Labor Code § 2698 et seq., to the extent waiver of such a claim is deemed unenforceable by a court of competent jurisdiction;

Claims for workers compensation, state disability insurance and unemployment insurance benefits;

Regardless of any other terms of this Agreement, nothing prevents you from making a report to or filing a claim or charge with the Equal Employment Opportunity Commission, U.S. Department of Labor, Securities Exchange Commission, National Labor Relations Board, or Office of Federal Contract Compliance Programs, and nothing in this Agreement or Arbitration Provision prevents the investigation by a government agency of any report, claim or charge otherwise covered by this Arbitration Provision. Nothing in this Arbitration Provision shall be deemed to preclude or excuse a party from bringing an administrative claim before any agency in order to fulfill the party's obligation to exhaust administrative remedies before making a claim in arbitration;

Disputes that may not be subject to a predispute arbitration agreement pursuant to applicable Federal law or Executive Order are excluded from the coverage of this Arbitration Provision;

Disputes regarding your, the Company's, or Uber's intellectual property rights;

This Arbitration Provision shall not be construed to require the arbitration of any claims against a contractor that may not be the subject of a mandatory arbitration agreement as provided by section 8116 of the Department of Defense ("DoD") Appropriations Act for Fiscal Year 2010 (Pub. L. 111-118), section 8102 of the Department of Defense ("DoD") Appropriations Act for Fiscal Year 2011 (Pub. L. 112-10, Division A), and their implementing regulations, or any successor DoD appropriations act addressing the arbitrability of claims.

iii.    Selecting The Arbitrator and Location of the Arbitration.

The Arbitrator shall be selected by mutual agreement of the Company and you.  Unless you and the Company mutually agree otherwise, the Arbitrator shall be an attorney licensed to practice in the location where the arbitration proceeding will be conducted or a retired federal or state judicial officer who presided in the jurisdiction where the arbitration will be conducted.  If the Parties cannot agree on an Arbitrator, then an arbitrator will be selected using the alternate strike method from a list of five (5) neutral arbitrators provided by JAMS (Judicial Arbitration & Mediation Services).  You will have the option of making the first strike.  If a JAMS arbitrator is used, then the JAMS Streamlined Arbitration Rules & Procedures rules will apply; however, if there is a conflict between the JAMS Rules and this Agreement, this Agreement shall govern. Those rules are available here:

http://www.jamsadr.com/rules-streamlined-arbitration/

The location of the arbitration proceeding shall be no more than 45 miles from the place where you last provided transportation services under this Agreement, unless each party to the arbitration agrees in writing otherwise.

    iv.    <u>Starting The Arbitration.</u>

All claims in arbitration are subject to the same statutes of limitation that would apply in court. The party bringing the claim must demand arbitration in writing and deliver the written demand by hand or first class mail to the other party within the applicable statute of limitations period. The demand for arbitration shall include identification of the Parties, a statement of the legal and factual basis of the claim(s), and a specification of the remedy sought. Any demand for arbitration made to the Company or Uber shall be provided to Legal, Rasier, LLC, 1455 Market St., Ste. 400, San Francisco CA 94103. The arbitrator shall resolve all disputes regarding the timeliness or propriety of the demand for arbitration. A party may apply to a court of competent jurisdiction for temporary or preliminary injunctive relief in connection with an arbitrable controversy, but only upon the ground that the award to which that party may be entitled may be rendered ineffectual without such provisional relief.

    v.    <u>How Arbitration Proceedings Are Conducted.</u>

In arbitration, the Parties will have the right to conduct adequate civil discovery, bring dispositive motions, and present witnesses and evidence as needed to present their cases and defenses, and any disputes in this regard shall be resolved by the Arbitrator.

**You and the Company agree to resolve any dispute that is in arbitration on an individual basis only, and not on a class, collective action, or representative basis ("Class Action Waiver"). The Arbitrator shall have no authority to consider or resolve any claim or issue any relief on any basis other than an individual basis. The Arbitrator shall have no authority to consider or resolve any claim or issue any relief on a class, collective, or representative basis.** Notwithstanding any other provision of this Agreement, the Arbitration Provision or the JAMS Streamlined Arbitration Rules & Procedures, disputes regarding the enforceability, revocability or validity of the Class Action Waiver may be resolved only by a civil court of competent jurisdiction and not by an arbitrator. In any case in which (1) the dispute is filed as a class, collective, or representative  action and (2) there is a final judicial determination that all or part of the Class Action Waiver unenforceable, the class, collective, and/or representative action to that extent must be litigated in a civil court of competent jurisdiction, but the portion of the Class Action Waiver that is enforceable shall be enforced in arbitration.

While the Company will not take any retaliatory action in response to any exercise of rights you may have under Section 7 of the National Labor Relations Act, if any, the Company shall not be precluded from moving to enforce its rights under the FAA to compel arbitration on the terms and conditions set forth in this Agreement.

**Private Attorneys General Act.**

Notwithstanding any other provision of this Agreement or the Arbitration Provision, to the extent permitted by law, (1) **You and Company agree not to bring a representative action on behalf of others under the Private Attorneys General Act of 2004 ("PAGA"), California Labor Code § 2698 et seq., in any court or in arbitration, and (2) for any claim brought on a private attorney general basis   i.e., where**

you are seeking to pursue a claim on behalf of a government entity both you and Company agree that any such dispute shall be resolved in arbitration on an individual basis only (i.e., to resolve whether you have personally been aggrieved or subject to any violations of law), and that such an action may not be used to resolve the claims or rights of other individuals in a single or collective proceeding (i.e., to resolve whether other individuals have been aggrieved or subject to any violations of law) ("PAGA Waiver"). Notwithstanding any other provision of this Agreement or the Arbitration Provision, the validity of the PAGA Waiver may be resolved only by a civil court of competent jurisdiction and not by an arbitrator. If any provision of the PAGA Waiver is found to be unenforceable or unlawful for any reason, (1) the unenforceable provision shall be severed from this Agreement; (2) severance of the unenforceable provision shall have no impact whatsoever on the Arbitration Provision or the Parties' attempt to arbitrate any remaining claims on an individual basis pursuant to the Arbitration Provision; and (3) any representative action brought under PAGA on behalf of others must be litigated in a civil court of competent jurisdiction and not in arbitration. To the extent that there are any claims to be litigated in a civil court of competent jurisdiction because a civil court of competent jurisdiction determines that the PAGA Waiver is unenforceable with respect to those claims, the Parties agree that litigation of those claims shall be stayed pending the outcome of any individual claims in arbitration.

    vi.    <u>Paying For The Arbitration</u>.

Each party will pay the fees for his, her or its own attorneys, subject to any remedies to which that party may later be entitled under applicable law (i.e., a party prevails on a claim that provides for the award of reasonable attorney fees to the prevailing party). In all cases where required by law, the Company will pay the Arbitrator's and arbitration fees. If under applicable law the Company is not required to pay all of the Arbitrator's and/or arbitration fees, such fee(s) will be apportioned equally between the Parties or as otherwise required by applicable law. However, you will not be required to bear any type of fee or expense that you would not be required to bear if you had filed the action in a court of law. Any disputes in that regard will be resolved by the Arbitrator as soon as practicable after the Arbitrator is selected, and Company shall bear all of the Arbitrator's and arbitration fees until such time as the Arbitrator resolves any such dispute.

    vii.    <u>The Arbitration Hearing And Award</u>.

The Parties will arbitrate their dispute before the Arbitrator, who shall confer with the Parties regarding the conduct of the hearing and resolve any disputes the Parties may have in that regard. Within 30 days of the close of the arbitration hearing, or within a longer period of time as agreed to by the Parties or as ordered by the Arbitrator, any party will have the right to prepare, serve on the other party and file with the Arbitrator a brief. The Arbitrator may award any party any remedy to which that party is entitled under applicable law, but such remedies shall be limited to those that would be available to a party in his or her individual capacity in a court of law for the claims presented to and decided by the Arbitrator, and no remedies that otherwise would be available to an individual in a court of law will be forfeited by virtue of this Arbitration Provision. The Arbitrator will issue a decision or award in writing, stating the essential findings of fact and conclusions of law. A court of competent jurisdiction shall have the authority to enter a judgment upon the award made pursuant to the arbitration. The Arbitrator shall not have the power to commit errors of law or legal reasoning, and the award may be vacated or corrected on appeal to a court of competent jurisdiction for any such error.

viii.    **Your Right To Opt Out Of Arbitration.**

Arbitration is not a mandatory condition of your contractual relationship with the Company. If you do not want to be subject to this Arbitration Provision, you may opt out of this Arbitration Provision by notifying the Company in writing of your desire to opt out of this Arbitration Provision, either by (1) sending, within 30 days of the date this Agreement is executed by you, electronic mail to optout@uber.com, stating your name and intent to opt out of the Arbitration Provision or (2) by sending a letter by U.S. Mail, or by any nationally recognized delivery service (*e.g*, UPS, Federal Express, etc.), or by hand delivery to:

> Legal
> Rasier, LLC
> 1455 Market St., Ste. 400
> San Francisco CA 94103

In order to be effective, the letter under option (2) must clearly indicate your intent to opt out of this Arbitration Provision, and must be dated and signed. The envelope containing the signed letter must be received (if delivered by hand) or post-marked within 30 days of the date this Agreement is executed by you. Your writing opting out of this Arbitration Provision, whether sent by (1) or (2), will be filed with a copy of this Agreement and maintained by the Company. Should you not opt out of this Arbitration Provision within the 30-day period, you and the Company shall be bound by the terms of this Arbitration Provision. You have the right to consult with counsel of your choice concerning this Arbitration Provision. You understand that you will not be subject to retaliation if you exercise your right to assert claims or opt-out of coverage under this Arbitration Provision.

ix.    _Full and Complete Agreement Related to Formal Resolution of Disputes; Enforcement Of This Agreement._

This Arbitration Provision is the full and complete agreement relating to the formal resolution of disputes arising out of this Agreement. Except as stated in subsection v, above, in the event any portion of this Arbitration Provision is deemed unenforceable, the remainder of this Arbitration Provision will be enforceable.

By clicking "I accept", you expressly acknowledge that you have read, understood, and taken steps to thoughtfully consider the consequences of this Agreement, that you agree to be bound by the terms and conditions of the Agreement, and that you are legally competent to enter into this Agreement with Company.

