## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| SAMUEL TYLER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 19-3492 (ABJ) |
| ) | |
| UBER TECHNOLOGIES, INC., *et al.*, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

## MEMORANDUM OPINION

*Pro se* plaintiff Samuel Tyler provides ride-sharing and food delivery services to customers through Uber.  He filed this action against Uber Technologies, Inc. ("Uber"), and a passenger he refers to as "Rider Grayson."  *See generally* Am. Compl. [Dkt. # 9].  Plaintiff was connected with Grayson through the use of Uber's smartphone application in June 2018.  Am. Compl. at 14.  Plaintiff alleges that during the ride, he rejected Grayson's sexual overtures, and Grayson retaliated by filing a complaint with Uber alleging that he was driving while intoxicated. Am. Compl. at 5.  Based on those circumstances, plaintiff claims that he was a victim of sexual harassment.  Am. Compl. at 5; Ex. A to Mot. to Dismiss [Dkt. # 13-2] ("EEOC Compl.") ¶ 4.  He also alleges that Uber's subsequent termination of his contract on the grounds that he was driving while intoxicated was unlawful for several reasons.

The complaint alleges that Uber failed to provide a safe working environment free from sexual harassment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"),[1] 42 U.S.C. § 2000e *et seq.*, and D.C. Code § 50-301.29a; that Uber discriminated against plaintiff on the basis of his status as a recovering alcoholic in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12111–12117; and that Uber violated the requirements of D.C. Code § 50-301.29a – which governs the investigation of allegations of impropriety in for-hire vehicles – when it terminated plaintiff's contract based on an inadequate investigation.  Am. Compl. at 7.

After removing the case to this Court pursuant to 28 U.S.C. §§ 1331, 1332(a)(1), 1367, 1441, and 1446, Uber moved to compel the arbitration of all of plaintiff's claims except for those alleging sexual harassment.  Def.'s Mot. to Compel Arbitration of Pl.'s Compl. [Dkt. # 6]; Def.'s Mot. to Dismiss Pl.'s Sexual Harassment Claims [Dkt. # 13] ("Mot. to Dismiss") at 1.  With respect to those claims, defendant has filed the instant motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  Mot. to Dismiss at 1; Fed. R. Civ. P. 12(b)(6).  Plaintiff has opposed the motion.  Pl.'s Mem. of P. & A. in Opp. to Def.'s Mot. to Dismiss [Dkt. # 17] ("Pl.'s Opp.").  Because the amended complaint, considered in conjunction with all of the plaintiff's pleadings in this case, does not plausibly allege that plaintiff is an employee of the defendant as opposed to an independent contractor, it does not state a claim for a Title VII violation, and defendant's motion to dismiss the sexual harassment claims will be granted.  The

---

1    Plaintiff relies on *Spirides v. Reinhardt*, 613 F.2d 826 (D.C. Cir. 1979), as the basis for his cause of action that Uber "didn't fulfill its legal obligation to ensure a safe working environment for Plaintiff[.]"  Am. Compl. at 7.  Because *pro se* plaintiffs' filings are to be construed liberally, *see Erickson v. Pardus*, 551 U.S. 89, 94 (2007), the Court interprets this claim as invoking and relying on Title VII, which was the basis for the plaintiff's claim in *Spirides*.  613 F.2d at 827. Moreover, plaintiff alleged a violation of Title VII in his EEOC Complaint.  EEOC Compl. ¶¶ 32-33.

claims brought pursuant to D.C. Code § 50-301.29a also fail as that provision does not give rise to a private cause of action. Whether the rest of the claims are subject to arbitration will be addressed in a separate Memorandum Opinion. The Court notes that nothing in this opinion should be read as expressing any point of view about the truthfulness of plaintiff's allegations concerning the interaction with passenger Grayson: the dismissal of these claims is based solely on the face of the complaint, accepting it as true and applying the legal authorities. Nor does this opinion express any doubt about whether plaintiff has suffered the damages he alleges; the only question that has been considered at this stage is whether he has stated a proper legal basis for his lawsuit.