# Exhibit B

| Driver UUID | Document Title | Date / Time Driver Accepted In-App (UTC) |
|---|---|---|
| f015f2da-509a-45cf-ab62-d0508ccf50be | DC-MD-VA Addendum | 7/9/2015 18:29 |
| f015f2da-509a-45cf-ab62-d0508ccf50be | Partner Agreement November 10 2014 | 7/9/2015 18:29 |
| f015f2da-509a-45cf-ab67-d0508ccf50be | Service Fee Schedule | 7/9/2015 18:29 |
| f015f2da-509a-45cf-ab62-d0508ccf50be | DC-MD-VA Addendum | 11/2/2015 2:07 |
| f015f2da-509a-45cf-ab62-d0508ccf50be | Service Fee Schedule | 11/2/2015 2:07 |
| f015f2da-509a-45cf-ab62-d0508ccf50be | DC TNC Addendum | 3/10/2016 20:57 |
| f015f2da-509a-45cf-ab62-d0508ccf50be | DC-MD-VA Addendum | 3/10/2016 20:57 |
| f015f2da-509a-45cf-ab62-d0508ccf50be | RASIER Technology Services Agreement December 10 2015 | 3/10/2016 20:57 |
| f015f2da-509a-45cf-ab62-d0508ccf50be | Service Fee Addendum - Washington DC p2p Rasier 20160819 | 9/1/2016 23:31 |
| f015f2da-509a-45cf-ab62-d0508ccf50be | TNC Addendum - Washington D.C. Rasier 20170106 | 1/6/2017 23:00 |
| f015f2da-509a-45cf-ab62-d0508ccf50be | Service Fee Addendum - Washington DC February 17 2017 | 2/18/2017 7:55 |
| f015f2da-509a-45cf-ab62-d0508ccf50be | VA TNC Addendum | 2/18/2017 7:55 |
| f015f2da-509a-45cf-ab62-d0508ccf50be | NFB Flow Indicator (p2p) | 2/26/2017 21:39 |
| f015f2da-509a-45cf-ab62-d0508ccf50be | VA TNC Addendum March 27 2017 | 3/29/2017 19:37 |
| f015f2da-509a-45cf-ab62-d0508ccf50be | RASIER Financial Terms Addendum May 22 2017 - v2 | 5/24/2017 1:47 |
| f015f2da-509a-45cf-ab62-d0508ccf50be | PORTIER P2P Services Agreement August 31 2016 | 5/25/2017 5:57 |
| f015f2da-509a-45cf-ab62-d0508ccf50be | PORTIER Tipping Addendum June 20 2017 p2p eats xd | 7/19/2017 19:28 |
| f015f2da-509a-45cf-ab62-d0508ccf50be | RASIER Tipping Addendum June 20 2017 p2p driver | 7/19/2017 19:28 |
| f015f2da-509a-45cf-ab62-d0508ccf50be | NFB 2 Indicator (p2p) | 7/25/2017 0:05 |

# Exhibit C

EEOC Form 161 (11/09)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| To: | Lawrence Strack | From: | San Francisco District Office |
| | Redacted | | 450 Golden Gate Avenue |
| | | | 5 West, P.O. Box 36025 |
| | | | San Francisco, CA 94102 |

|  | On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a)) | | |

| EEOC Charge No. | EEOC Representative | Telephone No. |
| | Patricia A. Finnegan, | |
| 550-2013-00209 | Investigator | (415) 522-3021 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

|  | The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC. |
| --- | --- |
|  | Your allegations did not involve a disability as defined by the Americans With Disabilities Act. |
|  | The Respondent employs less than the required number of employees or is not otherwise covered by the statutes. |
|  | Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge |
|  | The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge. |
|  | The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge. |
| X | Other (briefly state)    No Jurisdiction |

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit must be filed **WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.

On behalf of the Commission

Enclosures(s)

_____    03/30/2015
    Michael P. Connolly,            (Date Mailed)
    Acting District Director

cc:    Andrew M. Spurchise
    LITTLER, MENDELSON, PC
    650 California Street, 20th Floor
    San Francisco, CA 94108

# Exhibit D

EEOC Form 161 (11/09)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| To: Gary W █████████ | From: Houston District Office<br>Mickey Leland Building<br>1919 Smith Street, 7th Floor<br>Houston, TX 77002 |
|---|---|

| | On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a)) | |
|---|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 460-2016-00020 | Vernon M. Gardner, Jr.,<br>Investigator | (713) 651-4938 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

| | |
|---|---|
| [ ] | The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC. |
| [ ] | Your allegations did not involve a disability as defined by the Americans With Disabilities Act. |
| [ ] | The Respondent employs less than the required number of employees or is not otherwise covered by the statutes. |
| [ ] | Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge |
| [ ] | The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge. |
| [ ] | The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge. |
| [X] | Other (briefly state)        No Employee/Employeer Relationship |

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit must be filed **WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission,

_Rayford O. Irvin,_
**District Director**

JAN 2 8 2016

(Date Mailed)

Enclosure(s)

cc:    RASIER LLC
       1207 Vine St
       Houston, TX 77002

Hram Hanono
UBER TECHNOLOGIES, INC
1455 Market Street
San Francisco, CA 94103

TWC- Civil Rights Division
101 E. 15th Street, Rm. 144-T
Austin, TX 78778-0001

# Exhibit E

SOUTH CAROLINA HUMAN AFFAIRS COMMISSION
P. O. Box 4490
Columbia, South Carolina 29240
DISMISSAL AND NOTICE OF RIGHT TO SUE

Nathaniel E. Nash

█████████████████                           SCHAC # 2-16-203R

                          Complainant,

                                            EEOC Deferral #
                    Vs.                     14C-2016-00181

Uber Taxi
499 Cape Jasmine Way                        SHAC REPRESENTATIVE:
Lexington, SC 29073                         Alex Nelson, Staff Investigator

                                            TELEPHONE NUMBER: (803) 737-8829

                          Respondent

The Commission has dismissed your charge for the following reason(s):
☒   The Commission does not have jurisdiction to process your charge for the following reason:
    ☐  Untimely                              ☐  Complainant failed to state claim
    ☐  Prior court proceeding                ☐  Less than 15 employees
    ☒  No employee/employer relationship     ☐  Private membership nonprofit club

No cause: The Commission is unable to conclude, based upon the information obtained during its investigation,
that there has been a violation of the Human Affairs Law, Section 1-13-10, et seq. of the SC Code of Laws of
1976, as amended.

☐   You failed to provide requested necessary information, failed or refused to appear or be available for
    necessary interviews/conferences, or otherwise refused to cooperate to the extent that the Commission has
    been unable to resolve your charge. You have had at least 15 days in which to respond to our final written
    request.

☐   The Commission has made reasonable efforts to locate you and has been unable to do so. You have had at
    least 30 days in which to respond to a notice sent to our last known address.

☐   The Respondent has made a written settlement offer which affords full relief for the harm you alleged. You
    have refused to accept the final relief offered and/or at least 30 days have expired since you received actual
    notice of this settlement offer.

This Notice of Right to Sue concludes the Commission's investigation of your charge. If the Complainant wants to pursue the
charge further, the Complainant MUST DO SO WITHIN ONE YEAR FROM THE ALLEGED VIOLATION OR WITHIN
ONE HUNDRED TWENTY (120) DAYS FROM THE DATE OF ISSUANCE OF THIS NOTICE OF RIGHT TO SUE,
WHICHEVER OCCURS EARLIER; OTHERWISE, YOUR RIGHT TO SUE UNDER THE HUMAN AFFAIRS LAW IS
LOST.

THE COMPLAINANT AND THE RESPONDENT ARE HEREBY NOTIFIED THAT IF THEY REQUIRE
COPIES OF THE INVESTIGATIVE FILE OR OF ANY DOCUMENTS CONTAINED THEREIN FOR
PURPOSES OF LITIGATION, THEY MUST SUBMIT A REQUEST FOR SUCH COPIES, TO INCLUDE
THE COURT DOCKET NUMBER, WITHIN THREE (3) YEARS OF THE DATE OF ISSUANCE OF THIS
DETERMINATION. ONLY THOSE DOCUMENTS PERMITTED TO BE RELEASED BY S.C.
REGULATION 65-3(B)(11) WILL BE PROVIDED. IN ACCORDANCE WITH THE RECORDS
RETENTION SCHEDULE ESTABLISHED BY STATE ARCHIVES, THE FILE WILL BE DESTROYED
THREE (3) YEARS AFTER THIS DATE.

The parties are reminded that state and federal laws prohibit retaliation against persons who have exercised their right to
inquire or complain about matters they believe may violate the law. Discrimination against persons who have cooperated in
Commission investigations is also prohibited. These protections apply regardless of the Commission's determination on the
merits of the complaint.

You may contact the SHAC representative named above if you have any questions about your legal rights, including advice on
which Circuit Court has jurisdiction to hear your case. A copy of this NOTICE OF RIGHT TO SUE has been sent to the
respondent.

8/19/2016                                   On Behalf of the Commission:
_____                     _____
Date of Issuance                            Approving Authority

EEOC Form 161 (11/09)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

| To: Nathaniel E. Nash | From: | Charlotte District Office |
| --- | --- | --- |
| | | 129 W. Trade Street |
| | | Suite 400 |
| | | Charlotte, NC 28202 |

| | On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a)) | |
| --- | --- | --- |

| EEOC Charge No. | EEOC Representative | Telephone No. |
| --- | --- | --- |
| 14C-2016-00181 | Renee E. Grube, State & Local Program Manager | (704) 954-6446 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[ ] The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[X] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ] Other (briefly state)

### - NOTICE OF SUIT RIGHTS -

(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit must be filed <u>WITHIN 90 DAYS</u> of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.

On behalf of the Commission

Enclosures(s)

Reuben Daniels, Jr.,
Director

September 2, 2016
(Date Mailed)

cc:

Sophia Behnia, Counsel
**UBER TECHONOLOGIES INC**
1455 market Street
San Francisco, CA 94103

# Exhibit F

EEOC Form 161 (11/09)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

To:   Herman Fisher

From:   Philadelphia District Office
801 Market Street
Suite 1300
Philadelphia, PA 19107

☐    *On behalf of person(s) aggrieved whose identity is*
*CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
|  | Legal Unit |  |
| 530-2016-02919 | Legal Technician | (215) 440-2828 |

THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐    The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐    Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐    The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐    Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☐    The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge.

☐    The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☒    Other *(briefly state)*      There is no employer-employee relationship between the parties.

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit must be filed <u>WITHIN 90 DAYS</u> of your receipt of this notice; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.

On behalf of the Commission

Spencer H. Lewis, Jr.
District Director

9/26/16
*(Date Mailed)*

Enclosures(s)

cc:   UBER TECHNOLOGIES, INC.

Michael Chan, Paralegal – Employment (for Respondent)

# Exhibit G

EEOC Form 161 (11/16)   U.S. Equal Employment Opportunity Commission

## DISMISSAL AND NOTICE OF RIGHTS

| To: Tyreice D. Moore | Received | From: Detroit Field Office |
| | | 477 Michigan Avenue |
| | OCT 13 2017 | Room 865 |
| | | Detroit, MI 48226 |

|  |  |  |
|---|---|---|
| | Littler Mendelson, P.C. | |
| | On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a)) | |

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 23A-2017-00718 | Kiron R. Kothari, Investigator | (313) 226-7809 |

THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

| | |
|---|---|
| [ ] | The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC |
| [ ] | Your allegations did not involve a disability as defined by the Americans With Disabilities Act. |
| [ ] | The Respondent employs less than the required number of employees or is not otherwise covered by the statutes. |
| [ ] | Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge |
| [ ] | The EEOC issues the following determination. Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge. |
| [ ] | The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge. |
| [X] | Other (briefly state)   No employer employee relationship |

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.

On behalf of the Commission

_Angelique Moore_                          10-6-2017

Enclosures(s)                    Michelle Eisele,                    (Date Mailed)
                                 District Director

cc:   Uber
      c/o Shelley Vail
      Attorney
      Littler Mendelson, P.C.
      2301 McGee St., Suite 800
      Kansas City, MO 64108

# Exhibit H

EEOC Form 161 (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

| To   Lisa Alarcon | From:  Philadelphia District Office |
|---|---|
| | 801 Market Street |
| | Suite 1300 |
| | Philadelphia, PA 19107 |

[ ]    On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No | EEOC Representative | Telephone No |
|---|---|---|
| 530-2018-00585 | Legal Unit,<br>Legal Technician | (215) 440-2828 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ] Your charge was not timely filed with EEOC, in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[X] The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes   This does not certify that the respondent is in compliance with the statutes   No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge

[X] Other (briefly state)        No Jurisdiction.