## BACKGROUND

Plaintiff drove a for-hire vehicle in the Washington, D.C. metropolitan area for "[o]ver three years," using defendant's mobile application ("Uber App") to connect with riders. *See* Am. Compl. at 14. On June 3, 2018, plaintiff connected with Grayson using the Uber App. Am. Compl. at. 14. Plaintiff alleges that during that ride, Grayson took "his shot" at him and engaged in "sexually suggestive behavior." Am. Compl. at 14. Plaintiff states that he responded by "minimiz[ing] interaction," to protect himself and to protect Grayson "from the discomfort of disinterest." Am. Compl. at 14. Plaintiff characterizes Grayson's behavior as "wanting to play," but he does not specify what Grayson said or did, and he provides few details about the interaction. Am. Compl. at 6, 14. According to plaintiff, at the end of the ride, Grayson accused plaintiff of driving drunk, and he subsequently filed a formal complaint with Uber. Ex. E to Am. Compl. [Dkt. # 9] at 20. Plaintiff avers that he was not intoxicated during the interaction with Grayson; indeed, he insists that he has been sober for nineteen twenty years. Am. Compl. at 2 n.2, 10–12.

In response to Grayson's allegation and pursuant to D.C. Code § 50-301.29a(9)(B), Uber suspended plaintiff's Uber account while it conducted an investigation. *See* Ex. E to Am. Compl.

at 20.  The next day, June 4, Uber terminated its partnership with plaintiff after "complet[ing] a full review of [his] account and identif[ying] similar reports from past riders."  Ex. F to Am. Compl. [Dkt. # 9] at 21.  Plaintiff alleges that Uber's investigation into the allegation did not satisfy the standard required by D.C. Code § 50-301.29a(9)(C).[2]  Am. Compl. at 10.

Plaintiff's position is that Grayson made the drunk driving accusation in retaliation for plaintiff's rejection of his advances, and according to the complaint, the allegation itself constitutes sexual harassment on Grayson's part.  Am. Compl. at 5.  He attributes responsibility to Uber as well, and the complaint also alleges that Uber has "fail[ed] to ensure a work environment safe from sexual harassment."  Am. Compl. at 1.  Plaintiff claims that by terminating its relationship with him based on Grayson's allegation, Uber "defame[d] the Plaintiff as an alcoholic and or illegal drug user . . ." and ". . . materially threaten[ed] his safety and livelihood with a frivolous claim with severe legal implications."  EEOC Compl.  ¶¶ 32–33; Am. Compl. at 11–12 (citing EEOC Compl.).

Plaintiff identifies what he labels as "questions under [the] law" in his amended complaint, and he appears to predicate his sexual harassment claim on two statutory provisions.  *See* Am. Compl. at 6–7.  He argues that Uber had a responsibility to establish a work environment "free from racial and sexual harassment for both rider and driver" pursuant to Title VII and D.C. Code § 50-301.29a(10)(A)(ii).  Am. Compl. at 6–7.  In moving to dismiss, defendant contends that

---

2       The D.C. Code requires each private vehicle-for-hire company to "[e]stablish a policy of zero tolerance for the use of alcohol or illegal drugs or being impaired by the use of alcohol or drugs while a private vehicle-for-hire operator is logged into a private vehicle-for-hire company's digital dispatch[.]"  D.C. Code § 50-301.29a(9)(A).  Subsection (9)(C) of the statute provides that "[a] private vehicle-for-hire company shall:  Conduct an investigation when a passenger alleges that a private vehicle-for-hire operator violated the zero tolerance policy established by paragraph A of this subparagraph[.]"  *Id.* § 50-301.29a(9)(C).

plaintiff is an independent contractor and, therefore, does not qualify for the legal protections that Title VII provides to employees.  Def.'s Mem. of P. & A. in Supp. of Mot. to Dismiss [Dkt. # 13-1] ("Def.'s Mem.") at 2.  It further argues that D.C. Code section 50-301.29a does not give rise to an express or implied private right of action, and that plaintiff therefore has no standing to sue under that provision.  Def.'s Mem. at 2.  The motion to dismiss does not address plaintiff's other theories for relief.

## STANDARD OF REVIEW

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In *Iqbal*, the Supreme Court reiterated the two principles underlying its decision in *Twombly*: "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Iqbal*, 556 U.S. at 678.  And "[s]econd, only a complaint that states a plausible claim for relief survives a motion to dismiss."  *Id.* at 679, citing *Twombly*, 550 U.S. at 556.