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

_Jamie R. Williamson,_
**District Director**

1/29/18
(Date Mailed)

Enclosures(s)

cc:    **UBER TECHNOLOGIES**
Tony West (for Respondent)
800 Market St
San Francisco, CA 94102

# Exhibit I

EEOC Form 161 (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| To   Sandra Dunn | From   Philadelphia District Office |
|---|---|
| | 801 Market Street |
| | Suite 1300 |
| | Philadelphia, PA 19107 |

| ☐ | On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a)) |

| EEOC Charge No | EEOC Representative | Telephone No |
|---|---|---|
| 530-2018-02049 | Legal Unit, Legal Technician | (215) 440-2828 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☒ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge

☒ Other (briefly state)     No Jurisdiction.

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.

On behalf of the Commission

_Jamie R. Williamson_

Jamie R. Williamson,
District Director

2/15/18
(Date Mailed)

Enclosure(s)

cc     UBER TECHNOLOGIES, INC.
Achia Swift (for Respondent)
Director I, Employment
1455 Market Street, 4th Floor
San Francisco, CA 94103

# Exhibit J

EEOC Form 161 (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

| To: Naima Jackson | From: | Cincinnati Area Office |
|---|---|---|
| | | John W. Peck Fed. Bldg |
| | | 550 Main St  Room 10-019 |
| | | Cincinnati, OH 45202 |

| | On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a)) |
|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 473-2018-00991 | Amy M. Trzop-Vos, Investigator | (513) 684-2749 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ]  The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ]  Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ]  The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ]  Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[ ]  The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes  This does not certify that the respondent is in compliance with the statutes  No finding is made as to any other issues that might be construed as having been raised by this charge

[ ]  The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[X]  Other (briefly state)    **No Employee/Employer Relationship**

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you  You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court  Your lawsuit must be filed **WITHIN 90 DAYS** of your receipt of this notice, or your right to sue based on this charge will be lost  (The time limit for filing suit based on a claim under state law may be different )

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment  This means that backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.

On behalf of the Commission

*Melanie J Breen*                                          APR 2 6 2018

| Enclosures(s) | **Melanie L. Breen,** Area Office Director | (Date Mailed) |
|---|---|---|

cc

| Michael Chan | Stephen A. Simon |
|---|---|
| Paralegal | TOBIAS, TORCHIA & SIMON |
| UBER TECHNOLOGIES, INC. | 911 Mercantile Library Building |
| 1455 Market Street Suite 400 | 414 Walnut Street |
| San Francisco, CA 94103 | Cincinnati, OH 45202 |

# Exhibit K

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

LITTLER MENDELSON

To:   Jesus J. Medina

From:   Tampa Field Office
501 East Polk Street
Room 1000
Tampa, FL 33602

JUN 1 2 2018

RECEIVED

| | | |
|---|---|---|
| EEOC Charge No. | EEOC Representative | Telephone No. |
| 550-2018-00124 | Jearlean Johnson, Investigator | (813) 202-7913 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ]   The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ]   Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ]   The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ]   Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge.

[ ]   The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ]   The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[X]   Other (briefly state)        No Employee-Employer Relationship

### - NOTICE OF SUIT RIGHTS -

(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit must be filed **WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

*Evangeline Hawthorne*          5/31/18

Enclosures(s)

Evangeline Hawthorne,
Director

cc:

Michael Chan
Paralegal II
UBER TECHNOLOGIES INC.
1455 Market Street
San Francisco, CA 94103

Sophia Behnia
Littler Mendelson
333 Bush St., 34th Floor
San Francisco, CA 94115

# Exhibit L

EEOC Form 161 (11 16)            U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

To.   Michael R. Yeager                                    From:   Philadelphia District Office
                                                                  801 Market Street
                                                                  Suite 1300
                                                                  Philadelphia, PA 19107

| | On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a)) |
|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 530-2018-04531 | Legal Unit, Legal Technician | (215) 440-2828 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

| | |
|---|---|
| [ ] | The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC. |
| [ ] | Your allegations did not involve a disability as defined by the Americans With Disabilities Act. |
| [ ] | The Respondent employs less than the required number of employees or is not otherwise covered by the statutes. |
| [ ] | Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge |
| [ ] | The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge. |
| [ ] | The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge. |
| [X] | Other (briefly state)          no employee/employer relationship |

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit must be filed **WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

_Jamie R. Williamson_ _____          10/29/2018

Enclosures(s)                 Jamie R. Williamson,                  (Date Mailed)
                              District Director

cc      Michael Chan
        Paralegal

# Exhibit M

# Attachment B

December 21, 2018


US Equal Employment Opportunity Commission
131 M Street NE
Fourth Floor, Suite 4NW02F
Washington, DC 20507-0100

Ladies & Gentlemen

While writing and researching this sexual harassment claim against Uber I found the EEOC site
and learned that all sexual harassment claims begin with your office. I'm not an attorney and
couldn't afford one after being terminated. So I wrote and researched the case using templates
from other cases and the guide book from the DC District Court. The October 6, 2018 letter to
Uber is complete. But I stopped researching, writing and editing to first submit to the EEOC.
The case may not be as "legal-ly" as one produced by an attorney, but it's what I was working
with and pretty much sums everything up

Please feel free to contact me at anytime if I can help your office answer any questions about this
sexual harassment allegation against Uber, and thoughts on how I can move ahead. Thank you

Sam Tyler
901 New Jersey Avenue NW
Apt # 905
Washington, DC 20001
202.320.1179
SamuelLTylerjr@gmail.com

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SAMUEL L. TYLER
901 New Jersey Avenue NW – Apt #509
Washington, DC 20001

*Plaintiff*, pro se

     v.

UBER TECHNOLOGIES, INC
c/o
CT Corporation System
1015 15th Street NW
Suite 1000
Washington, DC 20005

Raiser, LLC
c/o
CT Corporation System
1015 15th Street NW
Suite 1000
Washington, DC 20005

Uber Rider, "Grayson"

*Defendants*.

## COMPLAINT

Plaintiff Sam Tyler, for his complaint against Defendant Uber Technologies, Raiser, LLC and Rider "Grayson" allege as follows

## INTRODUCTION

1.    Plaintiff Sam Tyler was an Uber Driver in Washington, DC for more than three years. In that time he provided over 10,247 trips to approximately 13,000 people in Maryland, Virginia and DC. Comments given by Riders described the Plaintiff as a "good man" with a "warm-heart", "friendly", "knows his way around DC", "intelligent", knowledgeable of DC, its nightlife and restaurants and

always up for thoughtful conversation   In several phone calls with Uber Driver Support initiated by the

Plaintiff and one initiated by Uber corporate head quarters following a physical attack, Uber described

the plaintiff as an asset, "one of the highest earning Drivers in this area." The plaintiff has a clean driv-

ing license with no marks and has over nineteen years of continuous sobriety from drugs and alcohol

2.        But on June 3, 2018 the Defendant summarily terminated its partnership with Tyler

based on, in the Defendant's words, the Plaintiff driving impaired by drugs and or alcohol.

3.        The accusation, made by Rider "Grayson" was another reminder of the sexual and racial

harassment that Drivers are vulnerable to.

4.        A non-transparent process of reviewing serious claims resulted in the malicious termina-

tion of the Plaintiff's contract    The accusation a retaliatory effort by a Rider for non-response to the

Rider's expression of romantic interest  Years of neglect by Uber to to protect Drivers from daily har-

assment both sexual and racial, implement a transparent and thorough review maintain a safe working

environment and stem the deep and pervasive culture of sexual harassment at Uber

5.        While Tyler was the target of sexual harassment and abuse by passengers and this case is

not a class action suit, Uber has failed to create a safe work environment to protect all Drivers from

sexual and racial harassment   From the beginning of its short 9 year history, Uber's unprecedented suc-

cess has been profoundly stained by systemic incidents of sexual and racial harassment throughout the

organization that end in law suits, one as recently as March 2018, management to subordinates, execu-

tive leadership and corporate image to the general public, Riders to passengers, passengers to Riders

6.        Lawsuits and investigations have shown a disturbing pattern of a work environment that

encourages sexual harassment and misconduct by it's neglect to protect against it.

The Perkins Coie Report (2017) concluded more than 215 incidents of sexual

harassment;

Covington and Burling investigation following the high-profile allegations of sexual harassment by Susan Fowler

7.      Termination based on a false accusation is only the beginning. After summary and arbitrary termination, the Plaintiff's account was immediately closed. All access to further communication, secure conversation regarding a sensitive sexual harassment claim or the Uber Driver app ended, thereby deprivation of safe place to respond, and a work environment that protects against sexual harassment

8.      Both state and local law expressly prohibit sexual harassment, and embrace protection from it, holding that "... it shall be an unlawful discriminatory practice to limit [or] otherwise adversely affect his status as an employee." DC Human Rights Act of 1977 (use legal section mark) 2-1401.11 (a) (1) the "limit" defined in refers to sustaining a "hostile" and "abusive" work environment Harris v Forklift Systems, Inc. 510 US 17, 114 (1993)

9.      Of particular note are the new dynamics introduced into the workplace by ride share and the on-demand economy. A temporary employee is defined as a "contractor", but the temp agency is not exempt from protecting its contractors from sexual harassment on assignment, consigned to ensure the onsite supervisor does not engage in the sexual harassment of contractor
New territory for the purposes of proximate terms

10.      Plaintiff brings this action to enforce federal and local protections against sexual harassment, remedy the detrimental financial and emotional impact of falsely terminating the contract, to ensure the defamation documented in all records of partnership is thoroughly deleted.

## PARTIES

11.    The Plaintiff is a former Uber Driver who, up until the moment of termination, was in good standing based on customer ratings and reviews and verbally confirmed by Uber's Driver Support. Tyler resides in Washington, DC.

12.    Plaintiff is in the final year of a joint program in Photojournalism and International Affairs at George Washington University.  Before the chance to complete a degree he traveled in Morocco, Mexico, Guatemala, Brazil, S. Korea, Oman, UAE, Thailand, Amsterdam, Tanzania, Turkey and licensed by the US Treasury Department to work as a journalist in Cuba.  The Plaintiff's expertise is in documenting conflict, post-conflict and emerging democracies.  Foreign governments, NGO's, international institutions, the US State Department and other other agencies routinely pull from an international data base (CIA, INTERPOL, FBI etc.) for personal and security information.  The dive deep background checks for visas, press credentials, approve attendance at high-level meetings, give access to sensitive geographic areas like refugee camps (Jordan, Lebanon, Turkey, Kenya) and talk to protected populations like political asylees (S. Korea). Photojournalists are ruthlessly scrutinized traveling abroad because of the immediate and profound power behind visual images:  Myanmar refugees in Bangladesh refugee camps,  the assassination of a Russian diplomat, children inside US immigration detention centers. If there's derogatory or suspicious information in an interview with a bureaucrat or on an application - even if it's not true or you forget to mention something – entry can be denied, you can be detained or asked to leave a country. And there's no chance to explain.  The Plaintiff has been pulled into a side room at the Jose Marti Airport in Cuba several times for questioning, had a second background check done sitting in the Centro de Prensa office in Havana after the first check by the Cuban Interest Section in DC was done; stopped, questioned and had his passport photographed by government security in Turkey. In Amsterdam and Israel airport security pulls travelers out of line and stands six inches away flipping through your passport. They're watching the veins in your neck to see if you get nervous. Security is tight globally. Yet, the Defendant regards a background check as it

would a routine employment verification that only confirms dates of employment and responsibilities. Fortunately nothing has ever turned up that prevented the Plaintiff from working in contested spaces, and it needs to stay that way.

13.     The issue of a false accusation of driving under the influence is a direct threat to the Plaintiff's specialized profession.  A normal  back ground check confirms dates of employment, position and salary.  However, back ground checks of the Plaintiff include rigorous review by foreign governments, the US State Department by non-US governments.