A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  A pleading must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action," *id.*, quoting *Twombly*, 550 U.S. at 555, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*

5

In evaluating a motion to dismiss under Rule 12(b)(6), a court must "treat the complaint's factual allegations as true and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (internal citation omitted), quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979); *see also Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011), quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005). Therefore, when considering a motion to dismiss, a court must construe a complaint liberally in the plaintiff's favor. *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).

Furthermore, in a case where the plaintiff proceeds *pro se*, the complaint, "'however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" *Erickson*, 551 U.S. at 94, quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). In other words, the Court can assure plaintiff that it does not expect a *pro se* litigant to write with "the same polish" as someone trained as a lawyer. *See* Plaintiff's Letter to the Court [Dkt. 11]. Nevertheless, the court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the court accept plaintiff's legal conclusions. *Kowal*, 16 F.3d at 1276; *see also Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). In ruling upon a motion to dismiss for failure to state a claim, a court may ordinarily consider only "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002), citing *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624–25 (D.C. Cir. 1997).

## ANALYSIS

### I.   Plaintiff's Title VII Claim

Title VII of the Civil Rights Act of 1964 states that

> It shall be unlawful employment practice for an employer –
>
> > (1)  to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
> >
> > (2)  to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a); *see also Singletary v. District of Columbia*, 351 F.3d 519, 523 (D.C. Cir. 2003) (recognizing that section 2000e-2(a)(1) forbids discrimination by private employers).

Defendant contends that plaintiff's Title VII claim must be dismissed because he was not an Uber employee:  he was an independent contractor.  Def.'s Mem. at 7.  Plaintiff does not specifically address this question in his opposition, *see* Pl.'s Opp., but in his surreply, he directed the Court to arguments he presented on this issue in earlier filings.  *See* Pl.'s Reply Mem. of P. & A. in Further Opp. to Def.'s Mot. to Dismiss [Dkt. # 22] ("Pl.'s Surreply") at 2.  Given that plaintiff is proceeding *pro se*, and he has addressed his employment status at length in various filings, the Court will not assume, as defendant asked it to do, that he has decided to concede this issue.

To determine whether an individual is an employee or an independent contractor, a court must look to a variety of factors to assess the "economic realities" of the relationship.  *Spirides v. Reinhardt*, 613 F.2d 826, 831 (D.C. Cir. 1979).  Although "no one factor is determinative," "the extent of the employer's right to control the 'means and manner' of the worker's performance" is

"the most important factor." *Id.* "If a [putative] employer has the right to control and direct the work of an individual, not only as to the result to be achieved, but also as to the details by which that result is achieved, an employer/employee relationship is likely to exist." *Id.* at 831–32.

A court must also weigh the following additional factors:

> (1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the "employer" . . . furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated; i.e., by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the "employer"; (9) whether the worker accumulates retirement benefits; (10) whether the "employer" pays social security taxes; and (11) the intention of the parties.

*Id.* at 832.

Here, the complaint does not include information related to the eleven factors that would support an inference that plaintiff is an employee, and most importantly, it fails to support a plausible claim that Uber controlled the means and manner of his work.

The second factor – whether the work performed involved special skills, and the eighth – whether the work is an integral part of the business of the employer, will be considered together in light of the D.C. Circuit's guidance that "[a]n affirmative answer to these questions may call into question the business bona fides of the decision to hire an independent contractor, possibly suggesting a purpose to circumvent rights afforded to employees." *Redd v. Summers*, 232 F.3d 933, 939 (D.C. Cir. 2000). The amended complaint is silent on the second factor, but other circuit courts have held that driving is not a service that requires a special skill, and this can make a driver more akin to an employee than an independent contractor. *See, e.g.*, *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 147 (3d Cir. 2020) ("It is generally accepted that driving is not itself a special skill."),

citing *Alexander v. FedEx Ground Package Sys., Inc.*, 765 F.3d 981, 995 (9th Cir. 2014). So this factor weighs in favor of finding that Uber drivers are employees. And as to the eighth factor, the amended complaint describes the Uber/driver partnership generally and makes references to "Uber's business model." *See e.g.,* Am. Compl. at 8 ("[Uber's] business model relies on a higher level of social intimacy between riders and drivers.") While this allegation is not the clearest way to express that the services provided by Uber drivers are integral to Uber's business, at this stage of the case, when the *pro se* plaintiff's complaint must be read in the light most favorable to him, the Court finds that this allegation, taken in the context of the complaint as a whole, supports an inference that Uber's business model relies upon the services provided by Uber drivers. *Kowal*, 16 F.3d at 1276. Thus, the complaint contains allegations with respect to factors two and eight that are consistent with an employment relationship.