14.     Defendant Uber Technologies, Inc./Raiser, LLC is a privately held Delaware corporation based in San Francisco, California with 16,000 employees world wide.   Defendant is a mobil-ride hailing business and transacts or has transacted business in The District and throughout the world.

15.     Defendant, "Grayson" made the baseless false accusation of drunk driving against the Plaintiff. Apart from being generally identified by Uber as the passenger, Grayson's account of events of that night that formed decision rests only with Uber.  The Defendant remains a user of the Uber app.


### JURISDICTION AND VENUE

16.     This court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

17.     On May 15, 2018 Uber Technologies, Inc. ended mandatory arbitration for individual claims of sexual assault or sexual harassment.

### FACTS

18.     Plaintiff Tyler was an Uber Driver for three years.  In that time he was recognized by Uber for having given over 3,000 night time rides, and as one of the highest earning Drivers in the region.

19.     As part of his job, Tyler drove a variety of strangers  to various destinations after dark

20.     The rides were in a closed environment that typically consisted of the Driver and one passenger  Distances ranged from a five minute drive "up the street", to as far away as New York City.

21.     To capitalize on surge. Uber's designated time for higher fares based on demand, Tyler focused on high volume areas populated by people enjoying nightlife.  One consequence was inebriated passengers, difficult passenger and passengers who took advantage of the one-on-one environment to make themselves overly familiar to the plaintiff.

22.     The spike in racial harassment and assault after the 2016 presidential election also became a liability for Tyler to navigate if he wanted to continue working.

23.     Since 2016 the increase in racial harassment forced Tyler to implement measures to stay safe and continue working.  Riders perpetrating racial harassment and sexual harassment used the same tactics. Tyler's response to each was to politely distance himself from Riders who showed a pattern of aggression Tyler had seen over three years.  During these times of lowered inhibitions and a party atmosphere some Riders feel a sense of entitlement to hit on the Driver, invite them to have "some fun" or join them for a drink. It's a unique environment where the Driver is given little protection, left to protect themselves

24.     Defendant Grayson was one of Tyler's passengers the night of the false accusation.  (The details of that encounter are detailed in the attached letter.).

25.     The Rider-Driver interaction is an unusual dynamic even at it's best.  The attached letter explains what happened that night, and how the environment and Uber's neglect to ensure that the Uber experience is as safe for Drivers as Riders.

### The June 3rd, 2018 Incident

26.     The incident is detailed in the October 6, 2018 letter to Uber. (Attached)

### June 4th, 2018 Uber Ends Partnership

27.     The Plaintiff received five separate emails from four different people at Uber.  Each email was stamped with a time different from the  actual time:

i.  Edward: June 3, 2018. 6:24am (Uber stamp) June 3, 2018. 2:24am (Actual).  This email informed the Plaintiff of the drunk driving accusation.

ii.  Nathan. June 3, 2018 at 7:22am (Uber time stamp.) June 3, 2018 at 3:22am (Actual.) Announced that a "summary of our conversation" would be sent in a separate email.

iii.  Nathan: June 3, 2018 at 7:26am (Time stamped.) June 3, 2018 at 3:26am (actual). No summary was sent.  Instead an email announcing that the Plaintiff's account was placed on hold.

iv.  Ram: June 3rd, 2018 at 3:10pm (stamped.) June 3, 2018 11:09am (actual). Confirmed the Plaintiff's account was placed on hold.

v.  Ram: June 4, 2018 at 7:03am (stamped). June 4, 2018 3:03am (actual). Expressed that the account was terminated because of driving under the influence of drugs and or alcohol.  The reason for termination directly referenced an earlier accusation that was disproved by the Defendant.

vi.  Sharon: July 26, 2018 at 1:09am (stamped.) July 26, 2018 at 9:09pm (actual).  The email indicated that the case was still being investigated, could only be done by the Incident Response Team, and that Team would be in contact soon.  No contact was made by the Defendant.

vii.  Uber had a literal and extensive world of material options to justify terminating the contract it's the Plaintiff, from"we're moving in another direction," to "the 2013 Acura is outside of the five year window for Uber cars." Each justification, including the two mentioned were protected by law.  Instead the Defendant seized o the least likely option, higher charged justification that carried the greatest potential for legal and punitive punishments

### The October 6, 2018 Letter to the Uber Executive Leadership

28.  From June 4th - July26th 2018, I considered sending a follow-up letter to Uber about the case  As above, a false accusation of drunk driving on the Plaintiff's record was a grave concern, as

was the absence of acknowledgment or follow-up on the Plaintiff's sexual harassment accusation. Af-

ter the July 26th email from Uber it seemed, as the email indicated, that the case was still be investi-

gated. With no response from Uber three months after its guarantee for a conclusion to the investiga-

tion, the Plaintiff sent a letter to Dara Khosrowshahi – Chief Executive Officer, Jill Hazelbaker - Senior

Vice President, Communications & Public Policy, Rachel Holt – Vice President & Head of New Mo-

dalities and Daniel Graf - Vice President & Head of Product).  There was no way to contact Uber other

than directing communication to its Executive Team as specified by the Uber website. The letter asked

for a closer look at the false accusation, suggested ideas to improve the Uber experience all around by

preventing racial and sexual harassment, and that Uber completely remove the false accusation of

drunk driving from the Plaintiff's record of partnership with Uber.  The emailed letter received no re-

sponse. After waiting 3 months for the conclusive decision from Uber, the Plaintiff took initiative and

emailed the contacts specified on the Uber page

     29.     Over the next several months the Plaintiff debated how or if to press Uber for clarifica-

tion or request a thorough investigation into the claim of sexual harassment. At the urging of his own

conscience and the increased danger that photojournalists were experiencing, he sent a detailed letter

on October 6, 2018 to the Uber Executive Management team (Dara Khosrowshahi – Chief Executive

Officer, Jill Hazelbaker - Senior Vice President, Communications & Public Policy, Rachel Holt – Vice

President & Head of New Modalities and Daniel Graf - Vice President & Head of Product).  The letter

asked for a closer look at the false accusation, suggested ideas to improve the Uber experience all

around by preventing racial and sexual harassment, and that Uber completely remove the false accusa-

tion of drunk driving from the Plaintiff's record of partnership with Uber.  Attached to that letter was a

photo of the Plaintiff's nineteen year Alcoholics Anonymous chip and two videos showing a violent

racist attack by a Rider in Arlington, VA.  The Executive Team did not respond. On October 17, 2018

Tyler sent a follow-up email.  That night Uber called to say case closed.  Uber determined that the issue

was concluded but didn't conclusively remove the false accusation from the record of partnership, or

say how the sexual harassment claim had been investigated. A false accusation of drunk driving is a dangerous piece of misinformation to have dangling out there.  Uber's buttoned up pretty tight so you can't tell where, if or how their information about you lives.

## The October 17, 2018 Follow-Up Email to the Uber Executive Leadership

30.    The plaintiff sent a follow up email the Executive Leadership to confirm receipt Of the October 6th letter. He included links showing the arbitrary reporting of black people to the authorities for no apparent reason.  Although racial harassment was used to show the vulnerability of Drivers, and to support the capricious nature of Rider rating, racial harassment was included to support the claim not the basis.  There was no response.

## The October 17, 2018 Phone Call From Uber (recorded by Uber)

31.    The evening of the follow-up email from the Plaintiff to the Executive Leadership "Lando" (no last name given) from Uber called the Plaintiff. Lando acknowledged that the email had been forwarded to him by Uber CEO Mr.  Khosrowshahi. He reiterated several times that there "was no new information" about the case.  When asked about the reason for terminating the contract when he referenced the the two previous accusations.  The Plaintiff accepted the decision an moved on in the conversation asking about the sexual harassment claim.  "Lando" repeated "there's no new information" several times during the conversation.  The Plaintiff indicated that he understood Uber's position on the drunk driving accusation, but requested a decision on the sexual harassment claim.  "Lando" asked why the accusation wasn't made at the time the contract was terminated, apparently unaware that being summarily terminated prevented any further interaction with the team through the App, or not having read the claim for sexual harassment.  Plaintiff responded that a) it was, a very sensitive accusation used the word "play" instead of sensitive details in public b) there is no where on the app to make the

claim after Ram removed me from the platform. "Lando" stopped recording the conversation by plac-

ing me on hold. He returned to the call and repeated that there was no new information. The Plaintiff

asked about other recourse and was sent the link to an Uber page. The page offers little information

repeating full paragraphs of the same information verbatim.

At the time of the incident Uber had no process in place to review a sexual harassment claim by

a Driver., there's no way to formally report racial or sexual harassment. The Desk Support agent was

asked what happened to the sexual harassment part of the claim. He asked why I didn't make a report

the night it happened, either unaware that being summarily terminated on the spot prevented further in-

teraction with the app, or not having read the claim we were discussing. He switched gears quickly,

putting me on hold so that conversation would not be recorded. A sub subpoena of that and other

phone records will show that some of this stuff is poorly conceived or conceived to fail. This call was

the first definitive and confirmed expression in five months that the contract was terminated. It refer-

enced the incident ans an earlier accusation that Uber had decided was in fact untrue.

### FIRST CAUSE OF ACTION
#### Violation of Title VII

32.    Uber is a new business model, where its Drivers are gradually becoming recognized as

"employees" not mere contractors. Although the issue is not yet settled law, this case argues that the

protections against sexual harassment flow from the headquarters and extends to Drivers. One model

to help navigate this new territory is the temporary employee who provides professional sometimes

specialized help on different sites through the agency. Although temporary employees are legally "con-

tractors" the temp agency has no less responsibility to protect a temporary employee from sexual har-

assment.

33.    In neglecting to protect against sexual harassment and provide a transparent, reasonable method to report it Uber maintains a hostile and unsafe work environment for Drivers;defame the Plaintiff as an alcoholic and or illegal drug user; cause the Plaintiff undue financial burden and psychological distress through its actions; materially threaten his safety and livelihood with a frivolous claim with severe legal implications the Plaintiff presents this request for an award of damages:

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the court enter each of the following forms of relief:

a.    Immediate and absolute retraction of "driving under the influence" as reason for termination of the contract ; a complete deletion of any and all references, suggestions or claims that termination of partnership was based on drunk driving submitted to Plaintiff through the court as a final and thorough remedy that will not appear anywhere near the Plaintiff's record of partnership with Uber.

b.    a declaration that although the Plaintiff's contract was terminated in error, not based on driving under the influence;

c.    a declaration that Uber's review process did not comprehensively address accusations against passengers for serious claims;

d.    Defamation  per quod $25,443.98 (based on yearly earnings from June - December. )

e.    $50,000 for emotional distress and anxiety directly caused by sexual harassment, the false accusation of driving while impaired, the frustration of having no process in place to review the accusation and the added embarrassment of being publicly forced into a position of discuss-

ing sexual harassment and the private matter of recovery.  The plaintiff was diagnosed with clinical de-

pression in 2009.  AA meetings, clinical counseling 200mm daily dose of Lamictal, an anticonvulsant

medication to treat depression.

        f.           $17,000 plus legal fees for repossessed automobile due too termination of

contract, and $240 in court fees for an eviction.

        g.        $63,174.27 ($18,174.27 [lost wages between June and Oct averaged from the

same period over the previous three years] + $45,000 [based on a $10 million 2018 Uber sexual harass-

ment settlement distributed between 483 former employees in its corporate office]).

        h.        The suit seeks an additional $204,000 ($360,000 [the $120,000 annual salary of

an Uber researcher over 3 years] - $156,000 [$1000 per week as a Driver over 3years]) **if** Uber uses any

ideas proposed by the Plaintiff in the October 6, 2018 letter.

        i.        $669 for unauthorized, unannounced "deductions" from Plaintiff's earnings. Fed-

eral Trade Commission v. Uber Technologies 3:17-cv-00261 The Defendant regularly made illegal de-

ductions to the Plaintiff's earnings. (Attached is one incident.)    Working hard, possible to earn up-

wards of $2,000 per week.  That amount steadily declined due to manipulating earnings and fares

and....effectively making a cap of $2,000 and underpaying jobs.  The market wasn't soft.  Unannounced

paying one Driver $195 for 65 rides while paying another $125 for 75 rides, all things being equal time

of day, etc.