But that is the extent of the good news for plaintiff. The amended complaint is silent with respect the first factor: "whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision." At no point does plaintiff allege that drivers work under any person who dispatches them or oversees or directs their work in any way.

As to the third factor, whether Uber furnished equipment to plaintiff, the amended complaint makes it clear that plaintiff relied on the Uber application, but it does not allege that Uber furnished him with any other equipment, such as a phone or the car he drove. Indeed, plaintiff's own submissions acknowledge that the car was his.[3] So this factor weighs against a finding that plaintiff was an Uber employee.

---

3       In his Personal Statement included in his EEOC Complaint, [Dkt. # 13-2 at PDF 18-20] referenced in the amended complaint at 4, plaintiff notes that Uber had many potential justifications for terminating the partnership legally, including by saying "your 2013 Acura falls outside of the five year Uber requirement for automobiles." *Id.* at 19.

The fourth factor, the length of time during which the individual has worked, suggests plaintiff was an independent contractor.  The amended complaint alleges that plaintiff worked as a driver for more than three years, and that he also worked internationally as a freelance photojournalist.  Am. Compl. at 12.  This flexibility suggests that Uber drivers are more akin to independent contractors than employees.

The amended complaint does not contain any allegations that address the fifth *Spirides* factor: whether plaintiff was paid based on the time he worked or the number of drives he completed; the seventh:  whether annual leave is afforded; the ninth:  whether plaintiff accumulated retirement benefits; or the tenth:  whether the 'employer' pays social security taxes.

The allegations concerning the two remaining factors do not support an inference that plaintiff was an employee.  Factor six, the manner in which the work relationship is terminated (i.e., by one or both parties, with or without notice and explanation) involves an "inquiry . . . whether the business is exercising a degree of control that seems excessive in comparison to a reasonable client-contractor relationship."  *Redd*, 232 F.3d at 939.   Here, the amended complaint alleges that plaintiff's contract was terminated by Uber, one day after Uber received the drunk driving complaint from Grayson and after it considered similar complaints it had previously received.[4]  *See* Am. Compl. at 6, 11; Ex. F to Am. Compl.  Plaintiff alleges that he received an explanation – indeed, it is the explanation that he disputes, *see* Am. Compl. at 6 – but that his account was terminated before any investigation took place.  *See* Am. Compl. at 5–6.  The

---

4       The amended complaint states:  "The prior references to marijuana don't prove that the Plaintiff was driving under the influence, they show a shift in the social and legal climate of Washington, DC."  Am. Compl. at 11.  It goes on to explain that the two prior incidents, which took place in 2016 and 2017, occurred after the District legalized marijuana and that plaintiff "drove almost exclusively at night and weekends, when the smell of marijuana lingered in Ubers, and at street level."  Am. Compl. at 11.

complaint also alleges that the District's Zero Tolerance Law mandates that ride-share companies "[e]stablish a policy of zero tolerance for the use of alcohol . . . while a private vehicle-for-hire operator is logged into a . . . company's digital dispatch." Am. Compl. at 10, quoting D.C. Code § 50-301.29a(9)(A).  So the complaint does not allege that plaintiff was terminated based on an inquiry that would involve a comparatively intrusive or excessive level of control.

With respect to the eleventh factor – the intentions of the parties – plaintiff's own allegations in this case reveal an express intention to be something other than an employee:  "Your Honor, [Uber] drivers don't want to be employees.  We enjoy the open road, the flexibility to earn a little extra for a family vacation while being home when the kids get in, or to pursue a freelance vocation."  Am. Compl. at 14.  Plaintiff's characterization of the advantages of Uber driving undermines his efforts to state a claim based on a plausible inference that he has the employee status necessary for a Title VII action.[5]

In sum, even if one looks at the complaint in the light most favorable to the plaintiff, it contains allegations that would support only two of the eleven factors; there are specific allegations that point towards an independent contractor relationship with respect to four of the factors; and it is silent with respect to the remaining five factors.