**JURY DEMAND**

        Plaintiff hereby demands a jury trial.

Dated:


EXHIBITS
Image of Alcoholics Anonymous chip
Letter to Executive Leadership
Email from Nathan
Email from Ram

Email from Sharon
Exhibit 5 Email Edward

### Plaintiff's Personal Statement

Your Honor,

    As the litigant and a citizen it troubles me to bring this suit. Uber couldn't have made a reasonable review of the driving under the influence or sexual harassment claim because it had no evidence to support or disprove either, and no interest in getting it. I beg the court's indulgence:

    This case shows a disturbing trend of lies accepted as truth, compounded with a sexual harassment allegation and no process to review it. Separately the two issues are pretty awful. Together they've been devastating. The personal fallout has been devastating.

    Consider this: This false accusation has caused the loss of my job. Future employment is threatened not only because of my work as a photojournalist but for unemployment benefits. While filing an unemployment claim after termination the application asked, "why were you terminated." The answer "driving under the influence," can be verified by the District of Columbia Office of Employment Services. Stating the reason for termination as "driving under the influence" is an admission of guilt to a government agency There's no space to explain. Even though the charge was not brought in a formal court of law, the information becomes attached to my profile in a system of government information. My car has been repossessed, I've been evicted and my credit has been damaged for the next seven years. More personally, the false accusation worsened an existing diagnoses of depression and anxiety.

    Truth has become the casualty of expediency and inertia. My concern is that acknowledging this environment may appear as political conscience when it's not. It's not possible to bring this suit without acknowledging the environment around it. Just like it's not

Uber relies heavily on solicited "feedback" from Drivers and it continued after they

terminated the contract.  Very soon after getting my October 6, 2018 letter the ideas I expressed

showed up on the site and on the app.  Approximately two weeks after my last contact with Uber,

where the representative thanked me for "the outside references", a number of changes proposed

in my letter began appearing on the Uber app and website, changes I had never seen while being

on the site or app almost daily for three years.  Two separate broadcast news reports

approximately two weeks apart: one aired a clip of an Uber initiative that installed a panic button

on the app for drivers to hit in dangerous situations; the other showed a clip of a members of a

professional sports team making disparaging comments about team business not knowing they

were being recorded, with the caveat, "be careful what you say in the back of an Uber."  Most

recognizable was the emphasis on diversity and Driver-Rider relations, a theme stressed in my

letter.  While it's possible that these changes may not be the product of the letter that proposed

them, a few subpoenas will establish that these connections are causal not circumstantial.

Thank you, your honor.


Respectfully submitted,

Sam Tyler

possible to respond to a false accusation of drunk driving without acknowledging oneself as in recovery with 19 years of continuous sobriety.

Grayson's accusation is demonstrably untrue. I wasn't drunk the night of the incident, and have not been since February 5th, 1999. Uber's acceptance of a lie for the truth as legitimate grounds for termination, simultaneously dismissing a report of sexual harassment, is consistent with its practice of deflecting issues rather than resolving them. It's a highly lucrative company but it keeps a thick wall between itself and the world, drivers in particular. One software engineer described what goes on behind that wall as "an asshole culture," (Julie Carrie Wong, The Guardian 3.7.17) where solutions that are presented as original, well reasoned and innovative are in practice stolen, reactionary and thin. It's not a stretch to say that truth doesn't matter inside that wall. But it matters a great deal outside of it.   I respectfully ask that this court intervene where Uber will not.

The attached letter to Uber was meant to underscore that drivers are highly vulnerable to the whims of disgruntled Riders. What better way to exploit that vulnerability than for a Rider to attack how a Driver earns a living.

Uber had a literal universe of options to choose from to end the partnership, all protected by law. The justifications ranged from " Uber is moving in a different direction," to "your 2013 Acura falls outside of the five year Uber requirement for automobiles " Instead it used the most damaging and provocative justification, one that has severe legal implications, one that relies on an earlier false accusation that Uber itself determined was untrue then but true now. This case refrains from asking the court to determine the wisdom or reasonableness of the "at-will" defense that Uber tends to hide behind. Instead it asks the court to review how Uber recklessly applied it.

# Attachment C

October 6, 2018

TO:    Dara Khosrowshahi – Chief Executive Officer
         Jill Hazelbaker - Senior Vice President, Communications & Public Policy
         Rachel Holt – Vice President & Head of New Modalities
         Daniel Graf - Vice President & Head of Product

FROM: Sam Tyler – Driver, Washington, DC

Re:    1) A false accusation of drunk driving.
        2) Daily sexual and racial harassment of drivers by riders.

Ladies and Gentlemen,

Uber terminated my partnership based on a false accusation of drunk driving. There was no thorough review by Uber, and no proof given by the rider. I reluctantly outed myself as a recovering alcoholic with more than 19 years of continuous sobriety to respond to the false accusation. The Uber review gave that fact no consideration. The review team pulled me off of the platform, closed my account and disconnected my phone line to Uber following. With out a thorough review of the accusation this note should go with the record of my partnership with Uber.

On July 27, 2018[1] rider "Grayson" falsely reported that I was driving drunk. On June 4, 2018 Ram at Uber ended my partnership. I said the accusation was sexual harassment from a rider. Ram decided that it happened because I was drunk. The rider was malicious and Ram was constrained by a review process that misdiagnosis serious accusations. The process misses the nuances of the driver-rider dynamic. I didn't know Grayson before that night. He showed the pattern of sexually suggestive behavior I had seen many times in three years of driving over 3,000 riders. I was cordial, polite, professional and focused on the road. I distanced myself from the rider to avoid another incident[2].

---

[1]        The time stamps on the emails are incorrect. The email from Sharon indicating that my account was on hold pending review (stamped Friday, July 27th, 2018 at 1:09am) came after the email from Ram (stamped Monday, June 4, 2018 at 7:03am) which closed the account. I include the time stamps here as they appear on the emails.

[2]        Harassment happened so often that I stopped reporting it. I scribbled notes and made mental notes to avoid getting repeat passengers. Parenthetical notes tell a street name (K St. NE), neighborhood (Mt. Pleasant) or landmark (Harris Teeter. corner).

Uber ride experience is oriented towards data from the rider-app and driver-app relationships. There's little emphasis on the driver-rider relationship. The driver-rider dynamic sets the tone inside the car and drives business more than anything.

Collectively, drivers experience harassment from riders daily.

## SEXUAL HARASSMENT

- A rider offered me $50 to give or get oral sex.

- A trans-rider took my silence as transphobia. She said that I was afraid of her. I was focused on the road. I started talking to her so that she, and anybody in my car, would feel comfortable and welcomed. She took that conversation as an invitation to touch me, grabbing my right shoulder firmly and rubbing my upper arm unnecessarily and repeatedly when she leaned forward to insist on a direction different than GPS. At her destination she said she'd be up for a while and suggested I come back.

- A rider picked up from The Eagle, a well-known hard core sex club, gave an extremely graphic description of his fetish and the bodily fluids involved. It was a first so I didn't know what to say. I was quiet, and sensed his embarrassment which made the ride uncomfortable for both of us.

- A rider called the Uber number asking suggestively for me to come back that night after I had dropped him off.

It was unexpected how sexually aggressive female riders can be. It was physical:

- A rider on her way home from DC to her wife in New York. At Union Station she stood and leaned completely over the front seat and asked three times to kiss me "on the lips". I declined. She grunted and slammed the door.

- One rider in a group of three going to club Cuba Libre reached forward twice and rubbed my right cheek with her left hand.

It was verbally direct:

2

- A rider in the front seat with her three friends in the back, turned to me as she got out and asked pointedly, "wanna have some fun?"

- Riders initiate the direct language of hooking up. One said she had just left the fourth guy she "smashed this week on the Bumble app" (dropped at apt complex off of H st.). Twice woman leaving a club volunteered that they had deep kissed three or four guys. One of those women jumped in the front seat of a non-pool ride. (dropped at Catholic Univ.). Another woman said suggestively that she goes on vacation to "f—k guys." Those comments set an awkward tone of expectation. In three of the four cases we were the only people in the car. Suggestive comments are followed with a long silence to watch and wait for a reaction.

- The rider from a DC club who left her purse in my car which was actually an empty bag. She called to say she needed back right away. She spoke in an exaggerated sultry voice explaining that she was home drinking Hennessy, could I bring the bag now. I agreed to bring it the next day. The next day I called to let her know I was outside. In the exaggerated sultry voice she asked me to come inside. I asked her to come outside. She came out in a low cut, push up top and leaned into the driver's window. She said that she had forgotten the return fee inside and asked me to come in. I insisted on waiting outside. She came back still speaking in the suggestive sultry voice. When she tried to lean in the window again I thanked her and drove off.

- The rider from Capitol Hill who talked on the phone loudly about her sexual prowess for the 45 minute ride. She yelled that she had "hallelujah p---y". I leaned further forward, against the door and as far out of the window as possible. When I adjusted away from her she scooched further into the middle of the back seat. She was leaning between the passenger and driver seat yelling into the phone about "hallelujah p---y" when the ride ended.

- The rider dropped at the Bahamian embassy residence who asked repeatedly for my personal telephone number. I said that any questions could be answered through the company. She talked about dating and relationships, that she was looking for a

3

boyfriend.  At her destination she asked again, "So you're not going to give me your number, huh?"

- The rider who flirted and said at her destination, "you know where I live."

- The rider hugging and kissing a guy when I drove up.  She told him good night, then walked towards the car.  "I'm sitting up front."  She pulled out her phone to show me her twerk videos and she said, "Guys like me 'cuz I got big t——s and a big a-s."

You can get caught between two people and the driver-rider dynamic is more nuanced:

- The woman who jumped in before the guy she was with, leaned in to me and said, "he's just a friend."(dropped at nightclub in the alley near Wendy's.)

- Several times woman on dates with guys directed their attention up front.  Some yanked hard on the seat belt repeatedly.  Two pulled so hard and so long that it felt like the seat belt was stuck.  Others jammed their knees into the back of the driver's seat, working them back and forth or kept them jammed into the seat for the entire ride. These weren't tall people.  Nothing suggests that these incidents were pleas for help on a bad Tinder date.  The mood was too light.  If it were they would have asked me to take them home when the guy got out.

- When I pulled up to SoundCheck Club (14th and K) to pick up the woman who had called, a guy jumped in with her.  From their conversation they had interacted before getting in.  He said "drive", she said "stop".  She called him another Uber, and he decided to wait in hers until his came.  I stepped out of the car for some air so he could save face.  Five minutes later he got out in a huff.  Oddly enough she invited me in for a drink at her destination.

It was a constant stream of invasive questions:

- The rider picked up from Founding Farmers (Pennsylvania Ave, Feb 2018) who got in the front seat during a pool, and immediately began a merciless interview, increasing the depth and frequency of her personal questions with each other pool rider who was dropped off.  She was the last passenger.  I learned further against the door, twisting my

shoulder away from her, a polite signal to stop the questions.  She leaned against her door drinking fragrant tea from a thermos and kept up the interview. The quieter I was, the more aggressive her questions got until she got out.