This brings us then, to the overarching question of control, and the complaint is devoid of allegations that Uber dictates the "means and manner" of the driver's performance.  Control for

---

5      Uber's motion repeatedly references the terms of the Agreement plaintiff signed through the Uber App that allowed him to work as an Uber driver. *See generally* Def.'s Mem.  But the terms of the Agreement are not specifically incorporated in the complaint, so they cannot be considered in connection to the motion to dismiss, *see St. Francis Xavier*, 117 F.3d at 624, and they would not be dispositive in any event. *See Spirides*, 613 F.2d at 833 ("The Court should have reviewed all of the circumstances surrounding [the plaintiff's] work relationship in addition to its consideration of the elements of her . . . contract.").

purposes of an employment relationship can involve such elements as job training, regular supervision, "set[ting] out [a] daily routine," and "t[elling] [an employee] what tasks needed to be done[.]" *Holt v. Winpisinger*, 811 F.2d 1532, 1539 (D.C. Cir. 1987).   But plaintiff has not alleged that Uber trained him, established his schedule, specified the tasks to be completed, or oversaw his work on a day-to-day basis.

Plaintiff does allege that the company keeps track of passenger reviews.  Am. Compl. at 11. But as another court in this district has noted, performance reviews based only on an end product do not by themselves establish control if the defendant is not involved in the actual performance of the work.  *Zhengxing v. Nathanson*, 215 F. Supp. 2d 114, 117–18 (D.D.C. 2002), *aff'd sub nom. Zhengzing v. Tomlinson*, No. 02-5267, 2002 WL 31926829 (D.C. Cir. Dec. 31, 2002), citing *Redd*, 232 F.3d at 938, and *Cobb v. Sunpapers, Inc.*, 673 F. 2d 337, 341 (11th Cir. 1982) (plaintiff was an independent contractor because he was not told how to perform the job; "the criterion used by the Defendant in connection with this relationship was the quality of the work actually performed"). The analogy to a ride-sharing service is not perfect, but collecting a review after a ride is over is more similar to evaluating an end product than monitoring work performance on an ongoing basis.

Plaintiff states, though, that Uber "assumes the rights of an employer to control and direct drivers," by using "algorithms to override driver control and direct drivers for every second the driver is working." Am. Compl. at 3.  But plaintiff has not pled any facts to support this conclusory allegation, and the article he relies upon as the source for this assertion explains that Uber uses

12

data analytics and other strategies to modify and motivate driver behavior precisely because it cannot control the drivers directly. [6]

Thus, plaintiff has not alleged sufficient facts to support a plausible claim that Uber was his employer under the *Spirides* test. Therefore, his Title VII claims will be dismissed without prejudice.

Plaintiff argues in his surreply that "the *Spirides* contrast between 'employee' and 'contractor' must be read in the unprecedented context of the gig economy" and that "Title VII take[s] effect in this case[.]"  Pl.'s Surreply at 2.  The thrust of plaintiff's argument is that a significant portion of the American workforce is contracted, and that organizations that contract with workers instead of hiring them outright should still bear a responsibility to ensure a safe working environment.  Am. Compl. at 3.  Maybe so.  But while plaintiff may have identified an issue that fairly warrants attention on the part of the legislature, this Court does not have the luxury of determining what the law should be, and it is bound to interpret the existing statutory language in accordance with binding precedent.

---

6       Plaintiff cites an article in The New York Times for this observation:  Noah Scheiber, *How Uber Uses Psychological Tricks to Push Its Drivers' Buttons*, N.Y. Times (Apr. 2, 2017), https://www.nytimes.com/interactive/2017/04/02/technology/uber-drivers-psychological-tricks.html.  *See* Superior Court Compl. [Dkt. # 1-3] at PDF 13 n.8; Am. Compl. at 3 nn.3–4.  But the premise of the article is that Uber drivers are "officially independent business owners rather than traditional employees with set schedules . . . . [Uber] cannot compel drivers to show up at a specific place and time."  It is this "lack of control" that, according to the article plaintiff references in his complaint, Uber seeks to remedy with a combination of sophisticated algorithms and social science:  it reportedly offers noncash rewards or other psychological inducements adapted from videogames to "incentivize" or "manipulate" drivers to pick up more passengers before logging off, and it has borrowed tools such as automatic queuing from other online platforms that are designed to keep users engaged. So even if one considers the article as part of plaintiff's factual allegations in this case, and one accepts as true the report that Uber has devoted considerable resources to modifying or affecting driver behavior, it does not allege "control" as that term is used in this context, or advance plaintiff's attempt to characterize the Uber driver as an employee.