- One rider in a group of women picked up from RPM (near K and 7th.)  She jumped in the front seat, leaned her back against the door and said, "I want to know about Sam!" The questions were constant, personal, suggestive: where do you live, are you single, do you date, any kids, how old are you, what time do you get off?

Unwanted attention is flattering for about five seconds, then it gets annoying, then it gets invasive, then it gets dangerous.

- The rider who sat quietly behind me in a pool.  After the two other pool riders got out, she abruptly wrapped her arms completely around the driver's seat and slowly drew both open hands across my chest saying she just had a dream.  It caught me off guard.  I briefly lost control of the car. (Apt in Arlington, VA.)

- One rider in a group picked up from a family reunion at a hotel (Arlington, VA.)  The car was quiet except for her speculation on my age and availability.  She took my picture popping the flash.  To deflect the awkwardness the guy in the front seat started a conversation about classic hip hop.  He apologized and gave a cash tip.

- The rider from Silver Spring, MD (Regal Cinema).  She began taking my picture, popping the flash.  I asked her to stop for safety reasons.  She continued, then leaned into the front blasting the flash in my face.  I was doing about 50mph and directed her to sit back and put the camera away. She argued, took more photos then sat back.

- **Tears:** Three or more times women got in and started crying for no reason. They were in a stable normal state before getting in. The sniffles and wimpers were contrived and got louder the more I ignored them. Eventually the tears stopped and the riders held casual conversations like nothing had happened.  They were completely unidentifiable from the crying person they were getting in. I wasn't callous, and it wasn't easy establishing that boundary. The crocodile tears were a damsel in distress scene and it wasn't clear where it was going.  **Vamping:** Male and female riders strut in front of the car

5

like a fashion show then jump in the front seat. I began stopping the car with the rear right side door directly in front of the rider. Riders still walked from where they stood to cross in front of the car. One woman walked in front of the car and stopped at the driver window smiling, extended and twisted her bare leg as if to inspect it. Once in the back seat she fidgeted and strained to be seen in the rear view mirror. (By then I drove with the rear view mirror slightly slanted up, low enough to see traffic and high enough to avoid the pop of flash.)

I didn't report sexual harassment or end rides when it happened. The situation was already weird. Ending the ride might bring more shame and embarrassment for the rider. I didn't want to be harsh to anyone for giving unwanted attention. If an unsuccessful pass is thrown in a normal setting the passer or passee can walk away. Inside an Uber both people are stuck together, usually 1-on-1 for nine to forty-five minutes or longer. Feelings of anger, embarrassment, or shame can amplify. Riders get vindictive when you don't respond to their advances or suggestive behavior. One woman threw the aux cord at me. Other people slammed the door or said nothing when I said "thanks, good night." And I didn't trust the review team to consider this nuance of the driver-rider dynamic.

## PRIOR INCIDENT

Grayson's false accusation wasn't the first. In Summer 2017 a rider smelled marijuana in my car during a pool ride and reported that I had been smoking it. The details of her odd behavior and why I believe the false accusation was made is documented in my partnership record. Nothing suggests that the young woman who made this false accusation was engaging in racial or sexual harassment. It does show a gap in the Uber review process. No one reviewing the accusation noticed that the ride was a pool until I asked them to carefully review the accusation. No one asked the accuser. "Were there other people in the car?" and "When did you notice the smell?" Ultimately the accusation was determined to be false, yet Ram cited it in his explanation for why my partnership was being terminated now.

Drivers are vulnerable to illegitimate negative reviews. Drivers know the power of ratings and riders do too. Riders can be disingenuous, and drivers feel that threat. A quality control rating system is most effective when it can't be abused by passengers.

- Five people wanted to pile into my four seat car (2419 Evarts St.) NE).  I explained that four people jammed into the back stressed the door hinges, that the four person max policy applied to everyone.  One of the five riders said, "it looks like someone wants a low rating."  I let them pile in to avoid a low rating.

Some drivers may not be able or willing to talk about harassment:

- An angry rider on a residential corner got in after an earlier driver ended her ride.  The rider was livid.  She dropped a word salad when I asked what happened:  ("…didn't speak English…wrong turn…Ethiopian…no English…told me to get out…")  I've photographed Ethiopian culture and huddled with Ethiopian drivers at the gas station on U St. when it's slow.  Their guests' comfort is more important than their own inside and outside of the car. An Ethiopian driver wouldn't just end a ride.  The more the rider talked the easier it was to see how the interaction probably played out.  The rider loved Vladimir Putin because he "looked out for his own".  She adored Trump for the same reason.  She asked if I was really American, liked that I spoke English.  The Ethiopian driver probably made a wrong turn, she catastrophized the misstep and lit into him.  He ended the ride.  During her ride with me she said she didn't like Jews.  I said I was Jewish to shut her up.  We rode the rest of the trip in silence.  If she was unreasonable and forthright in her racism with me going the right way, how had she treated the Ethiopian driver who went the wrong way?.

## RACIAL HARASSMENT

I didn't report every incident of racial harassment from riders.  I'd ask the Executive leadership to take a look at those to supplement this letter.  The incidents spiked after the 2016 presidential election[3].

Most racial harassment came from men.  The women present typically laugh, or apologize as they get out.  Their apologies confirmed that what had happened was racist.  If women did initiate racial harassment it was couched in "innocent" comments about sexual prowess, or in telling stories loud enough for the driver to hear about black men who have stolen valuable items or done something illegal or shameful.

---

3       Link: Southern Poverty Law Center Nov 13, 2017 Brett Barrouquere

I stopped reporting racial harassment to keep my job. I was on thin ice with ratings. I was concerned that reporting more incidents might cause me to be seen by Uber as "that guy" who made everything about race. Everything is not about race. The things that are about race are about race. Those things have been amplified since 2017 and I didn't trust the review system to pick up on this.

## GAPS

The review system misdiagnoses what happens inside the car because it doesn't account for the nuances of the driver-rider relationship. Grayson's false claim rests on his passionate plea against drunk driving. There are two problems with it: 1) No witnesses. Before he scolded me for driving drunk he told the only other person in the car to get out 2) Nothing supports his accusation which makes you wonder how he was so sure of something that turned out not to be true. There was no breathalyzer, no drug test, no marks on my license, no legal or criminal charges, no smell or sight of drugs or alcohol on me or in the car, no rational decision to end the ride, no deep-dive review, no real conversation between the driver and rider. I have hundreds of strangers in the US and abroad, friends, family and an AA chip I carry in my pocket (attached) that attests Grayson's accusation is fantasy. He stays on the platform with credible reviews and I get fired. A system that makes this possible needs a closer look.

There are fixable gaps in the review process. One is the counter-intuitive design for communication. All issues, from lost items to a serious accusations are managed through email. The communication with Ram about Grayson's false accusation – from notification to termination – was done entirely via email. Ram mentioned that he wanted to give me the chance to respond, then ignored the key confidential and personal detail I offered. It was unwise and unprofessional to talk about the sensitivity of sexual harassment via email. So I used the word "play" in hopes that Ram would pick up on that sensitivity then pick up the phone. Instead he terminated my account ending all communication. I didn't want pity or blind acceptance of my explanation. I wanted Ram to give the incident thought. The review process treated a drunk driving accusation - compounded with a sexual harassment report - the same as it does a lost umbrella.

Counter-intuitive communication makes the review process work against itself. In his last email Ram mentioned that safety is a feature of everything we do. I believe him. But the

8

material process contradicts that. When an email is sent from Uber you have to pull over and respond. Then drive again checking for a follow up email. Then stop. Drive. Stop. This repeats until the issue is fixed. Is it safer to write and read emails when you're driving than to talk on speaker phone?

Another fixable gap is not sharing negative comments with drivers. The driver app only shows ratings and positive comments. Positive reviews show rider satisfaction, not where improvement is needed. Drivers can use negative comments to improve the Uber experience if they're allowed to see them. If rider anonymity is the concern, then negative comments can be staggered a week or two so it's less likely to connect a rider with a comment. Or negative comments can be made available on request. Drivers want to know what was said, not who said it.

If ratings dipped I called Driver Support. Driver Support assured there was nothing to worry about. I insisted on hearing negative comments anyway to improve performance. The reviews were minor negative comments. None blamed a wrong turn on being drunk.

Another gap is in how riders are asked for comments. The after-ride review asks open ended questions, which prompt open ended answers. Open ended questions are popular conversation starters and good for interviews. They're less effective for quality control. Instead of only "tell us about your ride" type questions, what if questions like, "tell us something you liked about your driver?" were included.   Specific questions set the tone of the driver-rider dynamic, make it easier to suss out legitimate from illegitimate negative reviews. High standards for quality control and continuous improvement are excellent goals. When specific questions are asked, they get more precise answers to reach those goals.

A remarkable and confusing part of the driver-rider dynamic is how riders misplace their insecurities and perceptions on the driver. This might have happened with Grayson.

- A young white law student was going to a bar (14th and U). She mentioned being from (Arkansas? Mississippi?). Racial harassment was common. I scrutinized riders while giving them the benefit of the doubt, looking for MAGA hats, Duck Dynasty t-shirts, southern accents and sadly, the American flag. I said less when signs showed a high likelihood for trouble. Saying "hello' had provoked hateful behavior. I went home early many nights feeling slimed and angry. The conversation with this passenger was friendly. I stopped to

think how to keep it that way. Before I could ask if she was a 1L she said, "You think I'm stupid!" I didn't at all. I asked why she said that. "People here think people like me are stupid." I reminded her that she was in law school, that I was driving an Uber. Reason didn't phase her, like it hadn't phased Grayson. She was upset. The rest of the ride was painfully awkward.

It's easy to miss the nuance of the driver-rider dynamic because of the gap between the reviewer and the incident. A review system oriented towards the driver-rider relationship, and managed by people in Driver Support who approach incidents differently, would make up for that distance. Not everyone answering the Driver Support phones or reviewing the serious accusations are thorough or proactive in supporting drivers. So their conclusions raise questions:

- I stopped giving veterans a 10% discount. The discount was a small hit to my earnings compared to the sacrifice of veterans. There wasn't functionality in the app to sustain the discount. A veteran would be one of several back-to-back rides over an hour or so. The next ride would come while typing the discount note to Uber. The note is canceled when a job is accepted. It's hard to ID the veterans rider details by then because it's mixed up with four or five other rider details. When the discounts stopped no one asked why. Driver Support interpreted that as being disingenuous, and urged me to "be honest".

Grayson's accusation was a rare test of the Uber review system. I don't think it passed. The accusation compounded two serious issues: drunk driving and sexual harassment. Neither issue seemed to be reviewed with the gravity either demands. A million scenarios play out globally every hour between drivers and riders, and the system can't see most of them. Human interaction is too nuanced for the review process to be cursory, especially on serious issues. The increase in racial harassment and willingness for men and women to better define then call out sexual harassment guarantees more incidents of both.

Uber won a revolution in human transport and carved out a new model: the on-demand economy. It put a lot of people back to work after The Great Recession. That simple model spawned imitations in yoga, dog walking, food delivery, helicopter rides and freight ships carry-

ing cargo off the South African coast.  Uber's epic impact has even shaped modern language, existing as both a noun and a verb.  And it's extraordinarily profitable.

So why are there gaps?

"New" Racism & New Mass Talk About Sexual Harassment – Incidents of racial harassment and hate crimes in the US spiked only two years ago. Mass public awareness and discussion about sexual harassment happened less than a year ago. No one saw this coming. Institutions, government, national policy, media and corporations were caught off guard.  Although the increase in documented incidents of racial and sexual harassment prompted more and open discussion about both, people and businesses couldn't pivot fast enough to manage the load or complexity of what is happening.