## II.     Plaintiff's D.C. Code § 50-301.29a(10)(A)(ii) Claim

Defendant argues that plaintiff cannot state a claim under D.C. Code § 50-301.29a(10)(A)(ii) because the statute contains no express or implied right of action. Def.'s Mem. at 10.[7]  A review of the text of the provision confirms that it does not expressly confer a right to bring a civil claim, but plaintiff takes the position that the Court may find that one is implied.[8]

Neither side points to authority that would indicate that any litigant has previously attempted to rely upon a subsection of D.C. Code § 50-301 as the basis for a civil claim.[9]  To determine whether a private right of action is implied, the Court must consider three questions: (1) "is the plaintiff one of the class for whose especial benefit the statute was enacted;" (2) "is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one;" and (3) "is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?"  *Cort v. Ash*, 422 U.S. 66, 78 (1975); *Wachovia Bank & Tr. Co.,*

---

7        Plaintiff disagrees, *see* Pl.'s Opp. at 3–4, and he also argues that the right of action under D.C. Code § 50-301.29a "is expressed in the Americans with Disabilities Act, 42 U.S.C. § 12188(a)(1)."  Pl.'s Opp. at 3.  The Americans with Disabilities Act ("ADA") does not confer a right to bring sexual harassment claims.  *See generally* 42 U.S.C. § 12112.

8        Plaintiff directs the Court to a footnote from the dissent in *Cannon v. University of Chicago*, 441 U.S. 677, 730 n.1 (1979) (Powell, J., dissenting). Pl.'s Opp. at 3.  While that is not the source of the standard to be applied in this instance, the Court will analyze his contention that there should be an implied right of action using the proper legal test.

9        The Court has identified three cases that refer to D.C. Code § 50-301, but the statute did not form the basis for the cause of action in any of them.  *Alemu v. Dep't of For-Hire Vehicles*, 327 F. Supp. 3d 29 (D.D.C. 2018); *Classic Cab, Inc. v. District of Columbia*, 288 F. Supp. 3d 218 (D.D.C. 2018); and *Gebresalassie v. District of Columbia*, 170 F. Supp. 3d 52 (D.D.C. 2016).  The statute is not the basis of the cause of action in any of these cases.

*N.A. v. Nat'l Student Mktg. Corp.*, 650 F.2d 342, 351 (D.C. Cir. 1980).[10]  In the present case, taking the answers to the three questions together directs against finding that a private right of action should be implied.

With respect to the first question, D.C. Code § 50-301.29a appears to have been enacted for the benefit of for-hire vehicle passengers and the public at large, rather than vehicle operators such as the plaintiff.  The statute requires each private vehicle-for-hire company to establish a policy with "zero tolerance for the use of alcohol or illegal drugs or being impaired by the use of alcohol or drugs while a private vehicle-for-hire operator is logged into a private vehicle-for-hire company's digital dispatch," and section 50-301.29a(10)(D) mandates that  each company must undertake an investigation "when a *passenger* makes a reasonable allegation that an operator violated the zero tolerance policy established by subparagraph (A) of this paragraph."  D.C. Code § 50-301.29a(10)(D) (emphasis added).  There is no similar provision calling for a response to allegations lodged by operators.  *See generally id*. § 50-301.29a.

Plaintiff cannot point to any provision in the statute that specifically affords vehicle operators any protection.  He bases his allegation that the statute was enacted for the benefit of operators as well as passengers on the fact that the specific subsection relied upon, D.C. Code § 50-301.29a(10)(A)(ii), does not distinguish between passengers and operators while the immediately surrounding subsections do.  Pl.'s Opp. at 4 ("The legislature signaled its intent by designating protection of only the rider in three out of four enumerated sections of the statute, indicating protection of rider and driver in only one out of four in the same section.").

---

10      The fourth question from the *Cort* framework – "is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law" – is inapplicable when evaluating a state law.  422 U.S. at 78.