The Rider-Driver Dynamic – Uber is a revolutionary model that puts two strangers together in a closed environment often for an extended time.  Unlike taxi's, the ride happens in a personal car, and has a different set of protections.  There's no plastic partition.  Riders and drivers are encouraged to reach a healthy, reasonable level of social intimacy.  Unlike taxi's, Uber drivers are subject to a different level of scrutiny that's weighted in favor of passenger whims.

20th Century Answers to 21st Century Questions  -  Uber t uses 20th century methods of quality control in the 21st centurey. It relies on a "check the box" approach for big and small issues.  A non-personal automated review of serious issues diminishes efficiency.  It's like landing on a FAQ page that answers every question except the one you have.  In Grayson's accusation the system excluded basic features, like accurately stamping the date and time of the incident and the date and time of communication about the incident.  The nuances of human behavior are too delicate to be quantified.  When that data is interrogated it tells more precise stories.  Serious issues don't lend themselves to an automated review. Ticking boxes, being removed from the driver-rider relationship and not considering relevant real-time information that impacts an incident doesn't work in 2018.

## CHANGES

Sexual harassment leaves you feeling gross, racial harassment makes you angry. But I needed to work.  As both increased so did my boundaries.  I wanted to stay safe in a closed space

with people who didn't always see physical or social boundaries. I looked for external factors, causes and conditions that would shed light on answers.

DC is a power city with hot nightlife. It's notoriously lop-sided gender ratio makes it a hard place to date. Some riders may have an unhealthy intrigue about their driver based on positive comments from other riders. Or didn't understand that mutual respect is key to the Uber experience. Or because driver enthusiasm and good conversation can prompt over familiarity in some riders. Rider inhibitions are lowered at night. Maybe some riders wanted to see how far things might go. External factors didn't excuse harassment, they made me think that most people aren't creeps, maybe they're just lonely.

I found a road map to curb sexual harassment by listening and watching female riders, and considering #me too. Several woman talked about aggressive drivers. One rider said that her Uber driver was so aggressive in hitting on her that she jumped out of the car. Another said her driver showed up the next day and sat at the end of her street. Women who are fierce in disarming the potential for unwanted attention lay ground rules quickly for their ride: "I'm LaShon. You have the address. Thank you," then slip on headphones or make a call right away. The call is to a male loudly confirming that she'll be there shortly. When it was obvious that my only interest was to do what they were paying me for that austerity lifted. The ride ended with a warm "thank you for getting me home safely."

The spike in racial harassment was unbelievable. Washington, DC became ground zero after the election. An historic predominantly black city was now home to white supremacist gatherings in front of the White House. People wore MAGA hats on the historically black Howard University Campus[4], and yelled racist remarks at a bus load of black people on the X2 bus[5]. The election brought new government workers with a particular world view to Washington and tourists from rural communities celebrating the presidential win. Racism quickly gained momentum. Aggressive harassment and physical violence happened on nearly every shift.[6] I had never been called nigger so much in my life.

---

4               Link: The Washington Post Aug 22, 2017 Molly Roberts
5               Link: WUSA 9 Aug 20, 2018 Stephanie Ramirez
6               An attack in Arlington, VA is attached to this email. The attacker was the only person standing on the street when I responded to a rider request. I asked if he called. He said, "Get the f—k out of here you f-----g f----t!" As I drove away he yelled, "F-----g n----r!" I got out to record the incident because no one would believe it.

After Heather Heyer was murdered in Charlottesville by white nationalists a little over a year ago, I had to make changes. I closed off the front seat to non-pool rides without exception. I deleted "photojournalism major" from my bio to avoid aggression from people at war with the media. I scrubbed my bio of any details that might remotely welcome unwanted intrigue, like being a photographer, working in Cuba or studying International Affairs. I wore a turtle neck or summer scarf (careful not to wear my keffiyeh) to protect from a rear attack and rested my left hand on my right shoulder to deflect a surprise. I kept a roll of dimes nearby. These were necessary precautions to deal with unreasonable riders. On a dark trailer park road with pickup trucks on cinder blocks and a restaurant manager in the front seat calling you "boy", reason makes an exit.

I talked less, kept the conversation dry on purpose. Saying "hello" opened up abusive energy.

- I said "hello, how was your day?" to a white rider picked up from a suburban Metro stop. She answered: "I worked harder than a black woman trying to live like a white one."

Racism felt concentrated in places like Arlington or Annapolis. The riders were openly offensive. Four white riders (going to Whitlow's on Wilson) dropped words and phrases like "fried chicken, sun tan lotion, section eight housing, malt liquor, water melon" into their conversation that had nothing to do with any of these topics. The male rider in front apologized laughing when they got out. Some white riders synched with Bluetooth and chose songs that dropped the word n——h whole sale. They sang and laughed. One group of four white girls asked if I'd be offended. I suggested yes. They played the song any way, laughing.

One other thing stood out as the reason for or target of harassment: my Acura.

- A rider standing with a guy (Ava apartments corner 1st St. NE) got in. She reached for the front door. I mentioned that the rear seats were best after 6pm. She sighed getting, fidgeted in the back seat. She made a call dramatically loud enough for me to hear, describing the guy she was standing with as just a friend. In another call she described going home to role some weed and get in her pajamas. In a third call she spoke romantically asking the person to come over. Each call was very loud and highly suggestive. By the last call she was yelling. She

hung up, leaned forward between the two front seats fidgeting and checking her phone. When she got out, she leaned back in and said, "you have a really nice car."

- A white male rider got in at Dean & Deluca (Georgetown, Uber user name "bears", lower case.) He talked on the phone ignoring three or four confirmations of name and destination. Red flag. I explained that if he wouldn't confirm he was was the right person I couldn't take him. He got out and slammed the door. He eyed my Acura talking trash then spit twice on the windshield. From the sidewalk he kicked the front passenger door. He inspected the first kick, no dent. He sized up the space then kicked it a second time. "I just put a dent in your s——t! I got Jordans motherf——r!" I called the police. 8+ officers ran up Wisconsin Ave with two squad cars and a police SUV blocking Wisconsin and M. They surrounded and cuffed him. His clothes were ragged, plain especially his shoes that were beat up and off brand. He kicked at me between the officers surrounding him, emphasizing his non-Jordan's. "I got Jordans Motherf——r!! It was his own private class battle. He didn't think this black man should drive an Acura. The officer and I didn't see the dent because it was too dark. He was charged with disorderly conduct instead of destruction of property. I noticed the dent the next day.

I talked to police twice by visiting a station and numerous times when they were parked. I showed an officer (between H and NY Aves.) the dented passenger car door and talked about the harassment and attacks. She said the spike was happening globally. She called the attacks "hate crimes" to be documented in a police report the next time one happens.

## HOW IT FEELS

Harassment detonates a bomb inside the car. The shrapnel hits everybody.

- A white male pool rider (2188 I st.) wouldn't answer his phone. He walked unusually slow to the car when I drove up. The white couple were agitated. I pointed out that this was a pool with other riders. He said, "You wait for me, I don't wait for you." To avoid tension and not delay the couple I ended his ride. Getting out he said, "f—k you you f ——g f——t! F——g n——r!" It shocked the white couple in the back more than it did me.

Sexual harassment trivializes an intimate part of human expression, and it's done by a complete stranger.  There's nothing redemptive for people who talk about experiencing sexual harassment.  You don't want to relive the incident or stress about communicating something and not have people understand.  There's a different trickiness for guys.  People, especially other guys, treat unwanted attention like it's a good thing.  It's hard to list the incidents and paint the context of Grayson's accusation.  I didn't want to be seen as conceited or arrogant.

Ratings were a main concern.  I worried that ratings would be low for enforcing boundaries.  Did the four glam women going to the club give me 1 star for asking them to lower the camera?  Was the blonde soccer mom with a high earning husband offended because I was quiet when she wanted to talk about her "boobs"?

I'm not a blind prude.  I've met over 3,000 people driving for Uber.  Three were women who shared a mutual, respectful, consensual and light-hearted connection that ended with a burrito at Chipotle.

## GUERRILLA TACTICS

Nothing at all suggests that Grayson's false accusation was motivated by racism.  But riders who traffic in sexual or racial harassment use the same play book.  They use non-violent guerrilla tactics – small scale, constant surprise assaults using what's available and calculated to do the most damage with little effort. Guerrilla tactics are passive-aggressive and hard to defend against because of plausible deniability ("I was just talking on the phone…it was just a joke…the driver misunderstood…) A pattern of rider behavior emerged that explained or telegraph harassment.  A rider won't physically attack you, they will try to get you fired.  And what better way to harass someone who earns their living driving than to accuse them of drunk driving.  It's a twisted non-violent power play that's effective. It's not organized or formally defined or recognized by people who use it.

Classic guerrilla tactics track closely with some rider behavior and shows a nuance of the driver-rider relationship.  Guerrilla tactics are done to insult and destabilize.  Racists use them a lot now: a white woman calls the police on a black woman for using too many coupons. A Muslim mother and daughter are viciously berated for shopping at Target; a white person calls the police on a black boy on the first day of his new paper route; Latinos threatened with deportation

by people with no authority. The tactic is so popular that a Brooklyn State Senator has proposed legislation making calling the police on innocent black people a hate crime[7]. The tactic relies on legitimate things, like law enforcement or a review process, to hurt people.[8]

One tactic is contrarianism. A rider confirms that GPS is OK. After a right turn they say you should've went left, and vice versa for a left turn. They say the car is too hot, then complain when the heat is on. They ask a question then change the subject, then talk about the most absurd topics and take the most absurd positions. They shake the peace by yelling unexpectedly when you slow at a stop light. They send you in the wrong direction, or off the wrong exit, then lament repeatedly that you went the wrong way. It's about initiating mean spirited confusion to make a point about your inability. Contrarians aren't frat types "just messin'" with the driver or senior citizens getting their bearings. They're riders who set up negative comments to destabilize driver confidence and frustrate the Uber experience. It's an adolescent tantrum. Left is right, up is down, apples are oranges. The rating and review system can't process this nuance.

Riders who use guerrilla tactics want to force control inside the car. Sexual harassment isn't about gender, it's about power, in my view. Racial harassment felt like a white hot response by racists to their new symbol of executive power. That symbol was being corroded by scandal and ineptitude. People who celebrated that symbol simultaneously acted threatened and emboldened. I noticed that people who engaged in harassment were uncomfortable until they started to harass. I reported an incident where a white male in the front seat spit in my face. Before it happened he was increasingly agitated. He didn't feel I engaged enough with him and the two other white passengers. This unreasonable demand had happened before with white riders.

After Uber unplugged me I went to other company. A passenger reported that I was driving drunk. It was a colossal WTF moment. This time I pressed the company hard for precise details. Without outing myself as a recovering alcoholic with long term sobriety, I emphasized to the company that something here was very wrong. I insisted on knowing all of the details. A manager called me and suspended the no details policy. Me: What exactly did the comment say, verbatim? Manager: "Driver drunk" Me: How exactly did the rider draw that conclusion? Manager: "Wrong turn." Me: Did the driver see or smell any drugs or alcohol on me or in the car?

---

7           Link: The Huffington Post Aug 20, 2018 Dominique Mosbergen
8           Link: Vox May 29. 2918 Vesla Mae Weaver

Manager: No. Me: If the rider really believed I was drunk, why didn't they end the ride? Manager: Good question. The rider was my last passenger. I remembered him. Short ride, sixty-ish tall white male in a USA T-shirt with an American flag. He himself sounded drunk. He played the left right game, sending me to the wrong address when I called (The rider sees the driver's picture when the car is sent), coming out of a different house, scolding me for stopping at the given address and not seeing him at the unspecified house. I didn't say anything during the ride. The manager saw there was nothing to hang a drunk driving accusation on. She reinstated my account immediately. She urged me to call right away if that happened again.