While it is true that subsection (A)(ii) does not state explicitly that the zero tolerance for "alcohol or drug use" covers drug use by operators in particular, the fact that the sentence goes on to provide that the proscription applies "while the … *operator* is logged in" makes it clear that it is meant to apply to substance use by the operator.  And the Court should not infer that the legislature intended to extend the statute's protections to another class of individuals based solely on the fact that it remained silent.  *See Touche Ross & Co. v. Redington*, 442 U.S. 560, 571 (1979) ("[I]mplying a private right of action on the basis of congressional silence is a hazardous enterprise, at best."); *Cleveland v. United States*, 329 U.S. 14, 22 n.5 (1946) (Rutledge, J., concurring) ("Legislative intent derived from nonaction or 'silence' lacks all supporting evidences of legislation enacted pursuant to prescribed procedures . . . . Necessarily also the intent must be derived by a form of negative inference, a process lending itself to much guesswork.").  Therefore, the statute does not appear to have been enacted for the benefit of for-hire vehicle operators.

As to the second *Cort* question, there is no indication that there was "legislative intent . . . either to create such a remedy or to deny one."  422 U.S. at 78.  The portions of the D.C. Code that address private vehicle-for-hire drivers and companies – sections 50-301.29a–g – do not contain any provisions regarding the adjudication of or remedies for complaints by drivers against ride-for-hire companies.  And the D.C. Circuit has held that while a "plaintiff need not show an explicit legislative purpose to create a private right of action . . . the legislature must at least implicitly have intended to create a private right of action before the court can countenance such a suit," and "'unless this . . . intent can be inferred from the language of the statute, the statutory structure, or some other source, the essential predicate for implication of a private remedy simply does not exist.'"  *Dial A Car, Inc. v. Transportation, Inc.*, 132 F.3d 734, 745 (1998), quoting *Twyman v. Johnson*, 655 A.2d 850, 857 (D.C. 1995).  Here, where the statute is silent about a private right of

action and, in fact, does not raise any rights a driver has against the ride-share company, *see* D.C. Code §§ 50-301.29a–g, the Court will not infer that the statute created an implicit private right of action.[11]

Based on the first two questions, it follows that the third question – if a private right of action is "consistent with the underlying purposes of the legislative scheme," *Cort*, 422 U.S. at 78 – must be answered in the negative.  Not only does the D.C. Code fail to expressly or impliedly create a private right of action for private vehicle-for-hire drivers, nothing in section 50-301.29a suggests that the law was promulgated for the benefit of drivers at all.  Thus, finding that the statute creates a right of action for private vehicle-for-hire drivers would be inconsistent with the underlying purposes of the legislative scheme.

Because the answers to each of the *Cort* questions counsels against finding that D.C. Code § 50-301.29a(10)(A)(ii) establishes an implied right of action for private vehicle-for-hire operators

---

[11]     By contrast, in section 50-301, the legislature created and empowered the Department of For-Hire Vehicles ("DFHV") to "[r]eceive, hear, respond to, and adjudicate complaints lodged in the OHCR against the vehicle-for-hire industry, including taxicab operators, companies, associations, fleets, and taxi dispatch services, by consumers and officials or employees of government . . . ." and ". . . hear complaints and disputes occurring within the taxicab industry, including complaints and disputes between companies, associations, operators, or owners."  D.C. Code §§ 50-301.07(c)(14)–(15). And the DFHV has the power to enforce "fines and other penalties" in response to "[f]ailure by a private vehicle-for-hire company or operator to adhere to the requirements of this subchapter."  *Id.* § 50-301.29g(d).  So under that section it is clear that the legislature charged DFHV with adjudicating complaints arising under this particular provision. But the statute explains that the DFHV has "exclusive authority for intrastate regulation of the *public* vehicle-for-hire industry," *id.* § 50-301.04 (emphasis added), and there is no comparable provision in the Code for private vehicle-for-hire companies.

against their employers, plaintiff cannot state a valid claim under that section, and his claim based on this provision of the D.C. Code will be dismissed with prejudice. [12]

**<u>CONCLUSION</u>**

For the foregoing reasons, defendant's motion to dismiss will be granted.  A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE: September 17, 2020

---

12    The Court notes that to the extent plaintiff is trying to allege discrimination based on sex, race, or disability, the District of Columbia Human Rights Act, D.C. Code §§ 2-1401.01 *et seq.*, provides an extensive set of remedies for individuals who experience such discrimination.