Soon after that incident this company got aggressive with harassment. It formally reviewed harassment claims through its corporate Human Resources office instead of Driver Support. A call of racial or sexual harassment is received. The Driver Support rep asks questions to determine that it is in fact harassment. In less than three minutes the driver is connected to a 24 hour corporate HR Specialist who asks specific where/when/how questions and probes with thoughtful follow-up questions. The mind set is that a person reporting harassment must be listened to as carefully as a rider's report. The HR Specialist regularly apologizes that the driver had to go through that and confirms that you're safe, if you need the police. The report is filed, the incident documented and the rider flagged. The HR Specialist follows up the next day.

Grayson's accusation was malicious. The real problem was the process that reviewed it. I didn't experience sexual assault. And the harassment that did happen wasn't as frequent or severe as that experienced by woman daily. I probably wouldn't have reported sexual harassment if it hadn't caused my termination. Grayson's accusation shows how sexual harassment doesn't have to be assault or physical aggression to do damage. Harassment can snake through a review system and jam it up like sugar in a gas tank.

## IDEAS

For three years I had a front row seat to see human behavior play out in the Uber universe. Every rider inspired me to compare the ideal Uber experience with what actually happens inside the car. I'd like to offer a few ideas:

1) CAMPAIGN (3 PARTS) - The first part is to blast the general public with a funny campaign that shows rider and driver diversity. Something like, "We Get Around On Diversity!". Full

page ads. Clowns (or puppies dressed as clowns) piling into an Uber, the driver frozen in terror, staring straight ahead.  Under that imagery is a long list of people who ride Uber.  The real list morphs into a funny, improbable list:  (students, bankers, housewives...dreidel spinners, macrame specialists, stand-in Understudys...) Showing who Uber works with everybody doubles as a recruitment and retention tool.  Include the "How To Drive For Uber" link.

The second part is for drivers,  an internal initiative called "End It!" that reaffirms and clarifies Uber's "we've got your back" position in empowering drivers to stop rides where they're threatened, harassed or uncomfortable.  Some stage direction would help drivers navigate sticky situations. A bullet list that defines harassment and what to (and not) to do.  Neither campaign rattles the driver or rider.  The parts of the campaign taken together show corporate leadership and curb derogatory tendencies inside the car.

The final part is for riders, flash a quick reminder of the great experience they're stepping into immediately after they book a ride.  A note about how proud Uber is of its diverse team.  Include another link to sign up to drive. Riders will know more about the driver than their favorite restaurant. Address sexual harassment, too.   To a lonely rider, asking a driver for their personal telephone number, or insisting that you join them at the club seems reasonable. Another flash announcement can will cue riders to act differently: "Uber Drivers are great dancers, but it makes for a bumpy ride.  Let them get you to the nightlife safely."

This campaign won't change minds, it will contain riders prone to harassment.  People who traffic in sexual or racial harassment may not know it or care.  They're busiest when no witnesses are around.  What better way to secure their buy-in than a campaign that doesn't appear to call them out?

2) LEVEL UP FOR THE 21ST CENTURY (2 PARTS)

Train reviewers, especially those reviewing serious accusations like drunk driving, to interrogate the data.

At each hub hire a designated point person with a rich back ground in cultural competency, diversity and Human Resources.  Help reviewers to see that if it's happening in the world it's happening in the car.  Prompt driver support staff to identify what drivers and riders have in

common, then chat about current events like males reporting sexual harassment.  It keeps the dynamic transparent for reviewers. If it's happening in the world its happening in the car.

Give drivers who experience harassment the chance to meet with the point person at the hub and decompress.  It's not therapy. It's a chance to check-in, to talk.  If the incident involves aggressive sexual or racial harassment, drunk driving, or is violent or generates a police report then pull the driver into the hub. Sit them down. Take a look a them. Talk to them: "What happened out there?" Record the interview in person instead of over the phone or email.  Drivers know its serious, and will cooperate to clear their name and get back on the road ASAP.

3) SURPRISE RIDERS (1 PART) – There's a widely held belief that Uber observes drivers by using secret riders.  It's a great idea that would be better if this were transparent. Be open. Use it to gather data and listen for real-time experiences that shapes data into an accurate narrative. Perfect five star drivers are great.  A wider sample that includes 3 and 4 star drivers would offer perspective that perfect drivers might not.

Drivers have stories! Ask about them.

"*Hey Tomas, thanks for picking me up.  I'm Zach with Uber.*" The driver's first thought will probably be that they're going to get yelled at, so setting a conversational tone right away would work magic.  *"We've noticed you've been driving a lot, so we wanted to come by and say, thanks!  Did you just come out? How long are you staying out today? Have you eaten yet?* Give them a five dollar voucher for a Subway six inch during the ride  *"Do you drive in this neighborhood often or someplace else? What are your customers like? What do you do when you're not driving? What's your most memorable experience? Have you seen the new section of the app about you guys staying safe?*"

A good fare ensures time to talk.  A nice tip says thanks. The fare plus tip doesn't have to be like the big bonus five star drivers get.  It's a gesture of  thanks and an incentive to keep pushing for five stars.

## SUMMARY

No one saw that racial harassment would make a powerfully overt re-appearance, that sexual harassment would be shown by so many victims publicly for the deep stain it is, and that

both would be legitimized from the top. This is where we are. We're going to be here for a while. It doesn't have to be permanent. Education, an aging out of old thinking, civic engagement and corporate involvement will end the madness. Drivers do what we can to ensure a healthy driver-rider dynamic, but we're limited. Drivers lack the authority, reach and resources to lessen racial and sexual harassment inside the car as thoroughly as Uber can.

It's virtually impossible to go wrong aligning a brand against racism and sexual harassment. Success is baked in. Every talking point against sexual and racial harassment speaks to the decency in the human heart. Nike and Starbucks know it and it shows on the trading floor. What's happening in the country is cultish behavior. How can that be arrested? How do you solve problems that impact everyone when part of whole is unconvinced of the proven causes? Where do you make a place at the table for the white pride, anger, religious beliefs that discredits the beliefs of others? How do you reason with people when the facts don't matter to them? One answer is by using a wraparound approach. Uber may not be able to change minds, it can contain abusive behavior.

The driver-rider dynamic defines the Uber experience. When it isn't managed well it makes a pressure chamber inside the car. No driver works for a low rating. The goal is five star service. That effort and the Uber ethos are frustrated by some riders. Some riders use toxic ratings and comments to pass judgment on drivers for who the driver is outside of the car, not the Uber experience. High quality service hasn't changed. The attitudes and perceptions of too many people rating it has. And it's hard for the rating and review system to see behind this curtain.

If it's happening in the world, it's happening in the car.

## CLOSE

I don't duck legitimate negative comments or ratings. I wasn't very good at Uber Eats. With UberX or Pool I occasionally missed the mark compared to when I drove my A game. I drove a lot. It gave me the flexibility to go back to school and to finance photographing a thesis project on the global refugee crisis. I traveled to South Asia, the Middle East and East Africa. A tremendous diversity of riders was as excited to talk about my thesis as I was to be shooting it. Many tipped to help with the shoot. One rider was the Editor of Wired magazine who arranged to

publish a story on spec when principle photography wrapped. Another passenger set up a meeting with an entrepreneur who funded me to shoot in Istanbul and at the Turkish-Syrian border. I had a great chat about the refugee project with Uber General Manager, Carrol Chang and her husband when I picked them up for date night. My focus was camera equipment and plane tickets. Working a lot of hours made me less patient from time to time and that showed in ratings. It wasn't burnout. It was diminishing returns. The closer I got to buying the camera body, the less I slept.

After this Photojournalism program I'll be working abroad. That requires deep background checks and security clearances. A false accusation of drunk driving on my record is a big problem. Even if the Executive Leadership dismisses this memo because I stopped reporting harassment or because the incidents and experiences expressed here are from just one driver this note needs to accompany the record of partnership with Uber.

Sexual harassment isn't about gender, it's about power, in my view. Driving 3,000+ rides gave me a front row seat to human behavior. By the time Grayson got in I had seen it all. That night partiers spilled onto the street in front of the nightclub (near 7th and U). Grayson appeared in a tight white tank top wearing a few gold chains. He vamped in front of the car smoking a cigarette like a Hollywood celebrity. He looked at me then the hood of the car. He opened the rear passenger door to say someone else was coming. When she came he crossed to the other side and got in behind me. His grand entrance and decision to sit behind the driver worried me. I braced for the knee into the seat or a tug on the belt. I didn't want to dodge aggressive come-ons from anybody or manuever racist knuckleheads. I wanted to work.

I kept the talk short and professional to focus on the road. I slowed at a fork in the road on George Washington Parkway. That road has no street lamps or stop lights. Pedestrians cross in front of cars. The lanes twist across traffic merging from the other side. The GPS wasn't helping. I pulled up Grayson's address on the app to work from the memory of getting to similar destinations.

When we stopped at his destination he told the woman to get out then said I was drunk. I considered the gravity of the accusation, of being hauled in front of a judge, losing a clean license, getting a negative rating, how to weather another bogus accusation. The accusation wasn't

true, but the mere mention threatens your job. You worry about a million things. He kept making the case that I was without question drunk, like saying it over made it true. His demeanor was too calculated and calm to think he was going to die. He made a public service announcement directing me to never drive drunk again, then got out. Grayson threw a pass, I didn't catch it and his ego was bruised. What better way to hit back at someone who earns their living driving than to accuse them of drunk driving. He went into Guerrilla mode. He wanted payback, and he got it.

When my degree program in Photojournalism & International Affairs at George Washington University ends I'll be working abroad. Security clearance, domestic and international background checks are typically required. A false accusation of drunk driving is a real problem.

I had a great run with Uber! I told riders that Uber was "a better mousetrap," and still believe it. The independence to design your own workspace and set an earning goals were things I had never had in a job. Uber's ethos, global reach, and overall flow were added values. I'd ask that the Executive Leadership take a closer look inside the car that night, considerate the facts that Driver Support ignored by ending all communication and reinstate our partnership. Thank you.

Attachment 1: Video A

Attachment 2: Video B

Attachment 3: Photograph

SUPERIOR COURT
OF THE DISTRICT OF COLUMBIA
WASHINGTON, D.C. 20001

OFFICIAL BUSINESS
PENALTY FOR MISUSE

Molly
Uft

Ethan

Uber Technologies
815 Connecticut Avenue NW
Suite 400
Washington D.C. 20006

RECEIVED
NOV - 8 2019
DDLS

# Superior Court of the District of Columbia
## CIVIL DIVISION
### 500 Indiana Ave., N.W., Rm—JM-170
### Washington, D.C.   20001

*Plaintiff*

vs.

Civil Action No. _____

*Defendant*

## ANSWER OF DEFENDANT

DISTRICT OF COLUMBIA, ss:

The defendant, for answer to the claim of the plaintiff herein, says that he said plaintiff is not entitled to have judgment as demanded in the complaint for the following reasons:

_____

_____

_____

_____

_____

_____

And, therefore, said defendant respectfully demands that this suit be heard in open court.

| DEFENDANT: | ADDRESS: | TELEPHONE NO. |
|---|---|---|
| | | |
| COPY MAILED TO: (ATTORNEY FOR PLAINTIFF) | | |
| | | |

Form CV(6)-451 / Dec. 91

2-0881 wd-155